STERN KILCULLEN & RUFOLO, LLC
Herbert J. Stern
  hstern@sgklaw.com
Joel M. Silverstein
  jsilverstein@sgklaw.com
325 Columbia Turnpike, Suite 110
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

GIBSON, DUNN & CRUTCHER LLP
Theodore J. Boutrous, Jr., *pro hac vice forthcoming*
  tboutrous@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

*Attorneys for Defendants*
*Chevron Corporation and Chevron U.S.A. Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MATTHEW J. PLATKIN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY; NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and CARI FAIS, ACTING DIRECTOR OF THE NEW JERSEY DIVISION OF CONSUMER AFFAIRS, | Civil Action No. |
| | **NOTICE OF REMOVAL** |
| Plaintiffs, | |
| v. | |

EXXON MOBIL CORPORATION;
EXXONMOBIL OIL CORPORATION;
BP P.L.C.; BP AMERICA INC.;
CHEVRON CORPORATION;
CHEVRON U.S.A. INC.;
CONOCOPHILLIPS;
CONOCOPHILLIPS COMPANY;
PHILLIPS 66; PHILLIPS 66
COMPANY; SHELL PLC; SHELL OIL
COMPANY; and AMERICAN
PETROLEUM INSTITUTE,

           Defendants.

**TO THE CLERK OF THE ABOVE-TITLED COURT AND TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT Defendants Chevron Corporation and Chevron U.S.A. Inc. (collectively, "the Chevron Parties") remove this action—with reservation of all defenses and rights—from the Superior Court of New Jersey Law Division, Mercer County, Docket No. MER-L-001797-22, to the United States District Court for the District of New Jersey, pursuant to 28 U.S.C. §§ 1331, 1367(a), 1441(a), 1442, and 1446, and 43 U.S.C § 1349(b).  All other defendants that have been joined and served (collectively, "Defendants") have consented to this Notice of Removal.

This Court has original federal question jurisdiction pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b), and the Federal Officer Removal Statute, 28 U.S.C. § 1442.  Removal is also proper under 28 U.S.C. § 1331 and

1441(a), because the Complaint necessarily arises under federal laws and treaties and out of federal enclaves and presents substantial federal questions. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claims for which it does not have original federal question jurisdiction because they form part of the same case or controversy as those claims over which the Court has original jurisdiction.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................... 1

II.   TIMELINESS OF REMOVAL ................................................ 7

III.  SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL ............................................................................... 9

IV.   THE ACTION IS REMOVABLE BECAUSE PLAINTIFFS' CLAIMS NECESSARILY ARISE UNDER FEDERAL LAW ................. 14

V.    THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL SHELF LANDS ACT ..................................... 27

VI.   THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE ............................................ 36

    A.    The Courts Construe The Federal Officer Removal Statute Broadly In Favor Of Removal ........................................... 37

    B.    Defendants Satisfy All Elements Of The Federal Officer Removal Statute ............................................................... 39

        1.    Defendants "Acted Under" Federal Officers ........................... 41

            a.    Defendants Acted Under Federal Officers By Supplying Highly Specialized Fuels For Military Use ............................................... 46

            b.    Defendants Acted Under Federal Officers By Developing Mineral Resources On The Outer Continental Shelf ...................................... 56

            c.    Defendants Acted Under Federal Officers By Developing Mineral Resources On Federal Lands ........ 76

            d.    Defendants Acted Under Federal Officers By Operating The Elk Hills Reserve "In the Employ" Of The U.S. Navy ..................................... 79

e.   Defendants Acted Under Federal Officers By Supplying And Managing The Strategic Petroleum Reserve ..........................................................90

f.   Defendants Acted Under Federal Officers Pursuant To The Emergency Petroleum Allocation Act .............95

g.   Defendants Acted Under Federal Officers During World War II And The Korean War..............................96

h.   Defendants Acted Under Federal Officers By Constructing, Operating, And Managing Government Petroleum Production Facilities ............106

i.   Defendants Acted Under Federal Officers By Constructing Pipelines For Oil Transportation ...........109

2.   Defendants' Activities Are Related To Plaintiffs' Claims ....113

3.   Defendants Have Colorable Federal Defenses ......................120

VII.   THE ACTION IS REMOVABLE BECAUSE PLAINTIFFS' CLAIMS NECESSARILY RAISE DISPUTED AND SUBSTANTIAL FEDERAL ISSUES .......................................................124

A.   Plaintiffs' Claims Arise Under Federal Common Law And Are Thus Removable Under *Grable* .......................................125

B.   Plaintiffs' Claims Seek To Supplant Federal Energy Policy ...........126

C.   Plaintiffs' Claims Necessarily Interfere With Foreign Affairs ........133

D.   Plaintiffs' Claims Include Federal Constitutional Elements............140

VIII.   THE ACTION IS REMOVABLE BECAUSE IT ARISES FROM ACTS ON MULTIPLE FEDERAL ENCLAVES ....................................143

IX.   THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER ..................................................................................149

## I.    INTRODUCTION

For over a century, United States policy has expressly recognized the fundamental strategic importance of oil and gas to the Nation's economic well-being and national security.  It is not an accident that the United States Department of Defense is the single largest consumer of energy in the United States and one of the world's largest users of petroleum fuels.  In fact, for vital security and economic reasons, every Administration since that of Franklin D. Roosevelt has taken active steps to increase U.S. oil production.  While the alleged risks of global climate change have increased focus on alternative sources of energy, petroleum remains the ineluctable backbone of United States energy policy.

Now, however, Plaintiffs ask the court to find that this same petroleum production contributes to, among other things, an unlawful "public nuisance" and "trespass" under New Jersey state law.  Under various theories, the Complaint seeks to hold Defendants liable as "extractors, producers, refiners, manufacturers, promoters, marketers, and/or sellers of fossil fuel products."  Declaration of Joshua D. Dick ("Dick Decl."), Ex. 1 ("Compl.") ¶ 3 .  Plaintiffs seek "compensatory and natural resource damages," *id* ¶ 249, as well as orders compelling Defendants to "abate[] the public  nuisance," *id.* ¶ 295, among other things.  Compl. at 194, Prayer for Relief.

Plaintiffs' claims depend on Defendants' production, distribution and/or sale

of oil and gas that create greenhouse gas emissions when combusted by end users. Because Plaintiffs seek damages for harms allegedly caused by global greenhouse gas emissions, Plaintiffs do not—and cannot—limit their claims to harms allegedly caused by oil and gas extracted, produced, distributed, sold, marketed, or used in New Jersey. Instead, Plaintiffs' claims expressly target Defendants' nationwide and *global* activities. In fact, Plaintiffs' claims sweep even more broadly—they depend on the activities of billions of oil and gas consumers, including not only entities like the U.S. government and military, but also countless hospitals, schools, manufacturing facilities, and individual households around the world. Indeed, Plaintiffs themselves are prodigious consumers and users of fossil fuels, emitting millions of tons of $CO_2$ through their own consumption alone.[1]

The scope of Plaintiffs' theory is breathtaking—it would reach the sale of oil and gas anywhere in the world, including all past and otherwise lawful sales, including sales to the federal government. Because Plaintiffs challenge "production and consumption of fossil fuels," *id.* ¶ 4, over the past several decades, the Complaint necessarily calls into question longstanding decisions by the federal government regarding, among other things, national security, national energy policy,

---

[1] NJ Greenhouse Gas Emissions Inventory Report Years 1990-2019, 2022, https://dep.nj.gov/wp-content/uploads/ghg/2022-ghg-inventory-report_final-1.pdf.

environmental protection, the maintenance of a national strategic petroleum reserve program, development of energy resources on the United States' outer continental shelf lands, mineral extraction on federal lands (which has produced billions of dollars in revenue for the federal government), and the negotiation of international agreements bearing on the development and use of fossil fuels and the appropriate response to the problem of global climate change.

The federal issues and implications of Plaintiffs' Complaint and requests for relief demand resolution by a federal court under federal law.  The determination of how best to address *global* climate change, and the balancing of the costs and benefits of the use of fossil fuels that goes into that equation, has been and should continue to be made by the federal government through federal policies and international cooperation.  As the Ninth Circuit recently explained, "any effective plan [to reduce greenhouse gas emissions] would necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and legislative branches."  *Juliana v. United States*, 947 F.3d 1159, 1171 (9th Cir. 2020).  A patchwork of fifty different state-law answers to this necessarily global issue would be unworkable and precluded under our federal constitutional system. *See North Carolina ex. rel. Cooper v. TVA*, 615 F.3d 291, 298 (4th Cir. 2010) ("If courts across the nation were to use the vagaries" of state "public nuisance doctrine to overturn the carefully enacted rules governing air-borne emissions, it would be

increasingly difficult for anyone to determine what standards govern.").

Defendants recognize that the removal grounds asserted here are the same as those that were recently rejected by the Third Circuit in two similar climate change-related cases. *City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 705 (3d Cir. 2022). Defendants respectfully submit that the Third Circuit's decision was incorrect, and the defendants in those cases (many of whom are also Defendants here) intend to petition the Supreme Court for a writ of certiorari. Defendants assert these removal grounds here to preserve their arguments while these critical and threshold issues of federal jurisdiction remain on appeal and may be addressed by the U.S. Supreme Court in the near future.

In addition, there are currently two petitions for writs of certiorari pending in other similar climate change-related cases, *Suncor Energy (U.S.A.) Inc. v. Board of County Commissioners of Boulder County*, No. 21-1550 (U.S.) ("*Suncor*") and *BP P.L.C. v. Mayor and City Council of Baltimore*, No. 22-361 (U.S.) ("*Baltimore*"), both of which present the questions of: (1) whether federal common law necessarily and exclusively governs claims seeking redress for injuries allegedly caused by the effect of interstate greenhouse-gas emissions on the global climate; and (2) whether a federal district court has jurisdiction under 28 U.S.C. § 1331 over claims necessarily and exclusively governed by federal common law but labeled as arising under state law.

The U.S. courts of appeals are divided on these issues, making Supreme Court review appropriate. And critically, the Supreme Court recently issued an order inviting the Solicitor General to file a brief expressing the views of the United States on the petition for a writ of certiorari in *Suncor*. The Supreme Court's order is significant because petitions as to which the Court calls for the Solicitor General's views are "over 46 times more likely to be granted" than the average petition.[2] Moreover, the United States previously has taken the position that climate change-related claims similar to the ones asserted here are properly removable because "they are inherently and necessarily federal in nature." Brief for the United States as *Amicus Curiae* Supporting Petitioners at 26, *BP p.l.c. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021) (No. 19-1189) (citing *City of Oakland v. B.P. p.l.c.*, No. 18-16663 (9th Cir.), Dkt. 198); *see also* Transcript of Oral Argument at 31:2-12, *BP p.l.c. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021) (No. 19-1189) (explaining that "potentially conflicting" state law is inappropriate because the case "depends on alleged injuries . . . caused by emissions from all over the world"); *Oakland*, Dkt. 198 at 2 ("A putative state-law claim is also removable

---

[2] David C. Thompson & Melanie F. Wachtell, *An Empirical Analysis of Supreme Court Certiorari Petition Procedures: The Call for Response and the Call for the Views of the Solicitor General*, 16 Geo. Mason L. Rev. 237, 274 (2009).

if alleged in a field that is properly governed by federal common law such that a cause of action, if any, is necessarily federal in character.").

Indeed, the United States, under the Obama Administration, warned of the risk that common-law suits targeting greenhouse gas emissions might interfere with federal regulations, noting that the "EPA has directly entered the field plaintiffs would have governed by common-law nuisance suits" by "actively exercising its judgment and statutory discretion to determine when and how emissions from different categories of sources of greenhouse gases will be regulated."  Brief for the Tennessee Valley Authority as Respondent Supporting Petitioners at 45–46, *American Electric Power Co. v. Connecticut*, 564 U.S. 410 (2011) (No. 10-174) (2011 WL 1393805).  The conflict between the United States' previous positions that claims asserting injuries from global climate change are inherently federal and the position of the Tenth Circuit in *Suncor* (along with other circuits including the Third Circuit) further weighs in favor of Supreme Court review.

Given these pending and soon-to-be pending certiorari petitions and the significant likelihood of Supreme Court review, Defendants remove this action now despite the decision of the Third Circuit in order to avoid waiving their right to do so in the future.  *See, e.g., Horak v. Color Metal of Zurich, Switzerland*, 285 F. Supp. 603, 605 (D.N.J. 1968) (holding that where "plaintiff's complaint . . . state[d] a removable case, . . . defendants' failure to petition for removal within thirty days of

service of the complaint upon them precludes them from removing the case to this court at the present time").

At bottom, this case is about the global production, sale, and consumption of vital products that virtually every person on the planet uses (and relies upon) every day. Oil and gas power our national defense; keep our homes, offices, factories, hospitals and other essential facilities illuminated, powered, heated, cooled, and ventilated; and transport people and products, including virtually every consumer good—from food to medicine to clothing—across the nation and around the world. By means of this lawsuit, Plaintiffs seek to overturn decades of federal energy policy and threaten the reliable, affordable supply of energy on which this country, and the world, depends. "[T]he basic scheme of the Constitution . . . demands" that federal law (not state law) must serve as the exclusive source of governing law for such inherently interstate and international policy matters. *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*"). Accordingly, and because Plaintiffs' Complaint relates to and seeks substantial relief from Defendants' production of oil and gas on federal lands and under the direction, supervision, and control of federal officers, Plaintiffs' Complaint should be heard in this federal forum.

## II.    TIMELINESS OF REMOVAL

1.    Plaintiffs filed a Complaint against the Chevron Parties and other

named Defendants in the Superior Court of New Jersey Law Division, Mercer County, Docket No. MER-L-001797-22, on October 18, 2022. A copy of all process, pleadings, or orders in the possession of the Chevron Parties is attached as Exhibit A to the Declaration of Herbert J. Stern ("Stern Decl."), filed concurrently herewith.

2. This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it is filed less than 30 days after service. 28 U.S.C. § 1446(b). Chevron Corporation was served on October 24, 2022. Stern Decl. ¶ 2, Ex. A. The consent of the other Defendants is not required because removal does not proceed "solely under section 1441(a)." 28 U.S.C. § 1446(b)(2)(A). The Chevron Parties remove this action to federal court on several bases, including, for example, 28 U.S.C. § 1442(a)(1). Nevertheless, all properly joined and served Defendants have consented to removal. Dick Decl. ¶ 2. Consent is not required from any Defendant that has not been served. *See* 28 U.S.C. § 1446(b)(2)(A).[3]

---

[3]  In filing this Notice of Removal, the Chevron Parties, and all other Defendants, do not waive, and expressly preserve, any right, defense, affirmative defense, or objection, including, without limitation, lack of personal jurisdiction, insufficient process, and/or insufficient service of process. A number of Defendants contend that personal jurisdiction in New Jersey is lacking over them, and these Defendants intend to preserve that defense and move to dismiss for lack of personal jurisdiction at the appropriate time. *See, e.g.*, *Gordet v. Chryslergroup LLC*, 2015 WL 6407959, at *2 n.6 (D.N.J. Oct. 21, 2015) ("Removal does not, by itself, constitute a waiver of objection to personal jurisdiction."); *Morris & Co. v. Skandinavia Ins. Co.,* 279 U.S. 405, 409 (1929) (removal to federal court

## III.    SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL

3.    Plaintiffs bring claims against Defendants seeking damages and equitable relief for "climate-related injuries," Compl. ¶ 9, they claim to have suffered or allege they will suffer, such as sea level rise, extreme weather, and other natural phenomena.  *See, e.g.*, Compl. ¶¶ 15, 48.  Plaintiffs assert the following claims:  failure to warn, negligence, impairment of the public trust, trespass, public nuisance, private nuisance, and violations of New Jersey's Consumer Fraud Act.  In addition to compensatory and punitive damages, in its Prayer for Relief, Plaintiffs seek "disgorgement of profits," *id.* ¶ 333, as well as equitable relief, including abatement of the alleged nuisances and trespass.  Compl. at 194, Prayer for Relief.

4.    The Complaint makes clear that Plaintiffs' claims center on Defendants' worldwide "*extraction*, *production*, and *consumption*" of oil and natural gas that Plaintiffs allege caused a "substantial[]" "increase" in "[f]ossil fuel emissions."    Compl. ¶ 4 (emphases added).    While Plaintiffs allege certain misrepresentations, those are not the sole basis for Plaintiffs' claims.    Under Plaintiffs' theory of relief—and the global causal mechanism upon which it depends—alleged misrepresentations matter for Plaintiffs' tort claims only insofar as they purportedly led to a marginal increase in greenhouse gas emissions.    If Plaintiffs' tort claims were based *solely* on misrepresentations, the requested relief

does not waive right to object to personal jurisdiction).

sought would look much different—for example, the difference in value between a product purchased and one that a consumer would have purchased but for the alleged misrepresentation.   At most, the asserted remedies for those claims would necessarily be limited to injuries from any marginal increase in greenhouse gas emissions supposedly caused by an alleged "campaign of deception." But Plaintiffs' Complaint includes *no such limitation*.  Plaintiffs seek damages for the alleged full effects of global greenhouse gas emissions.

5.    If Plaintiffs intend to argue that their claims are based solely on misrepresentations and/or "deception"—which they cannot plausibly do, given the nature of their alleged claims, injuries, and theory of causation—Plaintiffs should, at a minimum, represent that the damages they seek are limited to those resulting from the incremental amount (if any) by which emissions increased as a provable result of any alleged misrepresentations and omissions.  If Plaintiffs do not represent that their damages are so limited, they should be foreclosed from arguing in support of remand that their claims are limited to Defendants' alleged misrepresentations and deception.  Plaintiffs cannot have it both ways.

6.    The Chevron Parties deny that any New Jersey court has personal jurisdiction over them and further deny any liability as to Plaintiffs' claims.  The Chevron Parties expressly reserve all rights in this regard.  For purposes of meeting the jurisdictional requirements for removal only, however, the Chevron Parties

submit that removal is proper on at least five independent and alternative grounds.

7.    *First*, Plaintiffs' claims arise under federal common law because federal law exclusively governs claims for interstate and international pollution, as well as claims implicating the foreign affairs and navigable waters of the United States. *See, e.g.*, *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972) ("*Milwaukee I*"); *City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) ("*Milwaukee II*"); *AEP*, 564 U.S. at 421–23. Federal law applies in those few areas of the law that so implicate uniquely federal interests that "borrowing the law of a particular State would be inappropriate." *AEP*, 564 U.S. at 422; *see also Milwaukee I*, 406 U.S. at 99 ("[P]ollution of interstate or navigable waters creates actions arising under the 'laws' of the United States within the meaning of [28 U.S.C. § 1331]."); *City of New York*, 993 F.3d at 95. Because this action necessarily arises under federal law, it is removable under 28 U.S.C. §§ 1331 and 1441(a). *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 847, 850 (1985) ("*National Farmers*") (explaining that it is "well settled" that section 1331's "grant of 'jurisdiction will support claims founded upon federal common law as well as those of a statutory origin'") (quoting *Milwaukee I*, 406 U.S. at 100).

8.    *Second*, this Court has original jurisdiction over this lawsuit and removal is proper pursuant to OCSLA. The allegations in the Complaint make clear that this action "aris[es] out of, or in connection with . . . any operation conducted

on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b); *see also Tenn. Gas Pipeline v. Hous. Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

9.    *Third*, Defendants are authorized to remove this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  Despite Plaintiffs' purported disclaimers, *see* Compl. ¶ 19, multiple Defendants:  (1) were "acting under" a federal officer; (2) have claims against them that relate to acts under color of federal office; and (3) assert colorable federal defenses.  *See In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 461, 469 (3d Cir. 2015); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2016); *In re Aqueous Film-Forming Foams Prod. Liab. Litig.*, 2019 WL 2807266, at *2–3 (D.S.C. May 24, 2019).  The Complaint expressly alleges that the cumulative impact of Defendants' *global* extraction and production activities over the past several decades—which necessarily include Defendants' substantial activities under the direction, supervision and control of federal officers—contributed to the *global* greenhouse gas emissions that Plaintiffs claim caused their alleged injuries.  *See, e.g.*, Compl. ¶ 40.

10.    *Fourth*, removal is authorized under 28 U.S.C. § 1331 and § 1441(a) because this action necessarily raises disputed and substantial federal questions that

a federal forum may entertain without disturbing a congressionally approved balance of responsibilities between the federal and state judiciaries. *See Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).

11.    *Fifth*, removal is authorized under 28 U.S.C. §§ 1331 and 1441(a) because—despite Plaintiffs' purported disclaimers, *see* Compl. ¶ 19—the Complaint makes clear that Plaintiffs' claims are based on alleged injuries and conduct occurring on federal enclaves. As such, Plaintiffs' claims are removable under federal-question jurisdiction. *See* U.S. Const. art. I, § 8, cl. 17; *Jones v. John Crane-Houdaille, Inc.*, 2012 WL 1197391, at *1 (D. Md. Apr. 6, 2012) ("A suit based on events occurring in a federal enclave . . . must necessarily arise under federal law and implicates federal question jurisdiction under § 1331.").

12.    The Chevron Parties will address each of these grounds in additional detail below. Should Plaintiffs challenge this Court's jurisdiction, Defendants reserve the right to further elaborate on these grounds and will not be limited to the specific articulations in this Notice. *Cf., e.g.*, *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014–16 (7th Cir. 2018) (holding that district court erred by requiring evidentiary submissions by defendant to support removal in advance of ruling on jurisdiction). Indeed, the Supreme Court has upheld removal where jurisdictional facts required to support the removal were found in later-filed affidavits rather than in the notice of removal. *See, e.g.*, *Yarnevic v. Brink's, Inc.*, 102 F.3d 753, 755 (4th Cir. 1996)

(citing *Willingham v. Morgan*, 395 U.S. 402, 407 n.3 (1969)).  "[T]he Court is not limited to an examination of the original petition in determining jurisdictional questions." *Giangola v. Walt Disney World Co.*, 753 F. Supp. 148, 153 n.5 (D.N.J. 1990) (citation and internal quotation marks omitted).

13.    Defendants do not waive and expressly reserve all rights to argue that this action is properly removable on these grounds.

14.    Some of the arguments and evidence set forth below were previously before this Court in *City of Hoboken v. Exxon Mobil Corp.*, 558 F. Supp. 3d 191, 196 (D.N.J. 2021), and the Third Circuit on review of Judge Vasquez's remand order, *City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 705 (3d Cir. 2022). Defendants acknowledge these decisions, and are removing this action to preserve their rights to removal in the event that the Supreme Court reverses the Third Circuit, which it may do in the coming months.

## IV.    THE ACTION IS REMOVABLE BECAUSE PLAINTIFFS' CLAIMS NECESSARILY ARISE UNDER FEDERAL LAW

15.    This action is removable because, as a matter of federal constitutional law and structure, Plaintiffs' claims necessarily arise under federal, not state, law. The issues presented by the Complaint are exclusively federal in nature and state law simply has no role to play.  As the Supreme Court has repeatedly confirmed: "When we deal with air and water in their ambient or interstate aspects, there is a federal common law." *AEP*, 564 U.S. at 421 (quoting *Milwaukee I*, 406 U.S. at 103).

14

Claims resulting from greenhouse gas emissions, like Plaintiffs', "must be brought under federal common law." *City of New York*, 993 F.3d at 95. And under 28 U.S.C. § 1331, federal courts have original jurisdiction over "claims founded upon federal common law as well as those of a statutory origin." *Nat'l Farmers*, 471 U.S. at 850 (quoting *Milwaukee I*, 406 U.S. at 100). Because Plaintiffs' claims necessarily arise under federal law, this Court has federal-question jurisdiction and removal is proper.

16.     The Court must determine at the outset whether Plaintiffs' claims arise under federal or state law. This analysis does not implicate preemption principles or standards because a claim that "arise[s] under federal common law . . . is a permissible basis for jurisdiction based on a federal question." *Treiber & Straub, Inc. v. U.P.S., Inc.*, 474 F.3d 379, 383 (7th Cir. 2007); *see also Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 126 (2d Cir. 1999) ("[I]f federal common law governs a case, that case [is] within the subject matter jurisdiction of the federal courts.").

17.     Section 1331 extends the original jurisdiction of federal district courts to "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. This jurisdictional grant encompasses actions that arise under federal common law, because "a cause of action . . . 'arises under' federal law if the dispositive issues stated in the complaint require the application of federal common law." *Milwaukee I*, 406 U.S. at 100.

18.    Federal common law governs when "a federal rule of decision is 'necessary to protect uniquely federal interests.'"  *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981).  Claims for interstate or international pollution implicate "uniquely federal interests" and must be subject to uniform federal law as a matter of fundamental constitutional structure.  In our federal system, each State may make law within its own borders, but no State may "impos[e] its regulatory policies on the entire Nation," *see BMW of N. Am. v. Gore*, 517 U.S. 559, 585 (1996), or dictate our "relationships with other members of the international community," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964). Federal law therefore must govern inherently interstate or international matters to the exclusion of state law, because "the basic scheme of the Constitution so demands." *AEP*, 564 U.S. at 421.

19.    The Supreme Court has confirmed repeatedly that when, as here, "we deal with air and water in their ambient or interstate aspects, there is a federal common law." *AEP*, 564 U.S. at 421 (quoting *Milwaukee I*, 406 U.S. at 103); *see also, e.g.*, *AEP*, 564 U.S. at 421 ("Environmental protection is undoubtedly an area 'within national legislative power,' one in which federal courts may fill in 'statutory interstices,' and, if necessary, even 'fashion federal law.'").  Indeed, "[f]or over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution." *City of New York*, 993 F.3d at 91.

Because federal law governs in order to protect uniquely federal interests, state law *cannot* apply to such claims: "if federal common law exists, it is because state law cannot be used." *Milwaukee II*, 451 U.S. at 313 n.7; *see also City of New York*, 993 F.3d at 98. The Supreme Court put the point succinctly in *International Paper Co. v. Ouellette*, observing that "interstate . . . pollution is a matter of federal, *not state*, law." 479 U.S. 481, 488 (1987) (emphasis added). "[S]ome areas involving 'uniquely federal interests' may be so important to the federal government that a 'federal common law' related to those areas will supplant state law . . . *regardless* of whether Congress has shown any intent to preempt the area." *Caudill v. Blue Cross & Blue Shield of N.C.*, 999 F.2d 74, 78 (4th Cir. 1993) (emphasis added). This is one such area.

20. As the United States recently explained to the Supreme Court in a similar climate change-related case: "[C]ross-boundary tort claims associated with air and water pollution involve a subject that 'is meet for federal law governance'" because any such putative claims "that seek to apply the law of an affected State to conduct in another State" have an "inherently federal nature." Brief of United States as Amicus Curiae at 26–27, *BP p.l.c. v. Mayor and City Council of Baltimore*, No. 19-1189 (U.S. Nov. 23, 2020) (quoting *AEP*, 564 U.S. at 422). Claims "that seek to apply the law of an affected State to conduct in another State" necessarily "arise under 'federal, not state, law' for jurisdictional purposes, given their inherently

17

federal nature." *Id.* at 27 (quoting *Ouellette*, 479 U.S. at 488).  At oral argument, the United States confirmed that Baltimore's claims, like Plaintiffs' claims here, "are inherently federal in nature." Tr. at 31:4–5.  The United States explained that although Baltimore "tried to plead around th[e Supreme] Court's decision in *AEP*, its case still depends on alleged injuries to the City of Baltimore caused by emissions from all over the world, and those emissions just can't be subjected to potentially conflicting regulations by every state and city affected by global warming." Tr. at 31:7–13.

21.    The two-step analysis the Supreme Court established in *Standard Oil* for determining whether a claim arises under state or federal law for jurisdictional purposes makes clear that this threshold question does *not* depend on the answer to the distinct substantive question of whether the plaintiff has stated a viable claim under federal law.    Under the applicable two-step approach, courts must: (1) determine for jurisdictional purposes whether the source of law is federal or state based on the nature of the issues at stake; and (2) if federal law is the source, determine the substance of the federal law and decide whether the plaintiff has stated a viable federal claim.  *United States v. Swiss American Bank, Ltd.*, 191 F.3d 30, 42–45 (1st Cir. 1999) (citing *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 305 (1947) ("*Standard Oil*")).  As the Third Circuit explained, "the power of federal courts to craft federal rules of decision is established in cases in which a federal

common law rule is 'necessary to protect uniquely federal interests,' such as federal proprietary interests, federal interests in international law and to resolve conflicts among the states." *McGurl v. Trucking Emps. of N.J. Welfare Fund, Inc*., 124 F.3d 471, 480 (3d Cir. 1997) (internal citations omitted).  That principle is controlling here.

22.    Although Plaintiffs purport to style their nuisance and other claims as arising under state law, it is the inherently federal nature of the claims stated on the face of the complaint, not Plaintiffs' characterization of them as *state-law* claims, that is controlling.[4]  It is well-settled that the question of whether a case arises under state or federal law is a question of subject matter jurisdiction that the federal court must resolve for itself, subject to its "unflagging obligation" to exercise such

---

[4]    *See* 14C Wright *et al*., Fed. Prac. & Proc. Juris. § 3722.1 (rev. 4th ed.) ("[A] plaintiff cannot frustrate a defendant's right to remove by pleading a case without reference to any federal law when the plaintiff's claim is necessarily federal."); *accord, e.g.*, *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n.2 (1981) (noting courts will "determine whether the real nature of the claim is federal, regardless of plaintiffs' characterization"); *Club Comanche, Inc. v. Gov't of Virgin Islands*, 278 F.3d 250, 259 (3d Cir. 2002) (in determining whether "a federal question is presented on the face of the Plaintiffs' properly pleaded complaint . . . [a] plaintiff's lack of reference . . . to federal law is not controlling") (citing *Am. Phillips Corp. v. Emery Air Freight Corp.*, 579 F.2d 229, 233 (2d Cir. 1978) ("[T]he lack of any reference to federal law in the complaint is not controlling" where "the substance of the[] allegations . . . sets forth a claim arising under federal law.")); *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 928 (5th Cir. 1997) (citing *Emery*, 579 F.2d at 234) (same); *City of Camden v. Beretta U.S.A. Corp.*, 81 F.Supp.2d 541, 546 (D.N.J. 2000) (same).

jurisdiction where it does exist.[5]  A federal court would contravene this fundamental obligation were it to treat as controlling a complaint's characterization of  a plaintiffs' claims as state-law claims where, as here, the substance of the complaint's allegations and demands for relief reveal that those claims are exclusively federal by virtue of the structure of our Constitution and, therefore, necessarily arise under federal law.

23.    Adhering to the "two-part approach" articulated in *Standard Oil*, the First Circuit in *Swiss American* recognized the key distinction between the "source question and the substance question."  191 F.3d at 43, 45.  The Court explained that the "source question" asks whether "the source of the controlling law [should] be federal or state."  *Id.* at 43.  The substance question, on the other hand, "which comes into play only if the source question is answered in favor of a federal solution," asks whether the governing rule should be borrowed from state law or instead be a "uniform federal rule."  *Id.*  Whether a claim "arises under" federal law "turns on

---

[5]    *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (federal courts have "the 'virtually unflagging obligation' . . . to exercise the jurisdiction given them"); *England v. Louisiana Bd. of Medical Examiners*, 375 U.S. 411, 415 (1964) ("When a federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction.") (quoting *Wilcox v. Consolidated Gas Co.,* 212 U.S. 19, 40 (1909)); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not").

the resolution of the source question." *Id.* at 44. Only that first question—which law applies—is relevant to the removal question and it must be resolved by a federal court. As the Supreme Court explained, this "choice-of-law task is a federal task for federal courts." *Milwaukee II*, 451 U.S. at 349 (quoting *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592 (1973)).

24.    Because Plaintiffs allege that climate change occurs as the result of undifferentiated, cumulative emissions from sources across the world over an extended period of time, *see, e.g.*, Compl. ¶ 48, any judgment as to the reasonableness of particular emissions or their alleged causal contribution to the overall phenomenon of climate change inherently requires an evaluation at an interstate and, indeed, international level. *See AEP*, 564 U.S. at 422 (noting that "[g]reenhouse gases once emitted become well mixed in the atmosphere") (internal quotation marks omitted); *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 880 (N.D. Cal. 2009) ("*Kivalina I*") ("Significantly, the source of the greenhouse gases are undifferentiated and cannot be traced to any particular source, let alone defendant, given that they 'rapidly mix in the atmosphere' and 'inevitably merge[ ] with the accumulation of emissions in California and the rest of the world.'"). Thus, even assuming that state tort law or the public trust doctrine may properly address local source emissions within New Jersey, that is not the nature or theory of Plaintiffs' claims, nor could it be. Plaintiffs seek to impose liability under

state tort law or the public trust doctrine for Defendants' alleged contributions to *global* climate change, based on *global* production and sales, which would require an overarching consideration of *all* of the emissions traceable to the extraction and sale of Defendants' products in each of the States, and in the approximately 195 countries of the world. Plaintiffs do not seek damages from Defendants as a result of their *intrastate* activity. Plaintiffs did not even attempt to disclaim oil and gas sales and their attendant emissions to the extent they occurred outside New Jersey or internationally. Nor could they under their causal theory. Just as with their failed attempt to exclude emissions resulting from sales to the federal government and the military, there is no method by which to distinguish the effect of emissions originating inside or outside the forum. As in *City of New York*, "[a]rtful pleading cannot transform the [County]'s complaint into anything other than a suit over global greenhouse gas emissions." 993 F.3d at 91. Therefore, given the federal government's exclusive authority over foreign affairs and foreign commerce, and its preeminent authority over interstate commerce, state law claims concerning climate change directly implicate uniquely federal interests as "the immense and complicated problem of global warming requires a comprehensive solution." *City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466, 475 (S.D.N.Y. 2018), *aff'd sub nom. City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021). As the Ninth Circuit has noted, "any effective plan [to reduce fossil fuel emissions] would necessarily

require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and legislative branches" of the federal government. *Juliana*, 947 F.3d at 1171. "Global warming presents a uniquely international problem of national concern" that has been addressed with "numerous federal statutory regimes and international treaties" governing greenhouse gas emissions. *City of New York*, 993 F.3d at 85–86. "It is therefore not well-suited to the application of state law." *Id.*; *AEP*, 564 U.S. at 422 (explaining that in cases involving greenhouse gas emissions "borrowing the law of a particular State would be inappropriate").

25.    Plaintiffs' claims also arise under federal law because they seek to regulate the production and sale of oil and gas abroad and, therefore, implicate the federal government's foreign affairs power and the Constitution's Foreign Commerce Clause. The federal government has exclusive authority over the nation's international policy on climate change and relations with foreign nations. *United States v. Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is not shared by the States; it is vested in the national government exclusively."). Accordingly, "our federal system does not permit the controversy to be resolved under state law," "because the authority and duties of the United States as sovereign are intimately involved" and "because the interstate [and] international nature of the controversy makes it inappropriate for state law to control." *Texas Indus.*, 451 U.S. at 641; *see also Sabbatino*, 376 U.S. at 425 (noting that issues involving "our

relationships with other members of the international community must be treated exclusively as aspects of federal law"); *Republic of Philippines v. Marcos*, 806 F.2d 344, 352 (2d Cir. 1986) (explaining that "there is federal question jurisdiction over actions having important foreign policy implications" under federal common law); *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 231 (4th Cir. 2012) ("[T]he federal government has exclusive power over foreign affairs, and . . . states have very little authority in this area.").

26.   As is evident from the Complaint's repeated use of the term "*global warming*," the causes of Plaintiffs' alleged injuries are not confined to particular sources, cities, counties, or even States, but rather implicate inherently national and international interests, including treaty obligations and federal and international regulatory schemes.  *See* Compl. ¶ 44, Figure 3 (depicting $CO_2$ emissions from various sources); *see also, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 509, 523–24 (2007) (describing Senate rejection of the Kyoto Protocol because emissions reduction targets did not apply to "heavily polluting nations such as China and India," and the EPA's determination that the predicted magnitude of future Chinese and Indian emissions "offset any marginal domestic decrease"); *AEP*, 564 U.S. at 427–29 (describing regulatory scheme of the Clean Air Act and role of the EPA); *accord* Dick Decl. Ex. 4 (Remarks Announcing United States Withdrawal From the United Nations Framework Convention on Climate Change Paris Accord (June 1,

2017),     https://trumpwhitehouse.archives.gov/briefings-statements/statement-president-trump-paris-climate-accord/ (statement by President Trump announcing United States' withdrawal from Paris Climate Accord based on financial burdens, energy restrictions, and failure to impose proportionate restrictions on China's emissions)); Dick Decl. Ex. 100 (Executive Order signed by President Biden rejoining the Paris Climate Accord).

27.    For example, the federal balancing of interests is evident in the Clinton Administration Commerce Department's report on whether oil imports threaten national security by hindering the development of domestic sources of oil and gas.[6] Despite the Department's conclusion that petroleum imports do threaten to impair the national security, it recommended that the President not take action to restrict imports because this could increase the price of oil and gas, and "low oil prices contributed to a reduction in inflation, a rise in real disposable income, and an increase in the Gross Domestic Product."  Rather than increasing the cost of oil and gas, the investigation recommended the Administration rely on existing programs "to increase domestic energy production" by increasing natural gas production and supporting "research, design, and development to promote the use of advanced

---

[6]  Dick Decl. Ex. 5 ("The Effect on the National Security of Imports of Crude Oil and the Refined Petroleum Products: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended, U.S. Department of Commerce, Bureau of Export Administration (November 1999)).

technologies to recover more oil and gas from existing reservoirs without environmental degradation."[7]

28.    As the United States explained as amicus in a similar case, "federal law and policy has long declared that fossil 'fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports.'" Brief of the United States as Amicus Curiae at 10, *City of Oakland v. BP p.l.c*, No. 18-16663 (9th Cir. Aug. 3, 2020) (ECF No. 198) (quoting 42 U.S.C. § 15927(b)(1)).

29.    The Complaint itself demonstrates that the unbounded nature of greenhouse gas emissions, diversity of sources, and the magnitude of the alleged attendant consequences have catalyzed myriad federal and international efforts to understand and address such emissions. *See, e.g.*, Compl. ¶ 100. But these are complex policy-balancing problems, on a necessarily national scale, and without fixed "right answers." As the Supreme Court put it in *AEP*, "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum: As with other questions of national or international policy, informed assessment of competing interests is required. Along with the environmental benefit potentially achievable, our Nation's energy needs and the

_____

[7] *Id*. at ES-10.

possibility of economic disruption must weigh in the balance." *AEP*, 564 U.S. at 427. As a "question[] of national or international policy," the question of how to address greenhouse gas emissions (which underlies Plaintiffs' claims and their requested relief) involves inherently federal concerns and can be resolved only by application of federal law; state law simply has no role to play. *See id.*

30. Because federal common law governs this "transboundary pollution" and climate change suit regardless of how Plaintiffs *labeled* their claims, this action is within this Court's original jurisdiction. *See, e.g.*, *Sam L. Majors Jewelers*, 117 F.3d at 928.

## V. THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

31. This Court has original jurisdiction pursuant to OCSLA. 43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline*, 87 F.3d at 155. In OCSLA, Congress granted federal courts original jurisdiction over all actions "arising out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) ("[T]h[e] language [of § 1349(b)(1)] [i]s straightforward and broad."). The OCS includes all submerged lands that belong to the United States but are not part of any State. 43 U.S.C. §§ 1301, 1331. Plaintiffs' claims encompass *all* of Defendants'

worldwide "exploration, development, extraction, and production" of fossil fuels. *E.g.*, Compl. ¶ 168. Therefore, Plaintiffs' claims necessarily encompass all such activities by Defendants on the OCS and fall within the "broad . . . jurisdictional grant of section 1349." *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).

32.    Under OCSLA, oil and gas activities on the OCS can be governed only by federal law. As the Supreme Court recently confirmed, "OCSLA defines the body of law that governs the OCS." *Parker Drilling Management Services, Ltd. v. Newton*, 139 S. Ct. 1881, 1887 (2019). In particular, OCSLA extends "[t]he Constitution and laws and civil and political jurisdiction of the United States" to the OCS. 43 U.S.C. § 1333(a)(1). Federal law applies "to the same extent as if the [OCS] were an area of exclusive Federal jurisdiction located within a State." *Id.* Disputes under OCSLA may borrow from the law of adjacent States, but such claims remain creatures of federal law. "[T]he civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the [OCS]." *Id.* § 1333(a)(2)(A).

33.    As *Parker Drilling* explains, "OCSLA makes apparent that federal law is exclusive in its regulation of [the OCS], and that state law is adopted only as surrogate federal law." 139 S. Ct. at 1889 (quotation marks omitted, alteration in original). Plaintiffs' attempt to affix a state-law label to their claims thus cannot

28

defeat removal. Courts have affirmed removal jurisdiction where Plaintiffs' claims, "though ostensibly premised on [state] law, arise under the 'law of the United States' under [43 U.S.C.] § 1333(a)(2)" such that "[a] federal question . . . appears on the face of [Plaintiffs'] well-pleaded complaint." *Ten Taxpayer Citizens Grp. v. Cape Wind Assocs., LLC*, 373 F.3d 183, 193 (1st Cir. 2004). Accordingly, Plaintiffs' claims are removable under OCSLA.[8]

34.    In order to vindicate the substantial federal interests in the OCS leasing program, Congress established original federal court jurisdiction over "the *entire range of legal disputes* that it knew would arise relating to resource development on the Outer Continental Shelf." *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985) (emphasis added). OCSLA is "a sweeping assertion of federal supremacy over the submerged lands outside of the three-mile [Submerged Lands Act] boundary" and is to be interpreted broadly in favor of removal. *Ten Taxpayer Citizens Grp.*, 373 F.3d at 188. As Professor Tyler Priest, a professor of history at the University of Iowa, has explained in declarations in similar climate change cases: "Between 1954 and 2016 . . . production from offshore leases totaled more than 20 billion barrels of oil" and "the federal government collected an estimated $80 billion in signature bonuses and $150 billion

---

[8]    Under *Parker Drilling*, Plaintiffs' claims related to operations on the OCS are also removable under 28 U.S.C. § 1331 because they arise under federal law.

in royalties—not adjusted for inflation—from offshore oil and gas leases."  Dick Decl. Ex. 102 ("Priest Decl.") ¶ 7(1).  Many of the Defendants in this lawsuit and their alleged predecessors, successors, or subsidiaries worked to develop the oil and gas resources on the OCS under federal government supervision.[9]

35.    The breadth of OCSLA federal jurisdiction reflects the Act's "expansive substantive reach."  *See id.*  Congress passed OCSLA "to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources."  *Id.* at 566.  "[T]he efficient exploitation of the minerals of the OCS . . . was . . . a primary reason for OCSLA."  *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).  Indeed, OCSLA declares it "to be the policy of the United States that . . . the [OCS] . . . should be made available for expeditious and orderly development."  43 U.S.C. § 1332(3).  The statute further provides that "since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States . . . such States, and through such States,

---

[9]    The Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates. Although Defendants reject Plaintiffs' erroneous attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of this notice of removal only, Defendants describe the conduct of certain predecessors, subsidiaries, and affiliates of certain Defendants to show that Plaintiffs' Complaint, as pleaded, can and should be removed to federal court.

affected local governments, are entitled to an opportunity to participate, *to the extent consistent with the national interest*, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf." *Id.* § 1332(4) (emphasis added).

36.    Consistent with Congress's intent, courts repeatedly have found OCSLA jurisdiction where the claims involved conduct that occurred on the OCS or where resolution of the dispute foreseeably could affect the efficient exploitation of minerals from the OCS. *See, e.g.*, *EP Operating*, 26 F.3d at 569–70; *United Offshore v. S. Deepwater Pipeline*, 899 F.2d 405, 407 (5th Cir. 1990).

37.    OCSLA jurisdiction exists even where a complaint pleads no substantive OCSLA claims. *See, e.g.*, *Deepwater Horizon*, 745 F.3d at 163 (finding OCSLA jurisdiction and denying motion to remand despite complaint's failure to plead any substantive OCSLA claims). Although the Complaint here attempts to "disclaim injuries arising on federal property," *see* Compl. ¶ 19, Plaintiffs' claims and injuries necessarily arise out of and are connected with production and exploration on the OCS. As Plaintiffs concede elsewhere in their Complaint, emissions from the combustion of fossil fuels cannot be traced to their sources, and Plaintiffs allege that their injuries are caused by undifferentiated "greenhouse gas pollution" generally. *Id.* ¶ 1. Indeed, the Complaint directly alleges that "it is not possible to determine the source of any particular individual molecule of $CO_2$ in the

atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gasses quickly diffuse and comingle in the atmosphere." *Id.* ¶ 293.

38.    Under OCSLA, the U.S. Department of the Interior administers an extensive federal leasing program that aims to develop and exploit the oil and gas resources of the federal OCS.  43 U.S.C. § 1334 *et seq.*  Under this authority, the Interior Department "administers more than 5,000 active oil and gas leases on nearly 27 million OCS acres.  In FY 2015, production from these leases generated $4.4 billion . . . in leasing revenue . . . [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production." Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Management, Before the House Committee on Natural Resources (Mar. 2, 2016), https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.[10]  In 2021, OCS leases supplied more than 627 million barrels of oil, together with 797 billion cubic feet of natural gas.  Bureau of Safety and Environmental Enforcement, Outer

---

[10]  The Court may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists.  *See, e.g.*, *Plains Gas Solutions, LLC v. Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 608 (D. Del. 2011) (citing *Amoco Prod. Co.*, 844 F.2d at 1205).

Continental Shelf Oil and Gas Production (last visited November 19, 2022), https://www.data.bsee.gov/Production/OCSProduction/Default.aspx.

39.    Certain Defendants (or their predecessors, subsidiaries, or affiliates) participate in the federal OCS leasing program.  For example, from 1947 to 1995, Chevron U.S.A. Inc. produced 1.9 billion barrels of crude oil and 1.1 trillion cubic feet of natural gas from the federal OCS in the Gulf of Mexico alone.  Dick Decl. Ex. 9 (Production by Operator Ranked by Volume for the Gulf of Mexico Region, 1947-1995, MMS).  In 2016, Chevron U.S.A. produced more than 49 million barrels of crude oil and more than 49 billion cubic feet of natural gas from the OCS in the Gulf of Mexico.  U.S. Dep't of the Interior, Bureau of Safety & Envtl. Enf't, *Gulf of Mex. Region, Prod. by Operator Ranked by Vol.* (2016), https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%202016.pdf.  According to data published by the U.S. Bureau of Ocean Energy Management ("BOEM"), numerous other Defendants conduct, and have conducted for decades, similar oil and gas operations on the federal OCS.  According to data published by the Department of the Interior for the period of 1947 to 1995, sixteen of the twenty largest—including the five largest—OCS operators in the Gulf of Mexico, measured by oil volume, is a Defendant (or predecessor of a Defendant) or one of their

subsidiaries.[11]  Also according to the Department of the Interior, in every subsequent year, from 1996 to the present, at least three of the top five OCS operators in this area is a Defendant (or a predecessor) or one of their subsidiaries.[12]   Indeed, Defendants (and their subsidiaries or affiliates) presently hold, in whole or in part, approximately 22.1% of all OCS leases.  *See Bureau of Ocean Energy Management, Lease        Owner        Informatio*n,         https://www.data.boem.gov/Leasing/ LeaseOwner/Default.aspx.[13]

40.    The Complaint itself makes clear that a substantial part of Plaintiffs' claims "arises out of, or in connection with," Defendants' "operation[s] conducted on the outer Continental Shelf" that involve "the exploration and production of minerals."  *Deepwater Horizon*, 745 F.3d at 163.  Plaintiff, in fact, challenges *all of* Defendants' extraction of oil, coal, and natural gas.  Compl. ¶ 4.  And a substantial quantum of those activities arises from OCS operations.  *See* Cong. Rsch. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas       3,       5       (updated       Oct.       23,       2018), https://crsreports.congress.gov/product/pdf/R/R42432 (recounting that, historically,

---

[11]  U.S. Dep't of the Interior, Bureau of Ocean Energy Mgmt., *Ranking Operator by Oil,* https://www.data.boem.gov/Main/HtmlPage.aspx?page=rankOil.

[12]  *Id.*

[13]  As explained in note 9 above, the Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates.

annual oil and gas production from federal leases has accounted for as much as 35% of domestic oil production and 25% of domestic natural gas production). Plaintiffs also allege that emissions have risen due to increased OCS extraction technologies. *See, e.g.*, Compl. ¶¶ 145–46 (discussing Arctic offshore drilling equipment and patents potentially relevant to conduct near Alaskan OCS).

41. Even if Plaintiffs' claims were based solely on allegedly deceptive promotion of oil and gas by Defendants (which they are not, as explained herein), that would not prevent removal based on OCSLA. For example, Plaintiffs allege that Defendants "[f]und[ed] front groups, fake grassroots organizations, think tanks, and industry-aligned scientists to obscure the climate science consensus," Compl. ¶ 320(c), and supposedly misled regulators and public officials, *id.* ¶ 141. Even accepting this allegation as true, Plaintiffs' claims would be removable under OCSLA because, as explained above and below, *their* theory of causation includes that such actions lead to increased demand for, and thus increased production of, oil and gas leading to increased greenhouse gas emissions, which has allegedly caused changes to the climate and Plaintiffs' alleged injuries. Thus, production of oil and gas—a substantial portion of which occurred on the OCS—is a direct and necessary link in the alleged causal chain upon which Plaintiffs' claims depend. Moreover, Defendants' alleged concealment and misrepresentations would have had the alleged effect of evading regulation and convincing policy makers to continue production

on the OCS and elsewhere. *Id.* ¶ 141.

42.    Jurisdiction is also proper under OCSLA for the separate and independent reason that the *relief* sought by Plaintiffs is unquestionably "in connection with" an OCS operation because it would affect Defendants' OCS extraction and development operations. *See, e.g.*, *id.* at 169, Prayer for Relief (seeking abatement and damages that would inevitably affect exploration and production on the OCS). Plaintiffs' desired remedies would clearly "alter[] the progress of production activities on the OCS" and "threaten[] to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS. Such a dispute was intended by Congress to be within the grant of federal jurisdiction contained in § 1349." *Amoco Prod. Co.*, 844 F.2d at 1210.

## VI.    THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

43.    The federal officer removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). A party seeking removal under section 1442 must show: (1) that it "act[ed] under" a federal officer; (2) that "the charged conduct was carried out for o[r] in relation to the asserted official authority"; and (3) that it has a "colorable federal defense." *Sawyer*, 860 F.3d at 254; *see also In re Commonwealth's Mot. to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457,

467 (3d Cir. 2015) ("*Def. Ass'n of Philadelphia*"); *Hammell v. Air & Liquid Sys. Corp.*, 2014 WL 4259206, at *2 (D.N.J. Aug. 29, 2014). So long as federal officer jurisdiction can be exercised as to one Defendant, the entire action is properly removed. *See* 28 U.S.C. § 1367. Defendants easily meet these criteria.

### A.    The Courts Construe The Federal Officer Removal Statute Broadly In Favor Of Removal

44.    "[T]he federal officer removal statute is to be 'broadly construed' in favor of a federal forum." *Def. Ass'n of Philadelphia*, 790 F.3d at 466. The Supreme Court has emphasized that "the statute must be liberally construed" and, in particular, "[t]he words 'acting under' are broad." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007). Courts have repeatedly held that "defendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute." *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014); *see also Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017) ("Throughout our analysis, we pay heed to our duty to 'interpret Section 1442 broadly in favor of removal.'") (quoting *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 431 (1999)). At this stage, a defendant's allegations "in support of removal" need only be "facially plausible," and the defendant receives the "benefit of all reasonable inferences from the facts alleged." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 941, 945 (7th Cir. 2020). A federal court must "credit the defendant's theory of the case," *Leite*, 749 F.3d at 1124, and

"construe the facts in the removal notice in the light most favorable to the" existence of federal jurisdiction, *Def. Ass'n of Philadelphia*, 790 F.3d at 466; *see also id.* at 474 ("[W]e must accept the [defendant's] theory of the case at this juncture."); *Baker*, 962 F.3d at 947 ("Our role at this stage of the litigation is to credit only the [defendant's] theory."). Defendants need not, at this juncture, affirmatively prove that they will prevail on the merits of any federal issue, because the sole issue is *where* such merits will be adjudicated. *See Willingham*, 395 U.S. at 407 (holding that a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed"). In *Acker*, for example, the Supreme Court "credit[ed] the [defendants'] theory of the case for purposes of [all] elements of [the] jurisdictional inquiry and conclude[d] that the [defendants] made an adequate threshold showing that the suit is 'for a[n] act under color of office.'" 527 U.S. at 432.

45. Plaintiffs' alleged injuries arise from global climate change, a phenomenon that purportedly arises from all of Defendants' production and sales activities (as well as activities of innumerable other sources). Defendants' theory that Plaintiffs' purported injuries arise from global emissions, and thus necessarily sweep in combustion of oil and gas Defendants produced and distributed, is a reasonable one. Plaintiffs' Complaint alleges that greenhouse gas emissions caused by billions of consumers' use of fossil fuels—which were produced, in part, at the federal government's direction—allegedly resulted in Plaintiffs' purported harms.

Plaintiff's claims thus implicate all of Defendants' oil and gas production, including for the federal government. In *County Board of Arlington County, Virginia v. Express Scripts Pharmacy, Inc.*, the Fourth Circuit recently held that the defendants' provision of opioids pursuant to DOD contracts was sufficient to establish federal officer removal jurisdiction, even though the complaint there "did not even mention the distribution of opioids to veterans, the DOD contract, or the operation of the [military pharmacy]." ___ F.3d ___, 2021 WL 1726106, at *9 (4th Cir. May 3, 2021) ("*Arlington*"). So too here. Plaintiffs' claims encompass harm from every greenhouse gas emission, just as the plaintiff in *Arlington* targeted "every opioid prescription" filled by the defendants there. *Id.* To ignore the fact that emissions are caused by oil and gas products produced for and sold to the federal government would improperly "elevate form over substance." *Id.*

46.    Where "[b]oth the [plaintiffs] and the [defendants] have reasonable theories of this case" the court's role is "to credit only the [defendants'] theory so long as the theory is 'plausible.'" *Baker*, 962 F.3d at 941, 947; *see also New Jersey Dep't of Envtl. Prot. v. E.I. Du Pont De Nemours & Co.*, 2020 WL 2611539, at *5 (D.N.J. May 22, 2020) ("[A] party is not required to 'win his case before he can have it removed.'") (quoting *Acker*, 527 U.S. at 431). Defendants' theory is more than plausible, and should be credited by this Court.

## B.    Defendants Satisfy All Elements Of The Federal Officer Removal Statute

47. Defendants satisfy all three elements of the federal officer removal statute. First, Defendants have acted under federal officers by repeatedly performing critical and necessary functions for the U.S. military to further the national defense and pursuant to government mandates, leases, and contracts under which they assisted the federal government in achieving federal objectives under federal direction, supervision, and control. Defendants have acted under federal officers in numerous ways, including by: (1) producing and supplying large quantities of highly specialized, noncommercial-grade fuels for U.S. military use that conformed (and still conform) to unique military specifications; (2) developing mineral resources on the OCS through highly technical leases that were overseen and managed by federal supervisors; (3) developing mineral resources on federal lands through specialized leases that were overseen and managed by federal supervisors; (4) operating the Elk Hills reserve "in the employ" of the U.S. Navy; (5) supplying fuel for and managing the Strategic Petroleum Reserve; (6) allocating their products pursuant to the Emergency Petroleum Allocation Act; (7) producing oil and gas for the U.S. military during wartimes under specific government guidance and directives; (8) building, operating, and managing government petroleum production facilities; and (9) constructing pipelines for oil transportation at the direction and control of the federal government. Second, Plaintiffs' claims relate to these acts under federal officers because there is "a connection or association between the act[s] in question

and the federal office." *Sawyer*, 860 F.3d at 258 (citations omitted).  Plaintiffs have brought suit for the downstream effects of all global combustion of oil and gas and the resulting emissions of greenhouse gases, which necessarily includes the combustion of products created for and at the direction of the federal government. Third, Defendants have several "colorable federal defenses," including the government-contractor defense, preemption, federal immunity, commerce clause defenses, due process, the foreign affairs doctrine, and the First Amendment.

### 1.    Defendants "Acted Under" Federal Officers

48.    Oil and gas are at the heart of economic, energy, and security policies of the United States, and have been for decades.  It has long been the policy of the United States that fossil "fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports."  42 U.S.C. § 15927(b)(1); *see also* 83 Fed. Reg. 23295, 23296 (Final List of Critical Minerals 2018) ("[F]ossil fuels" are "indispensable to a modern society for the purposes of national security, technology, infrastructure, and energy production.").  As Professor Mark Wilson, a professor of history at the University of North Carolina, has explained in declarations submitted in similar climate change cases:  "Over the last 120 years, the U.S. government has relied upon and controlled the oil and gas industry to obtain oil supplies and expand the production of petroleum products, in

order to meet military needs and enhance national security."  Dick Decl. Ex. 101

("Wilson Decl.") ¶ 2.

49.    Defendants "acted under" federal officers because the government

exerted extensive "subjection, guidance, or control" over Defendants' fossil fuel

production and because Defendants engaged in "an effort to *assist*, or to help *carry*

*out*, the duties or tasks of the federal superior."  *Watson*, 551 U.S. at 143, 152; s*ee*

*also St. Charles Surgical Hosp., LLC v. Louisiana Health Serv. & Indem. Co.*, 990

F.3d 447, 454–55 (5th Cir. 2021) ("In order to satisfy the 'acting under' requirement,

a removing defendant need not show that its alleged conduct was precisely dictated

by a federal officer's directive. . . .  Instead, the 'acting under' inquiry examines the

*relationship* between the removing party and relevant federal officer, requiring

courts to determine whether the federal officer 'exert[s] a sufficient level of

subjection, guidance, or control' over the private actor.").

50.    Both the Supreme Court and the Third Circuit have made clear that "the

statute must be liberally construed" and, in particular, "[t]he words 'acting under'

are broad."  *Id.* at 147; *Def. Ass'n of Philadelphia*, 790 F.3d at 468; *see also Baran*

*v. ASRC Fed. Mission Sols.*, 2018 WL 3054677, at *5 (D.N.J. June 20, 2018) ("The

'acting under' requirement, like the federal removal statute overall, is to be 'liberally

construe[d]'") (quoting *Papp*, 842 F.3d at 812)).  "The words 'acting under' describe

'the triggering relationship between a private entity and a federal officer.'  The

'triggering relationship' encompasses a broad range of relationships, including, but not limited to, agent-principal, *contract or payment*, and employer-employee relationships." *Doe v. UPMC*, 2020 WL 5742685 at *3 (W.D. Pa. Sept. 25, 2020) (emphasis added and internal citations omitted). Where, as here, a private party has specifically contracted with "the Government to produce an item that [the Government] needs," such assistance "goes beyond simple compliance with the law" and satisfies the "acting under" prong. *Baker*, 962 F.3d at 942. Indeed, the Fourth Circuit recently confirmed that courts "have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Arlington*, 2021 WL 1726106, at *4 (emphasis in original). Removal is even more appropriate here than in *Arlington*, because many of Defendants' activities and products, including non-commercial grade jet fuels that required the inclusion of "military unique additives that are required by military weapons systems,"[14] were more specialized and uniquely tailored under the direction of federal officers than the opioids in *Arlington*.

 51. For decades, Defendants have acted under the direction, supervision, or

---

[14] Dick Decl. Ex. 92, at 5, 7, 10 (DLA, *Detail Specifications, Turbine Fuels, Aviation Kerosene Types, NATO F-34(JP-8), NATO F-35, AND JP-8+100, MIL-DTL-83133E* (April 1, 1999)).

control of federal officers and have assisted them in securing domestic energy independence and meeting the requirements of the U.S. military and the national economy. Under these circumstances, 28 U.S.C. § 1442(a)(1) affords Defendants a right to insist that any claims based on this "special relationship" be heard in federal court. *Baker*, 962 F.3d at 941–42 (holding that "[t]he crux of the ['acting under'] inquiry . . . is whether there was a special relationship between the defendant and the federal government," which exists where an entity "provide[s] the federal government with materials that it need[s]"—particularly during wartime). The federal government has required and promoted the production of oil and gas for decades to meet the U.S. military and national economy needs, even as the public and the world increasingly recognized and understood the potential link between greenhouse gas emissions and global climate change.[15]    Indeed, the federal

---

[15] For example, the federal government took a number of other actions to promote the domestic production of oil and gas to protect important state actions. These include the Energy Petroleum Allocation Act of 1973, Pub L. No. 93-159, 87 Stat. 627 (1973) and the Federal Energy Administration ("FEA") Act of 1974, Pub. L. No. 93-275, 88 Stat. 96 (1974). The report published pursuant to the FEA stated, "Prospects for large, new discoveries of onshore oil and gas deposits in the lower 48 States are small. For this reason, it is proposed that leasing of the Federal OCS be accelerated, to include frontier areas of Alaska, the Atlantic and Pacific coasts, and the Gulf of Mexico." Dick Decl. Ex. 10, at 1012 (H.R. Doc. No. 93-406). The report further noted that "there would be strategic foreign policy and national security advantages in having energy sources which are not susceptible to interruption by a foreign power." *Id.* More recent administrations have continued to promote the development of oil and gas on the OCS through, *e.g.*, the Energy Policy Act of 2005 which, among other things, sought "to

government continues to promote domestic production of fossil fuels through a variety of lease programs, grants, loan guarantees, tax provisions, and contracts. For example, the Office of Fossil Energy states that the government seeks American energy dominance, which "promotes U.S. domestic homegrown energy development to achieve energy security and jobs in energy and technology around the world."[16]

52.    Not surprisingly, Defendants acted under federal officers in many respects, each directly stemming from the U.S. government's policies designed to meet the vital national interest in assuring adequate energy sources for the national defense and economic well-being.  Each of these examples provided below demonstrates that Defendants have produced or supplied oil and gas under the direction, supervision, and control of the federal government.  Any one of them alone is sufficient to support federal officer removal, and each demonstrates the strong federal interest in petroleum production, which Plaintiffs now seek to disrupt.[17]

---

promote oil and natural gas production from the [OCS] and onshore Federal lands under lease by providing royalty incentives to use enhanced recovery techniques."  Pub. L. No. 109-58, § 357(a)(2)(B), 119 Stat. 594 (2005).

[16]  U.S. Dep't of Energy, Office of Fossil Energy, 2018-2022 Strategic Vision, https://www.energy.gov/sites/prod/files/2019/12/f69/FE%20Strategic%20Vision.pdf.

[17]  The examples provided in this section, and other sections, of this Notice of Removal are meant only to provide illustrative examples.  These examples are by no means an exhaustive collection of the factual bases that support the grounds for removal asserted herein.  Defendants expressly reserve all rights to include

### a. Defendants Acted Under Federal Officers By Supplying Highly Specialized Fuels For Military Use

53. Many of the Defendants have produced and supplied to the U.S. military highly specialized petroleum products required for national defense and wartime efforts. Federal officer removal precisely "covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012). Defendants acted under federal officers by producing and supplying highly specialized, noncommercial-grade fuels for the military that continue to be the "lifeblood of the full range of Department of Defense capabilities," Dick Decl. Ex. 57. As in *Arlington*, these specialized fuels have "detailed requirements" pursuant to DOD contracts, and must be produced "in accordance with the guidelines promulgated by the DOD." 2021 WL 1726106, at *5.

54. During World War II, the federal government asserted substantial control over Defendants, directing the development and production of avgas.[18] Because avgas was "the most critically needed refinery product during World War

---

additional support for any and all grounds for removal in any further briefing should Plaintiffs challenge removal.

[18] During the war, approximately 80% of the seven billion barrels of crude oil needed to support the U.S. war effort was produced in this country. Dick Decl. Ex. 46, at 1, 169 (John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War, 1941-1945* (1946)).

II and was essential to the United States' war effort," *Shell Oil Co. v. United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014) ("*Shell II*"), the United States government exercised significant control over the means of its production during World War II. "The government exerted substantial control and direction over the refineries' actions, including decisions on how to use raw materials and labor," *Exxon Mobil Corp.*, 2020 WL 5573048, at *1 (S.D. Tex. Sept. 16, 2020), *appeal docketed*, No. 20-20590 (5th Cir. Nov. 13, 2020), in order to maximize production of fuel for the military and direct the allocation of pivotal resources, *see, e.g.*, *United States v. Shell Oil Co.*, 294 F.3d 1045, 1049–50 (9th Cir. 2002) ("*Shell I*").

55.    To this day, Defendants supply the DOD with highly specialized fuels to meet its need to power planes, ships, and other vehicles, and to satisfy other national defense requirements.  U.S. Navy Captain Matthew D. Holman recently explained that "[f]uel is truly the lifeblood of the full range of DOD capabilities, and, as such, must be available on specification, on demand, on time, every time.  In meeting this highest of standards, we work hand-in-hand with a dedicated team of Sailors, civil servants, *and contractors* to deliver fuel to every corner of the world, ashore and afloat."  Dick Decl. Ex. 58 (emphasis added).  "By 2010, the U.S. military remained the world's biggest single purchaser and consumer of petroleum products" and, "[a]s it had for decades, the military continued to rely on oil companies to supply it under contract with specialty fuels, such as JP-5 jet aviation fuel and other

jet fuels, F-76 marine diesel, and Navy Special Fuel." Wilson Decl. ¶ 40. Defendants Shell Oil Company, BP, and ExxonMobil (or their predecessors, subsidiaries, or affiliates), for example, have been three of the top four suppliers of fossil fuel products to the United States military, whose energy needs are coordinated through the Defense Energy Support Center ("DESC").[19]    DESC procures a range of military-unique, petroleum-based products from Defendants, including JP-8 fuel (MIL-DTL-83133) for the U.S. Air Force and Army, JP-5 fuel (MIL-DTL-5624 U) for the U.S. Navy, and a variety of other alternative fuels. Several other Defendants have also produced (and continue to produce) these critical products for the U.S. military.

56.    For example, during the Cold War, Shell Oil Company developed and produced for the federal government specialized jet fuel to meet the unique performance requirements of the U-2 spy plane and later the OXCART and SR-71 Blackbird programs.[20]    Shell Oil Company produced millions of gallons of

---

[19]    *See* Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 10 (2009), https://fas.org/sgp/crs/natsec/R40459.pdf.

[20]    *See* Dick Decl. Ex. 59, at 61–62 (Gregory W. Pedlow & Donald E. Welzenbach, The Central Intelligence Agency and Overhead Reconnaissance: The U-2 and OXCART Programs, 1954-1974 (1992)), https://www.archives.gov/files/declassification/iscap/pdf/2014-004-doc01.pdf ("Gen. James H. Doolittle (USAF, Ret.) . . . arranged for Shell to develop a special low-volatility, low-vapor-pressure kerosene fuel for the craft. The result was a dense mixture, known as LF-1A, JP-TS (thermally stable), or JP-7, with a

"Processing Fluid (PF-1)" under government contracts with specific testing and inspection requirements, as well as packaging that mandated "no other identification."[21]  Shell Oil Company also constructed "special fuel facilities" to handle and store PF-1, including a hangar, pipelines, and storage tanks at Air Force bases at home and abroad, and "agreed to do this work without profit" under special security restrictions per detailed government contracts for the OXCART program.[22]

---

boiling point of 300ºF at sea level.  Manufacturing this special fuel required petroleum byproducts."); *id.* Ex. 60 (CIA Doc. No. CIA-RDP90B00170R000100080001-5, Clarence L. Johnson, Development of the Lockheed SR-71 Blackbird (Aug. 3, 1981)) ("The Government stated that the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the technological challenge. . . . The extreme environment presented a severe cooling problem. . . . A new fuel and a chemical lubricant had to be developed to meet the temperature requirements. . . . Shell, and [other] [c]ompanies[,] took on the task of developing these fluids."); *see also id.* Ex. 61 (Ben Rich & Leo Janis, Skunk Works 127, 205 (1994)).

[21]  Dick Decl. Ex. 62 (CIA Doc No. CIA-RDP67B00074R000500400016-2, Contract No. AF33(657)-8577 (SH-511) (Aug. 14, 1962)); *see id.* Ex. 63 (CIA Doc. No. CIA-RDP67B00074R000500400012-6, Amendment No. 2 to Contract No. AF33(657)-5577 (SH-511) (Aug. 26, 1963)).

[22]  Dick Decl. Ex. 64 (CIA Doc. No. CIA-RDP67B00074R000500440005-0, Concurrence in Contract No. SH-515 with Shell Oil Company, Project OXCART (Sept. 20, 1963)); *see id.* Ex. 65 (CIA Doc. No. CIA-RDP67B00074R000500450004-0, Contract No. AF33(657)-13272 (SH-516) (June 30, 1964)); *id.* Ex. 66 (CIA Doc. No. CIA-RDP67B00074R000500440006-9, Contract No. AF33(657)-12525 (SH-515) (Sept. 20, 1963)); *id.* Ex. 67 (CIA Doc. No. CIA-RDP67B00074R000500430003-3, Concurrence in Contract No. SH-514 with Shell Oil Company, New York, N.Y. (June 28, 1963)); *id.* Ex. 68 (CIA Doc. No. CIA-RDP67B00074R000500420006-1, Contract No. AF33(657)10449 (SH-513) (Feb. 25, 1963)); *id.* Ex. 69 (CIA Doc. No. CIA-RDP67B00074R000500410006-2, Contract No. AF33(657)-8582 (SH-512) (Sept. 13, 1962)).

Under the OXCART program, Shell Oil Company also "tested" "refinery procedures" to ensure fuels were "up to standard."[23]  In providing specialized fuel and facilities under contracts for the federal government's overhead reconnaissance programs, Shell Oil Company acted under federal officers, *see, e.g.*, Dick Decl. Ex. 64 ("This work is under the technical direction of Colonel H. Wilson."), and helped the government to produce an essential item that it needed for national defense purposes. *See Watson*, 551 U.S. at 153.

57.     As another example, from at least 2010–2013, Shell Oil Company or its affiliates entered into billion-dollar contracts with the DOD's Defense Logistics Agency ("DLA") to supply specialized JP-5 and JP-8 military jet fuel.  *See* Dick Decl. Exs. 2–3, 83–89.[24]  The DOD's detailed specifications for the makeup of the military jet fuels require that they "shall be refined hydrocarbon distillate fuel oils" made from "crude oils" with "military unique additives that are required by military weapon systems."  *See* Dick Decl. Ex. 92, at 5, 10, §§ 3.1, 6.1; *id.* Ex. 90 at 5, 11,

---

[23]  Dick Decl. Ex. 70 (CIA Doc. No. CIA-RDP63-00313A000500130031-9, Summary of OSA Activities for Week Ending 21 August 1963 (Aug. 23, 1963)).

[24]  Given that Plaintiffs' claims encompass *all* of Defendants' production and sales activities, and its alleged injuries arise from *global* climate change, Plaintiffs necessarily complain about the federal government's emissions from jet fuel supplied by Defendants on U.S. military bases, and thus federal enclave jurisdiction supports removal. *See John Crane-Houdaille*, 2012 WL 1197391, at *1 ("A suit based on events occurring in a federal enclave . . . must necessarily arise under federal law and implicates federal question jurisdiction under § 1331.").

§§ 3.1, 6.1.

58.    Similarly, Marathon Petroleum subsidiary Tesoro Corporation and BP entities have contracted with the DLA to provide a significant quantity of specialized military fuels over decades.[25]  Tesoro entered into at least fifteen contracts with the DLA between 1983 and 2011 to supply highly specialized military jet fuels, such as JP-4, JP-5, and JP-8.[26]  And BP entities contracted with the DLA to provide approximately 1.5 billion gallons of specialized military fuels for the DOD's use in the years 2016 to 2020 *alone*.  Dick Decl. Ex. 71, at 5.  Since 2016, BP entities entered into approximately 25 contracts to supply various military-specific fuels, such as JP-5, JP-8, and F-76.  DLA required that the fuels contain specialized additives, including fuel system icing inhibitor ("FSII"), corrosion inhibitor/lubricity improver ("CI/LI"), and, for F-76 fuels, lubricity improver additives ("LIA").  *See generally id.*  Such additives are essential to support the high performance of the military engines they fuel.

---

[25]  Although Marathon Petroleum is not a defendant in this action, it is a defendant in a number of similar climate change-related cases.  The contract examples throughout this section, including those involving Marathon Petroleum, are only meant to be illustrative.  They are by no means an exhaustive collection of the contracts that Defendants and other similarly situated energy companies executed with the federal government to supply specialized military fuels during the relevant time period.

[26]  The contracts were executed by various Tesoro subsidiaries, such as Tesoro Refining and Marketing Company and Tesoro Alaska Petroleum Company.  For a list of the Tesoro contract numbers and dates, *see* Dick Decl. Ex. 91.

59.     The DOD exerted significant control over Tesoro's and the BP entities' actions in fulfilling these contracts, seeking to ensure that these unique fuels (1) ignite, but do not freeze, at low temperatures from high altitudes; (2) rapidly dissipate accumulated static charge so as not to produce sparks or fires during rapid refueling (such as on an aircraft carrier where such a fire would be devastating); (3) efficiently combust to allow for longer flights on less fuel; and (4) maintain the integrity of the fuel handling systems over a long period of time.[27]

60.     To meet its unique operational needs, the DOD required that Tesoro and the BP entities supply each fuel in accordance with highly specialized, DOD-mandated specifications.  As one would expect when dealing with highly specialized military equipment, these fuel contracts are far more specialized and prescriptive than for fuel intended for consumer-type vehicles.  Like the contracts in *Arlington*, the contracts for these specialized fuels established "how [Defendants] must operate" and fixed "[p]ricing . . . , shipping, payment, and many other specifications." *Arlington*, 2021 WL 1726106, at *5.

61.     In particular, the specifications require express amounts of "military

---

[27] Dick Decl. Ex. 72 § 1.2.2 (MIL-HDBK-510A); *id.* Ex. 73, tbl. 1, 2–9 (Air Force Wight Aeronautical Lab., *Military Jet Fuels, 1944-1987*, AFWAL-TR-87-2062 (Dec. 1987)) [hereinafter "Air Force Lab, *Military Jet Fuels*"]; NREL, *Investigations of Byproduct Application to Jet Fuel*, NREL/SR-510-30611, at 4–6 (Oct. 2001), https://www.nrel.gov/docs/fy02osti/30611.pdf.

unique additives that are required by military weapon systems," such as SDA, FSII, and CI/LI.[28] "[T]his [additive] requirement is unique to military aircraft and engine designs,"[29] and each additive served a vital role in allowing the DOD to fulfill its mission safely and efficiently.

62.    The DOD *required* Tesoro and the BP entities to use SDA, a conductivity improver additive, to dissipate static charge created during military jet distribution and refueling.  If the charge is not dissipated, refueling could result (and has resulted) in a spark or fire, especially when rapid refueling is necessary during combat with hot military engines.[30]

63.    The DOD *required* Tesoro and the BP entities to use FSII to depress the freezing point of military jet fuels.  FSII ensures that the fuels' natural water content does not freeze at low temperatures encountered by military jets at high

---

[28]  Dick Decl. Ex. 92, at 5, 7, 10 (DLA, *Detail Specifications, Turbine Fuels, Aviation Kerosene Types, NATO F-34(JP-8), NATO F-35, AND JP-8+100, MIL-DTL-83133E* (April 1, 1999)).  Tesoro Alaska Petroleum Company's September 5, 2007 contract with DLA Defense Energy Supply Center to supply JP-8 required that Tesoro meet the specifications of MIL-DTL-83133E.  *See* Dick Decl. Ex. 91.  Similarly, several of the BP entities' DLA contracts to supply JP-8 required that the BP entities meet the specifications of MIL-DTL-83133J.  Dick Decl. Ex. 71, at 4; *id.* 75 (MIL-DTL-83133J specs).

[29]  *Id.* at 10

[30]  Dick Decl. Ex. 72 § 1.4.1.2 (MIL-HDBK-510A); *id.* Ex. 73 at 28, 35 (Air Force Wright Aeronautical Laboratories, *Effect of Corrosion Inhibitors on Conductivity of Avian Turbine Fuel*, ARWAL-TR-85-2076), at 1 ("The Air Force and Navy have reported numerous incidents in the [1980s] solely related to electrostatic discharge."), https://apps.dtic.mil/dtic/tr/fulltext/u2/b100948.pdf.

altitudes, which would result in slush or ice crystal formation causing blockages of fuel filters, pumps, or lines and could ultimately cause engine flameout.[31]

64.    The DOD *required* Tesoro and the BP entities to use CI/LI to (1) improve lubricity, which reduces friction and ensures that the military engines do not seize during operation; and (2) prevent corrosion in military fuel handling, transportation, and storage equipment, primarily constructed of uncoated steel.[32]

65.    In addition, the DOD specifications required Tesoro and the BP entities to conform the fuels to specific chemical and physical requirements, such as enumerated ranges for conductivity, heat of combustion, thermal stability, and freezing point, specifications which are essential to performance of the military function.[33]  The specifications also required adherence to specific testing methods

---

[31]  Dick Decl. Ex. 80 (Dep't of Defense, FSII Specifications, MIL-DTL-85470B (June 1999)); *id.* Ex. 72 § 1.4.1.1; *id.* Ex. 73, at 30, 41–44) (Air Force Lab, *Military Jet Fuels*); *id.* Ex. 93 (Department of Army Technical Manual, *Petroleum Handling Operations for Aviation Fuel*, TM 10-1107 at 6 (Feb. 1960)) ("The jet aircraft is subject to wider and more rapid changes of temperature. . . . Consequently, any water present may freeze before it can reach the sumps of jet aircraft.  When this happens, ice particles may clog the fuel screen and cause fuel starvation.").

[32]  Dick Decl. Ex. 81 (Dep't of Defense, Performance Specification, Inhibitor, Corrosion / Lubricity Improver Fuel Soluble, MIL-PRF-25017H); *id.* Ex. 72 § 1.4.1.3 (MIL-HDBK-510A); *id.* Ex. 73, at 28, 30, 38–39 (Air Force Lab, *Military Jet Fuels*); *id.* Ex. 82 (MIL-PRF-32490 (LIA) specs).

[33]  Dick Decl. Ex. 92, at 6 (MIL-DTL-83133E); *id.* Ex. 73, at 17–35 (Air Force Lab, *Military Jet Fuels*) (describing the necessity for specific physical and chemical requirements in military jet fuels); *id.* Exs. 74–77, 79 (the JP-5 specs (MIL-DTL-5624W); the NATO-76 specs (MIL-DTL-16884N and -16884P); and Def Stan

for the various additives and chemical and physical requirements in accordance with enumerated American Society for Testing and Materials ("ASTM") standards, such as ASTM D2624 for conductivity and ASTM D3241 for thermal stability.[34]

66.    If the fuels did not conform to the exact specifications, the DOD exerted control over Tesoro and the BP entities by requiring them to either repair or replace the products at no increase in contract price.

67.    The DOD's detailed specifications for the makeup of the military jet fuels and "the compulsion to provide the product to the government's specifications" demonstrate the necessary "acted under" special relationship between Defendants and the government in each of these examples. *See Baker*, 962 F.3d at 943 (holding that the government's detailed specifications for the makeup of materials and the compulsion to provide the product to the government's specifications demonstrated the necessary "acted under" relationship to support federal officer removal). These specialized jet fuels are designed specifically to assist the military in fulfilling its unique and essential missions and thus fall into the category of specialized military products that support federal officer jurisdiction, *see Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998); *Baker*, 962 F.3d at 943, and not the

---

091-91 (Jet A-1) Issue 9 specs).

[34] Dick Decl. Ex. 92, at f76 (MIL-DTL-83133E); *see also id.* Ex. 78 (ASTM D1655-20 Jet A specs).

category of heavily regulated civilian products such as those described by the Supreme Court in *Watson*.

  **b.** **Defendants Acted Under Federal Officers By Developing Mineral Resources On The Outer Continental Shelf**

  68. As noted above, Congress first passed OCSLA in 1953, providing federal control over the OCS to ensure the "expeditious and orderly development" of what it recognized to be a "vital national resource" in "a manner which is consistent with . . . national needs." 43 U.S.C. § 1332(3). The initial regulations "went well beyond those that governed the average federally regulated entity at that time." Priest Decl. ¶ 19. "An OCS lease was a contractual obligation on the part of lessees to ensure that all operations *'conform to sound conservation practice'* . . . and *effect the 'maximum economic recovery'* of the natural resources on the OCS." *Id.* (citing 19 Fed. Reg. 90 (May 8, 1965), C.F.R. § 250.11, 2656) (emphases added). In fact, the federal government retained the power to "direct how oil and gas resources would be extracted and sold from the OCS." *Id.* ¶ 20. As in *Arlington*, Defendants "are required to comply with all of these contractual requirements along with the statutes, regulations and policy manuals governing" their operations. 2021 WL 1726106, at *5.

  69. Federal officials in the Department of the Interior—whom the Code of Federal Regulations called "supervisors"—exerted substantial control and oversight over Defendants' operations on the OCS from the earliest OCS exploration. *See*

Priest Decl. ¶ 19. Federal supervisors had complete authority to control and dictate the "rate of production from OCS wells," *id.* ¶ 26, and had authority to suspend operations in certain situations, *id.* ¶ 20. The supervisors also "had the final say over methods of measuring production and computing royalties," which were based on "the estimated reasonable value of the product as determined by the supervisor." *Id.* (internal quotation marks omitted).[35] As Professor Priest explains, these federal officials "did not engage in perfunctory, run-of-the-mill permitting and inspection." *Id.* ¶ 22. Rather, they "provided direction to lessees regarding when and where they drilled, and at what price, in order to protect the correlative rights of the federal government as the resource owner and trustee" of federal lands. *Id.* ¶ 28.

70. In addition, the federal government exerted substantial control by issuing highly specific and technical orders, known as "OCS Orders," which, among other things: "specified how wells, platforms, and other fixed structures should be marked"; "dictated the minimum depth and methods for cementing well conduct

---

[35] The federal government uniquely reserves the authority to determine the value of production for purposes of determining how much royalty a lessee owes. *See* Dick Decl. Ex. 19 § 6(b) ("The value of production for purposes of computing royalty shall be the reasonable value of the production *as determined by the Lessor*.") (emphasis added). A typical commercial private lease would never reserve similar unilateral authority to one contracting party to control a material term of the lease contract. *See* Dick Decl. Ex. 22 (Commercial Lease – Texas Association of Realtors, Form TAR-2101). This would be akin to a commercial rental lease providing that the landlord has sole discretion to specify the rent owed.

casing in place"; "prescribed the minimum plugging and abandonment procedures for all wells"; and "required the installation of subsurface safety devices on all OCS wells." *Id.* ¶ 24 (citations omitted). Professor Priest observes that through these OCS Orders, federal officials "exercised active control on the federal OCS over the drilling of wells, the production of hydrocarbons, and the provision of safety." *Id.* ¶ 25. These controls went far beyond typical regulations, as the federal government imposed requirements as the resource owner to achieve its economic and policy goals. *E.g.*, *id.* ¶¶ 28, 32.

71. During the 1960s, U.S. domestic oil consumption increased 51%, compared to only 36% during the previous decade.[36] Demand continued to climb into the early 1970s, and domestic supply failed to keep pace, so the United States soon found itself facing a precarious shortage of oil. The United States increasingly turned to foreign countries, particularly in the Middle East, for oil. The amount of oil that the United States imported grew from 3.2 million barrels per day in 1970 to 6.2 million barrels per day in 1973.[37] By April 1973, President Nixon warned Congress of an impending energy crisis:

> As America has become more prosperous and more heavily industrialized, our demands for energy have soared. Today, with 6 per cent of the world's population,

---

[36] Dick Decl. Ex. 11, at 17 (Jay Hakes, *A Declaration of Energy Independence* (2008)).

[37] Dick Decl. Ex. 12, at 591 (Yergin, *The Prize*).

we consume almost a third of all the energy used in the world. Our energy demands have grown so rapidly that they now outstrip our available supplies, and at our present rate of growth, our energy needs a dozen years from now will be nearly double what they were in 1970. . . . If recent trends continue unchecked, we could face a genuine energy crisis. But that crisis can and should be averted, for we have the capacity and the resources to meet our energy needs if only we take the proper steps—and take them now.[38]

72.    To avert a national energy crisis, President Nixon ordered a dramatic increase in possible production on the OCS:

Approximately half of the oil and gas resources in this country are located on public lands, primarily on the Outer Continental Shelf [OCS]. The speed at which we can increase our domestic energy production will depend in large measure on how rapidly these resources can be developed. I am therefore directing the Secretary of the Interior to take steps which would triple the annual acreage leased on the Outer Continental Shelf by 1979, beginning with expanded sales in 1974 in the Gulf of Mexico and including areas beyond 200 meters in depth under conditions consistent with my oceans policy statement of May, 1970.[39]

73.    Before the nation's precarious energy balance could stabilize, events abroad would exacerbate the crisis. The 1973 OPEC Oil Embargo "led to nationwide shortages of petroleum, a $60 billion drop in GNP, [and] more rapid

---

[38]    Dick Decl. Ex. 13 (Excerpts From Nixon Message, N.Y. Times, Apr. 19, 1973, https://www.nytimes.com/1973/04/19/archives/excerpts-from-nixon-message-developing-our-domestic-energy.html).

[39]    *Id.*

inflation," among other harms.[40]  The government called upon the oil and gas industry, including Defendants, to address this shortage.  *See infra* ¶ 120.  The nation's energy woes continued to mount in the mid-to-late 1970s, with a natural gas shortage caused by an abnormally cold winter in 1976–77, a national coal strike in 1978, and a substantial reduction in crude oil supplies following the Iranian Revolution of 1979.[41]  Yet the nation's dependency on imported oil continued to increase.  By 1977, the United States was importing up to 8.8 million barrels per day—fully half of the nation's total domestic oil consumption.[42]  The growing influence of OPEC, the quadrupling of oil prices during the energy crises of the 1970s, the staggering loss in GNP, and the now-infamous gas lines, price controls, and rationing that accompanied these energy crises spurred the U.S. government to take action over the ensuing decades to quickly and dramatically increase domestic oil production.

74.    In 1973, President Nixon established the goal of energy independence for the U.S. by 1980.  President Nixon dubbed this plan "Project Independence 1980" and, among other things, ordered the Secretary of the Interior "to increase the

---

[40] U.S. Dep't of Energy, National Energy Plan II, at 1 (1979), https://books.google.com/books?id=VR7PpPbRKFgC&printsec=frontcover#v=onepage&q&f=false.

[41] *Id.*

[42] *Id.* at tbl. IV-1.

acreage leased on the [OCS] to 10 million acres beginning in 1975, more than tripling what had originally been planned."[43]  President Nixon explained:

> Let me conclude by restating our overall objective.  It can be summed up in one word that best characterizes this Nation and its essential nature.    That word is "independence."    From its beginning 200 years ago, throughout its history, America has made great sacrifices of blood and also of treasure to achieve and maintain its independence.    In the last third of this century, our independence will depend on maintaining and achieving self-sufficiency in energy. . . .  What I have called Project Independence 1980 is a series of plans and goals set to [e]nsure that by the end of this decade, Americans will not have to rely on any source of energy beyond our own.[44]

75.    In 1978, Congress amended OCSLA to further encourage the leasing of the OCS to meet national energy and security needs created by the oil embargoes of the 1970s.  Congress's express purpose in amending the statute was to foster

---

[43]  Special Message to the Congress on the Energy Crisis, 1 Pub. Papers 17, 29 (Jan. 23,                                                          1974), https://quod.lib.umich.edu/p/ppotpus/4731948.1974.001/69?rgn=full+text;view =image;q1=to+increase+the+acreage.

[44]  Address to the Nation about National Energy Policy, 1 Pub. Papers 973, 976 (Nov.                                    25,                                    1973), https://quod.lib.umich.edu/p/ppotpus/4731942.1973.001/1030?rgn=full+text;vie w=image.  After the Arab Oil Embargo, there was immense public pressure for Washington to "do something"— to return prices to what they had been before the embargo and, at the same time, ensure adequate domestic supplies.  Dick Decl. Ex. 12, at 660 (Yergin, *The Prize*).  *See also* Meg Jacobs, *America's Never-Ending Oil Consumption*, Atlantic (May 15, 2016), https://www.theatlantic.com/politics/archive/2016/05/american-oil-consumption/482532/.

"expedited exploration and development of the OCS in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments."[45]    Congress expressly underscored the national public interest in "develop[ing] oil and natural gas resources in the [OCS] in a manner which is consistent with the need . . . to make such resources available to meet the Nation's energy needs as rapidly as possible." 43 U.S.C. § 1802(2).

76.    During the debate over the 1978 amendments, Senator Fritz Hollings proposed that the federal government create a national oil company to facilitate the development of oil and gas on the OCS:  "My bill authorizes and directs the Secretary of the Interior to initiate a major program of offshore oil exploration— including deep drilling—in frontier areas of the [OCS]. . . .  The Federal Government can conduct this program by using the same drilling and exploration firms that are usually hired by oil companies.  The taxpayers of the United States—rather than the oil companies—would be the clients for these drilling companies, and the

---

[45]  43 U.S.C. § 1802 (1) & (2);  *see California ex rel. Brown v. Watt*, 668 F.2d 1290, 1296 (D.C. Cir. 1981); *see also* S. Rep. No. 93-1140, at 4937 (1974) ("During the next decade, development of conventional oil and gas from the United States Outer Continental Shelf can be expected (a) to provide the largest single source of increased domestic energy, (b) to supply this energy at a lower average cost to the U.S. economy than any alternative and (c) to supply it with substantially less harm to the environment than almost any other source.").

information received would pass directly into the public domain."[46]  The proposal to create a government agency to develop the OCS was ultimately rejected—instead, the government decided to contract with private energy companies to perform these essential tasks on its behalf with expanded oversight and control by the government. Dick Decl. Ex. 14; Priest Decl. ¶¶ 55–56.

77.    This was not the only proposal at the time to create a national oil company.  *See* Priest Decl. ¶¶ 52–53; Cong. Rec. H4490 (daily ed. Feb. 26, 1975) (statement of Rep. McFall); Dick Decl. Ex. 14.  Another proposal "would have formally established a 'Federal Oil and Gas Corporation'" that would be "'owned by the federal government' and 'in case of any shortage of natural gas or oil and serious public hardship, could itself engage in production on Federal lands in sufficient quantities to mitigate such shortage and hardship.'"  Priest Decl. ¶ 53.  Yet another proposal, from Representatives Harris and McFall, "would provide for the establishment of a National Energy and Conservation Corporation—to be called Ampower—similar to the Tennessee Valley Authority."  121 Cong. Rec. H4490 (daily ed. Feb. 26, 1975).  Representative Harris explained:  "The creation of a quasi-public corporation such as Ampower can and should perform these functions on public lands" to "[e]nsure that the public's oil and gas is developed in the public

---

[46]  *See* Dick Decl. Ex. 15 (121 Cong. Rec. S903-11 (1975)).

interest." Dick Decl. Ex. 14, 9275–76.  These proposals were ultimately rejected in favor of an arrangement by which the government would contract with private companies, including Defendants—*acting as agents*—to achieve this federal objective with expanded federal supervision and control.  *See* Priest Decl. ¶ 55.

78.    It is significant that Congress considered creating a national oil corporation to develop the oil and gas resources on the OCS, as many other countries seeking to exploit their domestic petroleum resources have done.   Ultimately, Congress decided that the best and most efficient way to meet the enumerated national objectives was to contract with private energy companies, including many of the Defendants here, to produce oil and gas from these federal lands.  The result was a closely supervised leasing program directed by the Department of the Interior and providing the federal government with control over the production sufficient to protect the national interests.[47]  As the Supreme Court has explained, removal is appropriate where private companies have "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson*, 551 U.S. at 154.

79.    One of the Federal Energy Administration's first undertakings in 1974 was to propose significantly expanding the OCS leasing program, because "[r]ecent

---

[47]   *See* Dick Decl. Ex. 15 (Cong. Rec. S903-11 (Jan. 27, 1975)).

world events have spotlighted the growing dependence of the United States on imported crude oil and petroleum products" and "[i]nterruptions in oil imports impose severe costs on the United States due to the pervasive economic role of petroleum in almost every sector of the economy."[48]  This increased OCS leasing represented a crucial federal policy, because "the Outer Continental Shelf represents one of the most important potential sources of increased domestic energy production, [and so] the President has called for an accelerated leasing program as a mechanism to [e]nsure that the most favorable OCS exploration prospects become available for near-term development."  *Id.*

80.    Around this time, it was necessary to spur production of oil and gas on the OCS because alternatives were not feasible.  In the lead-up to the 1978 amendments, the Ad Hoc Select Committee on the OCS published a report stating that "alternative sources of energy will not be commercially practical for years to come," and thus, "a healthy economy remains dependent on supplies of oil and gas."[49]  The Committee concluded that "[d]evelopment of our OCS resources will afford us needed time—as much as a generation—within which to develop alternative sources of energy."[50]

---

[48]  Dick Decl. Ex. 10, at App'x 2 (H.R. Doc. No. 93-406 (1974)).

[49]  Dick Decl. Ex. 16, at 254 (H.R. Rep. No. 94-1084 (1976)).

[50]  Dick Decl. Ex. 17, at 1460 (H.R. Rep. No. 95-590 (1977)).

81.    The 1978 OCSLA amendments greatly increased the Secretary of the Interior's control over the OCS leasing program to align production with national goals.[51]  The amendments instructed the Secretary of the Interior to create an oil and gas leasing program on a five-year review cycle that provides as precisely as possible the size, timing, and location of leasing activities "which [the Secretary] determines will best meet national energy needs for the five-year period following its approval or reapproval."  43 U.S.C. § 1344(a)–(e).  Since 1977, several federal statutes have further expanded the OCS leasing program to promote the development of national energy supplies, including reductions in royalty payments to increase participation by Defendants to explore and develop deepwater resources.[52]

82.    In the 1990s, the Clinton Administration amended OCSLA to permit the Secretary of the Interior to grant certain royalty relief payments aimed at "reduc[ing] America's dependence on unreliable sources of imported oil by helping unlock an estimated 15 billion barrels of oil in the central and western Gulf of Mexico" for energy companies' exploration and production.  Press Secretary, White

---

[51]  *See* H.R. Rep. No. 95-590, at 53 (Aug. 29, 1977), reprinted in 1978 U.S.C.C.A.N. 1450 (recognizing that the amendments provided the federal government with the power and oversight capability to "expedite the systematic development of the OCS, while protecting our marine and coastal environment").

[52]  *See, e.g.*, Outer Continental Shelf Deep Water Royalty Relief Act, Pub. L. No. 104-58, 109 Stat. 557 (1995); Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005); Gulf of Mexico Energy Security Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922 (2006).

House Office of Communications, Statement on North Slope Oil Bill Signing, 1995 WL 699656, at *1 (Nov. 28, 1995).  And in the 2000s, the Bush Administration opened up approximately 8 million additional acres of OCS lands for leasing in the Gulf of Mexico, stating:  "By developing these domestic resources in a way that protects the environment, we will help address high energy prices, protect American jobs, and reduce our dependence on foreign oil."[53]

83.    As Professor Priest explains, these OCS leases are "*not merely commercial transactions* between the federal government and the oil companies. They reflect the creation of a valuable national security asset for the United States over time."  Priest Decl. ¶ 7(1) (emphasis added).  The development of the OCS was a "political and policy-driven project to incorporate the OCS into the nation's public lands and manage OCS resources in the long-term interest of U.S. energy security." *Id.*  The federal OCS program "procured the services of oil and gas firms to develop urgently needed energy resources on federal offshore lands that the federal government was unable to do on its own."  *Id.*  The federal government "had no prior experience or expertise," and "[t]herefore . . . had little choice but to enlist the service of the oil firms who did."  *Id.* ¶ 18.  But it was the federal government, not

---

[53] George W. Bush, *Statement By President George W. Bush Upon Signing [H.R. 6111],* White House Press Release, 2006 U.S.C.C.A.N. S73, S75 (2006).https://books.google.com/books?id=o2ei8yOphboC&printsec=frontcover#v=onepage&q&f=false.

the oil companies, that "dictated the terms, locations, methods and rates of hydrocarbon production on the OCS" in order to advance federal interests and accordingly, "[t]he policies and plans of the federal OCS program did not always align with those of the oil firms interested in drilling offshore." *Id.* ¶ 7(2). "Federal officials viewed these firms as agents of a larger, more long-range energy strategy to increase domestic oil and gas reserves." *Id.* The importance of the OCS to domestic energy security and economic prosperity has continued to the present, and across every administration. *See* Priest Decl. ¶ 79. For example, in 2010, President Obama announced "the expansion of offshore oil and gas exploration" because "our dependence on foreign oil threatens our economy." *Id.* ¶ 78.

84. The leases require Defendants to maximize the ultimate recovery of the hydrocarbons from the leased area; require that drilling take place in accordance with a government approved exploration plan ("EP"), development and production plan ("DPP") or development operations coordination document ("DOCD") [as well as] approval conditions; and specify that the federal government retains the right to oversee the lessee's rate of production from its leases.[54] BOEM maintains oversight over the lessees as they operate on federal land. Prior to exploration, development,

---

[54] *See generally* Dick Decl. Exs. 18–21; Adam Vann, Congressional Research Service, RL33404, Offshore Oil and Gas Development: Legal Framework (2018), https://fas.org/sgp/crs/misc/RL33404.pdf (describing the multistep process for approval of development plans and BOEM oversight procedures).

or production, lessees must prepare and comply with detailed plans that are subject to comment and amendment by BOEM, state reviewers, or other agencies.[55]  Indeed, for decades, Defendants' OCSLA leases have instructed that "[t]he Lessee *shall comply* with all applicable regulations, orders, written instructions and the terms and conditions set forth in this lease" and that "[a]fter due notice in writing, the Lessee *shall conduct* such OCS mining activities at such rates as the Lessor may require in order that the Leased Area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles."[56]

85.    Under these requirements, OCS lessees are subject to exacting oversight by BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE") over each stage in developing the leasehold property.[57]  At all stages—from exploration, to preparation for developing and producing oil and gas reserves that have been discovered, to actual drilling and production—OCS lessees must submit exhaustive operational plans demonstrating how they will comply with the complex and detailed technical requirements imposed by these agencies.  The relevant agency must then find, complete, and approve these plans before any such work can begin.  BSEE then carefully monitors compliance with the approved plan

---

[55]  *See* Offshore Oil and Gas Development: Legal Framework at 11–13.

[56]  Dick Decl. Ex. 18 § 10 (emphases added).

[57]  *See, e.g.*, 30 C.F.R. §§ 250.101–115, 250.130–146, 250.168–295, 250.400–463 (BSEE) & 550.101–147 (BOEM).

and must approve any significant modification thereof.

86.     The federal government retains the right to control a lessee's rate of production on the OCS from its lease.[58]  In particular, BSEE, within the Interior Department, may set the Maximum Efficient Rate ("MER") for production from a reservoir—that is, a cap on the production rate from all of the wells producing from a reservoir.[59]  This requirement has existed since 1974,[60] and the government adopted this "significant burden" to control production from its leases for the purpose of responding to "a period of oil shortages and energy crises."[61]

87.     Through federal leases, the government retains supervision and control over the use of federal property.  The mineral leasing laws, including OCSLA and the Mineral Leasing Act of 1920, 30 U.S.C. §181 *et seq.* ("MLA"), discussed below, are an exercise of Congress's power under the Property Clause of the Constitution. U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.").  The government issues onshore and offshore

---

[58]  *See* Dick Decl. Ex. 18 § 10; 43 U.S.C. § 1334(g) (The lessee "shall produce any oil or gas, or both, . . . at rates consistent with any rule or order issued by the President in accordance with any provision of law.").

[59]  30 C.F.R. § 250.1159.

[60]  *See* 39 Fed. Reg. 15885 (May 6, 1974) (approving OCS Order No. 11).

[61]  75 Fed. Reg. 20271, 20272 (Apr. 19, 2010).

leases for a primary term of five to ten years, with a habendum clause under which the lessee retains the lease for so long after the primary term as the lease produces oil and gas in paying quantities. 30 U.S.C. § 226(e) (onshore); 43 U.S.C. § 1337(b)(2) (OCS); Dick Decl. Ex. 19 § 3. But when the lease terminates, the property interest reverts to the United States; the lessee cannot acquire fee title interest. Nor may a federal lessee assign its lease to another person without express government approval. 30 U.S.C. § 187; 43 C.F.R. § 3106 (onshore leases); 30 C.F.R. §§ 556.701(a), 556.800 (OCS leases).

88. The United States controls federal mineral lessees like Defendants in other ways. An OCS lessee does not have an absolute right to develop and produce; rather, it has only an exclusive right to seek approval from the United States to develop and produce under the lease. *See Sec'y of the Interior v. California*, 464 U.S. 312, 337–39 (1984); *Vill. of False Pass v. Clark*, 733 F.2d 605, 614–16 (9th Cir. 1984). The government conditions OCS leases with a right of first refusal to purchase all minerals "[i]n time of war or when the President of the United States shall so prescribe."[62] The federal government also maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property. The government reserves the right to purchase up to 16⅔% of lease

---

[62] Dick Decl. Ex. 18 § 14; Dick Decl. Ex. 19 § 15(d); *see* 43 U.S.C. § 1341(b).

production, less any royalty share taken in-kind.[63]  The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration (government civilian operations), the Department of Defense (military operations), or the Department of Energy (*e.g.*, Strategic Petroleum Reserve).[64]

89.    Through federal leases, the government balances economic development with environmental considerations.  The Secretary may reduce or eliminate the United States' royalty share, and thus provide the lessee an additional economic incentive to produce oil and gas.[65]  The Secretary may suspend production from an OCS lease "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human

---

[63]  43 U.S.C. § 1353(a)(2).  The United States also reserves the right to all helium produced from federal leases, which the lessee produces solely for the government's benefit.  *See* 43 U.S.C. § 1341(f).

[64]  *Id.*  In addition, the Secretary may compel a lessee to offer a percentage of lease production "to small or independent refiners" (*e.g.*, in shortage situations where independent refiners may not have access to production to the same extent as integrated producers/refiners).   Dick Decl. Ex. 19 § 15(c); *see* 43 U.S.C. § 1337(b)(7).

[65]  43 U.S.C. § 1337(a)(3) ("The Secretary may, in order to promote increased production on the lease area, through direct, secondary, or tertiary recovery means, reduce or eliminate any royalty or net profit share set forth in the lease for such area.").

environment."[66]

90.    As these statutory and lease provisions demonstrate, a federal oil and gas lease is the means by which the federal government directs a lessee to develop federal minerals on the government's behalf, and the government retains extensive supervision and control over the lessees for many purposes, including in some cases solely to further public policy or achieve purely governmental objectives.  These are activities that the federal government would itself have to undertake unless the Defendants did it for the government through the obligations of federal leases on federal lands.  Under *Watson*, this is not run-of-the-mill regulation.  On the contrary, it is the kind of "special relationship" that supports federal officer removal.  *Watson*, 551 U.S. at 157.

91.    Authorization of each five-year OCS leasing program is subject to environmental review under the National Environmental Policy Act, requiring the preparation of an Environmental Impact Statement ("EIS") to support the Record of Decision approving the scope of the program.  The EIS approving each five-year leasing program is massive and includes details regarding the national need for oil and gas and how the leasing program meets those needs.[67]

---

[66]  43 U.S.C. § 1334(a)(1); *see* 43 U.S.C. § 1334(a)(2) (authority to cancel any lease for similar reasons).

[67]  *See, e.g.*, 2012–2017 EIS.

92.    These environmental analyses confirm that the OCS leasing program exists to fulfill Congress's mandate to manage and encourage production of oil and natural gas from the OCS in order to further the national interest, not merely the commercial interests of the lessees.  In 2009, for example, oil produced from the OCS accounted for 30% of all domestic production.  The U.S. Treasury averages more than $10 billion per year from OCS bonuses, rental payments, and royalties. In evaluating alternatives that could replace OCS leases or the required "no action" alternative (*i.e.*, no OCS leases), the 2012-2017 EIS concluded that such alternatives would not meet the federal government's purpose and need because any reduction in production would be replaced mostly by foreign imports of oil and gas, frustrating congressional intent.[68]

93.    The Record of Decision approving the 2017–2022 OCS Leasing Programs recognizes that the Secretary of the Interior must develop schedules of OCS oil and gas leasing that "best meet national energy needs for the 5-year period following its approval or re-approval."[69]  Although the federal government identified the no-lease alternative as the most environmentally preferred alternative, the government rejected it because it did "not meet the purpose and need for the action

---

[68]  *See id.* at 1–4, 4-606, 4-643 (projecting changes in oil markets if OCS production was halted).

[69]  43 U.S.C. § 1344(a)–(e).

. . . as it leaves a void in planning for national energy needs."[70]

94.    In 2019, oil production by private companies, including some Defendants, from federal offshore and onshore leases managed by the Interior Department was nearly one billion barrels.  Historically, annual oil and gas production from federal leases has accounted for as much as 36% of domestic oil production and 25% of domestic natural gas production.[71]  The federal government has reaped enormous financial benefits from the ongoing policy decision to contract for the production of oil and gas from federal lands in the form of royalty regimes that have resulted in billions of dollars of revenue to the federal government. Moreover, the activities of lessees (including Defendants) pursuant to these leases further Congress's directives to the Executive Branch to facilitate and manage the production of oil and natural gas from the OCS in order to achieve the federal government's policy objectives.  If not for these activities of lessees under the direction and control of federal resource-management agencies, the federal government would have needed to perform those activities itself in order to

---

[70] U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., Record of Decision and Approval of the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program (Jan. 17, 2017), https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2017-2022/2017-2022-Record-of-Decision.pdf.

[71] See Cong. Rsch. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 3, 5 (updated Oct. 23, 2018), https://crsreports.congress.gov/product/pdf/R/R42432.

implement Congress's directives regarding production of oil and gas from the OCS.

95.    The federal government's control over oil and gas production is thus fundamentally different from the government's regulation of tobacco products, which the Supreme Court addressed in *Watson*.  There, the Court recognized that a private party does not come within the scope of the federal officer removal statute "simply [by] *complying* with the law."  *Watson*, 551 U.S. at 152.  Accordingly, "a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone," even "if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored."  *Id.* at 153.  This is because mere regulation does not indicate that the federal government would undertake the regulated activity if private actors did not—the government regulates tobacco products because of their health risks, not because tobacco production is a federal imperative.  Plaintiffs' claims, by contrast, seek to punish Defendants for activities conducted under the close supervision of the federal government that effectuate national energy policy and support the national defense.  Plaintiffs' claims thus implicate precisely the type of "special relationship" that supports federal officer removal.  *Id.* at 157.

### c.    Defendants Acted Under Federal Officers By Developing Mineral Resources On Federal Lands

96.    Defendants also acted under the direction, supervision and control of the federal government in developing mineral resources on federal lands onshore.

The Interior Department's Bureau of Land Management ("BLM") leases, similar to OCS leases, provide that the United States "reserves the right to specify rates of development and production in the *public interest*."[72]

97.    The federal government also maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property. The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration (government civilian operations), the Department of Defense (military operations), or the Department of Energy (*e.g.*, Strategic Petroleum Reserve).[73] "Oil and gas produced from the Federal and Tribal mineral estate are significant parts of the nation's energy mix. For fiscal year (FY) 2018, sales of oil, gas, and natural gas liquids produced from the Federal and Tribal mineral estate accounted for approximately 8 percent of all oil, 9 percent of all natural gas, and 6 percent of all natural gas liquids produced in the United States." Dick Decl. Ex. 30.

98.    For onshore leases, the Secretary may take any royalty owed on oil and gas production in-kind and "retain the same for the use of the United States."[74] BLM leases also provide that "Lessor reserves the right to ensure that production is sold

---

[72]  Dick Decl. Ex. 21 § 4 (emphasis added).

[73]  *Id.*

[74]  30 U.S.C. § 192.

at reasonable prices and to prevent monopoly."[75]  In addition, the Secretary may

compel a lessee to offer a percentage of lease production to "small refiners" (*e.g.*, in

shortage situations where independent refiners may not have access to production to

the same extent as integrated producers/refiners).[76]

99.    The federal government also uniquely reserves the authority to

determine the value of production for purposes of determining how much royalty a

lessee owes, which is a provision included in BLM leases.[77]  A typical commercial

private lease would never reserve similar unilateral authority to one contracting party

to control a material economic term of the lease contract.  *See* Dick Decl. Ex. 22

(Commercial Lease – Texas Association of Realtors, Form TAR-2101).  This would

be akin to a commercial lease providing that the landlord has sole discretion to

specify the rent owed.

100.   Through federal leases, the government balances economic

development with environmental considerations.  The Secretary may reduce or

eliminate the United States' royalty share, and thus provide the lessee an additional

economic incentive to produce oil and gas.[78]  The Secretary may also direct or grant

---

[75]  Dick Decl. Ex. 21 § 10.

[76]  43 USC § 1353(b).

[77]  *See* Dick Decl. Ex. 21 § 2 ("Lessor reserves the right . . . to establish reasonable minimum values on products . . . .").

[78]  43 C.F.R. § 3103.4-1(a) ("[T]he Secretary . . . may waive, suspend or reduce . . .

suspensions of operations.[79]  BLM onshore leases also require the lessee to cease any operations that would result in the destruction of threatened or endangered species or objects of historic or scientific interest.[80]

101.   The MLA limits the onshore federal oil and gas lease acreage that may be held by any one person, enforceable by an action in federal court.  30 U.S.C. § 184(d), (h).  The government has the right to obtain "prompt access" to facilities and records.  *See* 30 U.S.C. § 1713.  And the United States also reserves the right to all helium produced from federal leases, which the lessee produces solely for the government's benefit.  *See* 30 U.S.C. § 181.

102.   As discussed with respect to OCS leases, *supra* Section VI.B.1.b., a federal oil and gas lease is a contract to develop federal minerals on the government's behalf, and the government retains extensive supervision and control over the lessees.  These are activities that the federal government would itself have to undertake without Defendants and thus removal is proper.  *Watson*, 551 U.S. at 157.

### d.    Defendants Acted Under Federal Officers By Operating The Elk Hills Reserve "In the Employ" Of The U.S. Navy

103.   Defendants have played an essential role in assisting the federal

---

the royalty on an entire leasehold, or any portion thereof.") (MLA leases).

[79]  *See* 30 U.S.C. § 226(i); 43 C.F.R. § 3103.4-4.

[80]  Dick Decl. Ex. 21 § 6.

government with meeting its petroleum needs to power the nation's economy and the U.S. military to ensure national security. The connection between oil and national security began in the early 1900s, when the world's leading navies switched from coal to oil as the preferred energy source for ships. President Taft recognized the national interest in developing domestic oil sources in his address to Congress on December 6, 1910: "As not only the largest owner of oil lands, but as a propsective [sic] large consumer of oil by reason of the increasing use of fuel oil by the Navy, the Federal Government is directly concerned both in encouraging rational development and at the same time insuring the longest possible life to the oil supply."[81] This national security concern led to the September 2, 1912 executive order creating the Naval Petroleum Reserve at Elk Hills, California, which was intended to preserve oil in the ground for national emergencies. Dick Decl. Ex. 24.

104.    At the turn of the twentieth century, government lands in the West were being rapidly turned over to private owners. At the same time, there was a growing realization of the importance of oil for the Navy, which was then changing its ships from coal- to oil-burning. In response to arguments that the government should preserve oil for naval purposes, President Taft withdrew large portions of land in

---

[81]    Dick Decl. Ex. 23 (Hearings Before Committee on Naval Affairs of the House of Representatives on Estimates Submitted by the Secretary of the Navy, 64th Cong. 761 (1915)).

California and Wyoming from eligibility for private ownership, and in 1912 set aside Naval Petroleum Reserve No. 1 at Elk Hills by an Executive Order. The establishment of the Reserve, however, was expressly made subject to preexisting private ownership. There are approximately 46,000 acres within the Reserve, and Standard Oil of California ("Standard Oil") (Chevron's predecessor) owned approximately one-fifth and the Navy owned the remainder. The Standard Oil lands were not in one block, but were checker-boarded throughout the Reserve.[82]

105. "The Elk Hills Naval Petroleum Reserve (NPR-1) . . . was originally established in 1912 to provide a source of liquid fuels for the armed forces during national emergencies."[83] "Congressional intent was to retain the oil [at the Reserve] in the ground except when it was needed for national defense or to avoid damage to the field and the irretrievable loss of oil."[84] In other words, Congress's policy objective was to take those steps necessary to maintain and preserve the fields exclusively for federal defense purposes. Standard Oil and the Navy eventually developed an understanding that neither would drill additional wells or produce oil

---

[82] The history of Elk Hills is recounted in *Standard Oil*, 545 F.2d at 624.

[83] Dick Decl. Ex. 25 U.S. Gov't Accountability Off., GAO/RCED-87-75FS, Naval Petroleum Reserves: Oil Sales Procedures and Prices at Elk Hills, April Through December 1986, at 3 (1987) ("GAO Fact Sheet"), http://www.gao.gov/assets/90/87497.pdf.

[84] Dick Decl. Ex. 26 (U.S. Gov't Accountability Off., *Naval Petroleum Reserve No. 1: Efforts to Sell the Reserve*, GAO/RCED-88-198 at 15 (July 1988) ("GAO Report"), https://www.gao.gov/assets/220/210337.pdf).

inside the Reserve without providing six months' notice to the other.[85]  In doing so, Standard Oil agreed to maintain the Reserve for national security purposes.  The maintenance of the Reserve itself under the direction of the federal government in furtherance of federal policy gives rise to federal officer removal.[86]  Standard Oil's efforts ensured that the Reserve was ready to produce oil for the U.S. war efforts in World War II.

106.    World War II marked a new phase.  "Shortly after the entrance of the United States into the war, it became apparent that additional crude oil production would be required on the West Coast."[87]    Standard Oil and the Navy began negotiations for production on the Reserve.  On March 1, 1942, President Roosevelt "stated that if satisfactory arrangements could not be promptly concluded with [Standard Oil], the Secretary of the Navy was authorized to start condemnation proceedings through the Department of Justice to acquire the property" for the federal government.[88]

107.    The Navy and Standard Oil entered into a Unit Plan Contract ("UPC") that President Roosevelt approved on June 28, 1944.  The UPC "governed the joint

---

[85]    *See Standard Oil*, 545 F.2d at 627.

[86]    *See generally* GAO Report.

[87]    *Id.* at 14.

[88]    *Id.*

operation and production of the oil and gas deposits . . . of the Elk Hills Reserve."

*Chevron U.S.A., Inc. v. United States*, 116 Fed. Cl. 202, 205 (Fed. Cl. 2014). It

provided that the Elk Hills Reserve "was to be operated as a single property (a unit)

and granted the Navy, subject to the provisions of the contract, *absolute control* over

(1) the time and rate of exploration and development and (2) the quantity and rate of

production."[89] The UPC shows the federal government's "full and absolute" power

and "complete control" over fossil fuel exploration, production, and sales at the

reserve. *See* Dick Decl. Ex. 27 (Statement of Gerald D. Morgan, Special Counsel to

the Committee on Naval Affairs, Hearing on Amendment Proposed to Unit Plan

Contract Governing Development and Operation of Naval Reserve Petroleum No. 1

(Elk Hills), U.S. House of Representatives, Committee on Naval Affairs, at 3737–

38 (Sept. 9, 1946)) ("It must be recognized that although Navy and Standard entered

into a unit-plan contract . . . the interests of each are conflicting. It is to Navy's

interest to conserve as much oil as possible in the ground . . . [and] it is to Standard's

interests to produce its oil as rapidly as is consistent with maintaining a balance

between economical production and greatest ultimate recovery. The conflict of

interest between Navy and Standard Oil was decided in Navy's favor upon the

execution of the unit-plan contract, for absolute control over the time, manner, and

---

[89] *Id.* at 15 (emphasis added).

rate of production is vested in the Secretary of the Navy subject to the control of Congress.").

108.   The plan was designed to "[a]fford [the] Navy a means of acquiring *complete control over* the development of the entire Reserve *and the production of oil therefrom*."[90]   *See* Dick Decl. Ex. 27 (Statements of Commodore W.G. Greenman, U.S. Navy, Director, Naval Petroleum Reserves, Hearing Records at 3693–94) ("[The] agreement between Navy and Standard . . . placed the control of production from both Standard and Navy lands under the absolute control of the Secretary of the Navy.").

109.   "[The] Navy shall, subject to the provisions hereof, have the *exclusive control* over the exploration, prospecting development and operation of the Reserve."[91]

110.   "[The] Navy shall have *full and absolute power* to determine from time to time the rate of prospecting and development on, and the quantity and rate of production from, the Reserve, and may from time to time shut in wells on the Reserve if it so desires."[92]

111.   "[A]ll   exploration,   prospecting,   development,   and   producing

---

[90]   Dick Decl. Ex. 20, Recitals § 6(d)(i) (emphases added).

[91]   *Id.* § 3(a) (emphasis added).

[92]   *Id.* § 4(a) (emphasis added).

operations on the Reserve" occurred "under the supervision and direction of an Operating Committee" tasked with "supervis[ing]" operations and "requir[ing] the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the reserve."[93]  In the event of disagreement, "such matter shall be referred to the Secretary of the Navy for determination; and his decision in each such instance shall be final and binding upon Navy and Standard."[94]

112.   The Navy retained ultimate and even "absolute" discretion to suspend production, decrease the minimum amount of production per day that Standard Oil was entitled to receive, or increase the rate of production.[95]

113.   Standard Oil (and later Chevron) could participate in an Operating Committee, which was responsible for production decisions such as the number, design, and location of wells and facilities.  Both the Navy and Standard Oil had an equal vote on the Committee, but in the event of a tie the Secretary of Navy held the tiebreaker.[96]

114.   Critically, the federal government had to decide who would operate its portion of the Reserve—the Navy, a private contractor, or someone else.  The "*Navy*

---

[93]  *Id.* § 3(b).

[94]  *Id.* § 9(a).

[95]  *Id.* §§ 4(b), 5(d)(1).

[96]  *See id*.

*chose to operate the reserve through a contractor rather than with its own personnel*" and opened the contract to competitive bidding.[97]  Standard Oil "bid for the operator's contract in 1944, was awarded the contract, and continued to operate NPR-1 [for the Navy] for the next 31 years."[98]  Although the Navy could have developed the resources on the Reserve itself, it decided to use a third-party contractor to maximize production as quickly as possible.  This is reflected in government documents explaining the decision to hire Standard Oil to operate the Reserve, which also noted that Standard Oil offered to perform the work without making a profit:

> A substantial increase in production at the earliest possible date was urgently requested by the Joint Chiefs of Staff to meet the critical need for petroleum on the West Coast to supply the armed forces in the Pacific theatre. . . .  The Standard Oil Company of California was chosen as operator because it was the only large company capable of furnishing the facilities for such a development program and partially because it was the largest private owner of lands in the Reserve.  The Navy has expressed its appreciation of the patriotism of the Standard Oil Company in undertaking such a project at cost with no profit to be received by the Company.[99]

115.    The Operating Agreement provided that "OPERATOR *[Standard Oil] is in the employ of the Navy Department* and is responsible to the Secretary thereof."

---

[97]    *Id.*

[98]    *Id.*

[99]    *See* Dick Decl. Ex. 28, at 1 (Elk Hills Historical Documents).

*See* Dick Decl. Ex. 29, at 3.  Standard's Oil's operation and production at Elk Hills for the Navy were subject to substantial supervision by Navy officers; and naval officers directed Standard Oil to conduct operations to further national policy.  For example, "[s]hortly after the unit plan contract was signed, the Congress, according to DOE, authorized the production at [the Elk Hills Reserve] at a level of 65,000 B/D [barrels per day] to address fuel shortages and World War II military needs."[100] Production reached this "peak of 65,000 barrels per day in 1945."[101]  As another example, in November 1974, the Navy directed Standard Oil to increase production to 400,000 barrels per day to meet the unfolding energy crisis, advising Standard Oil that "you are in the employ of the Navy and have been tasked with performing a function which is within the exclusive control of the Secretary [of] the Navy."  *See* Dick Decl. Ex. 20, at 3.

116.   Standard Oil's operation and production at Elk Hills for the Navy were subject to substantial and continued oversight and inspections by Navy officers.  The Operating Agreement between the U.S. Navy and Standard Oil directs that "OPERATOR *[Standard Oil] is in the employ of the Navy Department* and is responsible to the Secretary thereof through the Officer in Charge and the Director,

---

[100]    GAO Report at 15.

[101]    GAO Fact Sheet at 3.

Naval Petroleum and Oil Shale Reserves."[102]  In November 1974, for example, when a dispute arose concerning whether it was possible to produce 400,000 barrels per day to meet the unfolding energy crisis, the Navy directed the Unit Operator (Standard Oil) to prepare a plan, rejecting objections and advising Standard Oil that "since you are in the employ of the Navy and have been tasked with performing a function which is within the exclusive control of the Secretary of Navy to order accomplished, the approval of the Operating Committee is not to be considered a prerequisite to the initiation of the above action on your part."[103]

117.    Accordingly, for at least 31 years, Standard Oil operated Elk Hills under the "subjection, guidance or control" of federal Navy officers.  *Watson*, 551 U.S. at 151; *see id.* at 153–54 (noting that removal was proper where company "fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war").  At a minimum, Defendants' theory, which must be credited for purposes of removal, *see Def. Ass'n of Philadelphia*, 790 F.3d at 474, is that Standard Oil's relationship with the federal government was "an unusually close one involving detailed regulation, monitoring, or supervision," *id.* at 468.

118.   After the OPEC oil embargo in 1973–74, Congress authorized preliminary activity to develop Elk Hills and other National Reserves to their full

---

[102]    *See* Dick Decl. Ex. 29 (Contract No. Nod-9930).

[103]    *See* Dick Decl. Ex. 20.

economic potential.  *See* Supplemental Appropriation Act of 1974, Pub. L. No. 93-245 (1974).  In 1975, Standard Oil chose to withdraw from operating Elk Hills to concentrate on other federal objectives:

> [T]he current domestic energy situation is so serious that all oil companies are devoting their available resources to the discovery and production of new oil reserves.  The President has requested that every effort be made to increase domestic production of petroleum, and Standard is focusing its attention on this objective.[104]

119.  A year later, Congress enacted the Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258 (1976), which reopened the Elk Hills Reserve and "authorized and directed that [the Reserve] be produced at the *maximum efficient rate for 6 years*."[105]  Congress directed production at Elk Hills to be significant.  Indeed, Commander Roger Martin, the naval officer in charge of the facility, explained:  "We expect to reach a level of about 100,000 barrels daily in a few months, and 300,000 by the end of the [1970s]."[106]  Production of 100,000 barrels would amount to about 5% of then-current imports and result in a cost saving to the federal government of approximately $1 billion annually.

---

[104] *See* Dick Decl. Ex. 32 (letter from J.R. Grey, Standard, to Jack L. Bowers, Acting Secretary of the Navy, requesting to terminate its position as Operator of the Elk Hills Reserve).

[105] Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258 (1976); *see also* Dick Decl. Ex. 34.

[106] Dick Decl. Ex. 34.

120.   In 1977, Congress transferred the Navy's interests and management obligations to the Department of Energy ("DOE"), and Chevron continued its interest in the joint operation until 1997, when the Reserve was sold.  From 1976 to 1998, Elk Hills generated over $17 billion for the United States Treasury.[107]

121.   Although other prime contractors operated Elk Hills for the Navy following 1975, Standard Oil and later Chevron were still actively involved in the operations, both through their role on the Operating Committee *and* as subcontractors.[108]   Under the Navy's direction and control, Chevron conducted exploration and production on the Reserve to fulfill the government's demand for significant production from the Reserve.  Accordingly, Chevron's activities under federal officers went far beyond its role as co-owner under the auspices of the UPC or simple compliance with the law as a participant in a regulated industry.

### e.    Defendants Acted Under Federal Officers By Supplying And Managing The Strategic Petroleum Reserve

122.   In response to the Oil Embargoes of the 1970s, Congress created the

---

[107] *See* U.S. Dep't of Energy, *Naval Petroleum Reserves*, https://www.energy.gov/fe/services/petroleum-reserves/naval-petroleum-reserves (last visited Oct. 7, 2020).

[108] *See* Dick Decl. Ex. 35, at 192–93 (History of Naval Petroleum Reserve No. 1) (describing the June 13, 1978 contract between Chevron and Williams Brothers for 60 million cubic feet of gas to be processed by Chevron's 17Z McKittrick plant, and an agreement with Chevron and Atlantic Richfield to acquire pipeline capacity of 220,000 barrels per day).

Strategic Petroleum Reserve ("SPR") in the Energy Policy Conservation Act of 1975, Pub. L. No. 94-163, 89 Stat. 871, to protect the country's energy security. The SPR was a "stockpile of government-owned petroleum managed by the DOE [created] as a response to gasoline supply shortages and price spikes . . . to reduce the impact of disruptions in supplies of petroleum products and to carry out U.S. obligations under the 1974 Agreement on an International Energy Program."[109] Several Defendants "acted under" federal officers in producing oil for the SPR and managing it for the federal government.

123. The Act "declar[ed] it to be U.S. policy to store up to 1 billion barrels of petroleum products, provid[ed] for an early reserve, to contain at least 150 million barrels by December 1[9]78, and for an eventual storage system of at least 500 million barrels by December 1982. It [was] estimated that a 500 million barrel reserve, combined with conservation measures, [could] essentially replace lost imports, for a period of 6 months for the most likely interruptions." Dick Decl. Ex. 36 (Statement of Hon. John F. O'Leary, Administrator, Federal Energy Administration, Hearing before the Committee on Interior and Insular Affairs, U.S. Senate, on FEA's Strategic Petroleum Reserve Plan, at 30 (Feb. 4, 1977)).

124. Under 43 U.S.C. § 1353(a)(1), "all royalties . . . accruing to the United

---

[109] *See* H.R. Rep. No. 115-965, at 3 (2018), https://www.congress.gov/115/crpt/hrpt965/CRPT-115hrpt965.pdf.

States under any oil and gas lease [under OCSLA] . . . shall, on demand of the Secretary [of the Interior], be paid in oil and gas." For example, after the September 11, 2001 attacks, President George W. Bush ordered that the SPR, "an important element of our Nation's energy security," "will be filled . . . principally through royalty-in-kind transfers to be implemented by the DOE and the Department of the Interior."[110] From 1999 through December 2009, the U.S. government's "primary means of acquiring oil for the [SPR]" was by taking its royalties from oil produced from federal offshore leases as royalties "in kind" as part of the so-called Royalty In Kind ("RIK") program.[111] During that time, "the Strategic Petroleum Reserve received 162 million barrels of crude oil through the RIK program" valued at over $6 billion.[112]

125. The federal government required certain Defendants (and/or their predecessors, subsidiaries, or affiliates), as lessees of federal offshore leases on the OCS, to pay royalties "in kind," which the government used for its strategic

---

[110] Statement on the Strategic Petroleum Reserve, 2 Pub. Papers 1406 (Nov. 13, 2001), https://www.govinfo.gov/content/pkg/PPP-2001-book2/pdf/PPP-2001-book2.pdf.

[111] U.S. Dep't of Energy, *Filling the Strategic Petroleum Reserve*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/filling-strategic-petroleum-reserve (last visited May 25, 2021).

[112] Dick Decl. Ex. 37 (U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report for Calendar Year 2010, at 18, 37 (2011) ("SPR 2010 Report")); *see id.* at 39 (Table 13).

stockpile, a crucial element of U.S. energy security and treaty obligations.[113]  The

federal government also contracted with some of the Defendants (including their

predecessors, subsidiaries, or affiliates) to deliver to the SPR millions of barrels of

oil under the RIK program.[114]  The government also contracted with those

Defendants to assist in the physical delivery of these RIK payments to the Strategic

Petroleum Reserve.  *See, e.g.*, Dick Decl. Ex. 40, at 19.

126.  Finally, some of the Defendants acted under federal officers by

operating the SPR infrastructure for the government.  For example, from 1997 to

2019, DOE leased to Defendant Shell Oil Company affiliates the Sugarland/St.

James Terminal and Redstick/Bayou Choctaw Pipeline in St. James, Louisiana.

"Under the lease agreement, Shell provide[d] for all normal operations and

---

[113] *See, e.g.*, Dick Decl. Ex. 38 (Dear Operator Letter) (invoking OCSLA and royalty provisions in federal leases operated by certain Defendants, and/or their predecessors, subsidiaries, or affiliates, "to use royalties in kind (RIK) to replenish the Strategic Petroleum Reserve (SPR)").

[114] *See, e.g.*, Dick Decl. Ex. 39 (U.S. Dep't of Interior, Minerals Management Service, *MMS RIK Program to Help Fill Strategic Petroleum Reserve* (May 31, 2007)) (describing such contracts "to transport Royalty in Kind (RIK) crude oil that will be used to resume filling the nation's Strategic Petroleum Reserve (SPR)"); Minority Staff of the Permanent Subcomm. on Investigations of the Comm. on Governmental Affairs, S. Prt. 108-18, U.S. Strategic Petroleum Reserve: Recent Policy Has Increased Cost to Consumers But Not Overall U.S. Energy Security (1st Sess. 2003) (describing government contract with a predecessor affiliate of Defendant Shell Oil Company to deliver nearly 19 million barrels of oil to the Strategic Petroleum Reserve as part of the RIK program), https://www.govinfo.gov/content/pkg/CPRT-108SPRT85551/html/CPRT-108SPRT85551.htm.

maintenance of the terminal and [wa]s required to support the Strategic Petroleum Reserve as a sales and distribution point in the event of a drawdown."[115]  Starting January 2020, the DOE leased the St. James facilities to an affiliate of Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation (ExxonMobil Pipeline Company).[116]  Similarly, "[u]nder the lease agreement, Exxon Mobil [Pipeline Company] . . . *must support the SPR as a sales and distribution point in the event of an SPR drawdown*."[117]  And the DOE has leased to the same ExxonMobil affiliate two government-owned pipelines that are part of the SPR near Freeport, Texas.[118]

127.   The SPR subjects Defendants to the federal government's supervision and control in the event of the President's call for an emergency drawdown.[119]  The

---

[115] *See* SPR 2010 Report at 16.

[116] *See* U.S. Dep't of Energy, *Department of Energy Awards Strategic Petroleum Reserve Lease to ExxonMobil* (Oct. 28, 2019), https://www.energy.gov/articles/department-energy-awards-strategic-petroleum-reserve-lease-exxonmobil.

[117] U.S. Dep't of Energy, *Strategic Petroleum Reserve Annual Report for Calendar Year 2018*, at 15 (Jan. 2020) (emphasis added) https://www.energy.gov/sites/prod/files/2020/01/f70/2018%20SPR%20Report%20to%20Congress.pdf.

[118] *See* Dick Decl. Ex. 37 (SPR 2010 Report) at 25, 49; U.S. Dep't of Energy, *DOE Signs Major Agreement with Exxon Pipeline to Lease Idle Pipelines at Strategic Reserve* (Jan. 14, 1999), https://fossil.energy.gov/techline/techlines/1999/tl_bmlse.html.

[119] *See* 42 U.S.C. § 6241(d)(1) ("Drawdown and sale of petroleum products from the Strategic Petroleum Reserve may not be made unless the President has found drawdown and sale are required by a severe energy supply interruption or by obligations of the United States under the international energy program.").

United States has exercised this control, including as a result of President Bush's Executive Order to draw down the reserve in response to Hurricane Katrina in 2005 and President Obama's Executive Order to draw down the reserve in response to disruptions to oil supply in Libya in 2011.[120]   Thus, the hundreds of millions of barrels of oil flowing through these facilities—the sale and combustion of which are part of the causal chain leading to Plaintiffs' alleged injuries—were subject to federal government direction, control, and supervision.[121]

### f.  Defendants Acted Under Federal Officers Pursuant To The Emergency Petroleum Allocation Act

128.  Also in response to the oil embargoes of the 1970s, Congress passed the Emergency Petroleum Allocation Act of 1973, Pub. L. No. 93-159, 87 Stat. 637 (1973), in order to manage resulting shortages and "distribute [petroleum products] fairly across the total spectrum of petroleum use in this country." *Oversight— Mandatory Petroleum Allocation Programs: Hearings Before the S. Comm. on Interior and Insular Affs.*, 93rd Cong., 25 (1974) (Statement of John C. Sawhill, Deputy Administrator, Federal Energy Office) ("Mandatory Allocation

---

[120] *See* Dick Decl. Ex. 41 U.S. Dep't of Energy, *History of SPR Releases*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/releasing-oil-spr (last visited May 25, 2021); Dick Decl. Ex. 33, at 17, 18, 21.

[121] *See generally* U.S. Dep't of Energy, *2018-2022 Strategic Vision*, https://www.energy.gov/sites/prod/files/2019/12/f69/FE%20Strategic%20Vision.pdf (last visited Oct. 23, 2020).

Hearings"). Pursuant to the Act, from 1974 to 1981, the federal government implemented an "omnibus mandatory allocation program covering every facet of the petroleum industry and affecting, if not dictating, virtually every domestic transaction involving crude oil and covered petroleum products." *Emergency Petroleum Allocation Act Extension: Hearing on H.R. 15905, H.R. 151000, H.R. 15491, H.R. 16116, H.R. 16303, H.R. 16757, and S. 3717 (and all identical bills) Before the Subcomm. on Communications and Power of the H. Comm. on Interstate and Foreign Commerce*, 93d Cong. 8 (1974) (Statement of Hon. John C. Sawhill, Deputy Administrator, Federal Energy Office). This program required that Defendants distribute available gasoline supplies to wholesale purchasers (largely service stations) on a pro rata basis. *See* Mandatory Allocation Hearings at 37. Further, the program mandated that Defendants regularly report to the federal government on their crude oil supplies and refining activities; where a Defendant's crude oil supplies exceeded a certain benchmark, it was forced to sell to others who fell below that benchmark. *See id.* at 41. Congress deemed the allocation system, and the oil companies' participation in it, necessary due to "shortages of crude oil" that constituted "a national energy crisis which is a threat to the public health, safety, and welfare" requiring "prompt action by the Executive branch." Pub. L. No. 93-159, sec. 2(a)(1) & (3), 87 Stat. 628.

> **g.** **Defendants Acted Under Federal Officers During World War II And The Korean War**

129.    World War II confirmed petroleum's role as a key American resource and underscored the government's interest in maintaining and managing it. *See* Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, Special Committee Investigating Petroleum Resources, S. Res. 36, at 4 (Nov. 28, 1945) ("Our overseas forces required nearly twice as many tons of oil as arms and armament, ammunition, transportation and construction equipment, food, clothing, shelter, medical supplies, and all other materials together.  In both essentiality and quantity, oil has become the greatest of all munitions."); Dick Decl. Ex. 42 (National Petroleum Council, *A National Oil Policy for the United States* at 1 (1949)) ("A prime weapon of victory in two world wars, [oil] is a bulwark of our national security.").  As the United States prepared for war in 1941, its need for large quantities of oil and gas to produce high-octane fuel for planes ("avgas"), oil for ships, lubricants, and synthetic rubber far outstripped the nation's current capacity.  The government created agencies to control the petroleum industry, including Defendants, *see infra* ¶ 129, to build refineries; direct the production of certain petroleum products; and manage scarce resources for the war effort.  "No one who knows even the slightest bit about what the *petroleum industry* contributed to the war can fail to understand that it was, without the slightest doubt, *one of the most effective arms of this Government* . . . in bringing about a victory."  Dick Decl. Ex. 43, at 1 (Statement of Senator O'Mahoney, Chairman, Special Committee

Investigating Petroleum Resources, S. Res. 36 (Nov. 28, 1945)) (emphases added).

130.    In 1941, President Roosevelt created the Office of Petroleum Coordinator and designated Interior Secretary Harold Ickes as the Petroleum Coordinator for National Defense.[122]  President Roosevelt explained that:

> [r]ecent significant developments indicate the need of coordinating existing Federal authority over oil and gas and insuring that the supply of petroleum and its products will be accommodated to the needs of the Nation and the national defense program ... One of the essential requirements ... which must be made the basis of our petroleum defense policy ... is the development and utilization with maximum efficiency of our petroleum resources and our facilities, present and future, for making petroleum and petroleum products available, adequately and continuously, in the proper forms, at the proper places, and at reasonable prices to meet military and civilian needs.[123]

The Office of Petroleum Coordinator promptly began issuing a number of "directives" and "recommendations" to the oil and gas industry, requiring refineries to prioritize the production of aviation gasoline.

131.    In 1942, President Roosevelt established several *agencies* to oversee wartime production.  Among those with authority over petroleum production were the War Production Board ("WPB") and the Petroleum Administration for War ("PAW").  The WPB established a nationwide priority ranking system to identify

---

[122] *See* 2020 WL 5573048, at *10.

[123] *Id.*

scarce goods, prioritize their use, and facilitate their production; it also limited the production of nonessential goods. The PAW centralized the government's petroleum-related activities. It made policy determinations regarding the construction of new facilities and allocation of raw materials, had the authority to issue production orders to refineries and contracts that gave extraordinary control to federal officers, and "programmed operations to meet new demands, changed conditions, and emergencies." *See generally Shell I*, 294 F.3d at 1049 (discussing federal control). The "PAW told the refiners what to make, how much of it to make, and what quality."[124] *See* Dick Decl. Ex. 44 (Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, S. Res. 36 at 11 (Nov. 28, 1945) ("The supply of crude to each refinery, the finished and intermediate products to be made in each plant, and the disposition of the products were all closely scheduled, by daily telegraphic directives when necessary.")); Dick Decl. Ex. 45 (Statement of George A. Wilson, Director of Supply and Transportation Division, Wartime Petroleum Supply and Transportation, Petroleum Administration for War, Special Committee Investigating Petroleum Resources, S. Res. 36 at 212 (Nov. 28, 1945)) ("PAW was further expected to designate for the military forces the companies in a given area from which the product could be secured, as well as the amount to be produced by

---

[124] *Shell II*, 751 F.3d at 1286 (quoting John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War, 1941-1945*, at 219 (1946)).

each company and the time when the product would be available.").  The Office of the Petroleum Coordinator for National Defense stated that "[i]t is *essential*, in the national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses *be increased immediately to the maximum*."[125]

132.  The government dictated where and how to drill, rationed essential materials, and set statewide minimum levels for production.  Dick Decl. Ex. 46 at 171, 177–78, 184.  As Professor Wilson explains:  "PAW instructed the oil industry about exactly which products to produce, how to produce them, and where to deliver them."  Wilson Decl. ¶ 11.  Professor Wilson establishes that "[s]ome directives restricted the use of certain petroleum products for high-priority war programs; others dictated the blends of products; while others focused on specific pieces of the industry, such as the use of individual pipelines."  *Id.*

133.  The PAW's directives to Defendants were often coercive.  The PAW's message to the oil and gas industry was clear:  It would "get the results" it desired, and if "we can't get them by cooperation, then we will have to get them some other way."[126]  The PAW also maintained "disciplinary measures" for noncompliance, including "restricting transportation, reducing crude oil supplies, and withholding

---

[125] *Shell II*, 751 F.3d at 1286 (quoting Office of Petroleum Coordinator for National Defense Recommendation No. 16).

[126] Dick Decl. Ex. 47 (Secretary Harold Ickes, Conference of Petroleum Industry Chairmen, 8 (Aug. 11, 1941)).

priority assistance."[127]    In sum, the federal government deployed an array of directions, threats, and sanctions to ensure Defendants assented to PAW's production directives.

134.    The court in *Exxon Mobil Corp. v. United States* acknowledged the long history of federal government control over Defendants' lawful oil production-related activities in finding that the government was responsible for certain environmental response costs under CERCLA: "By controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry." 2020 WL 5573048, at *11.    The *Exxon Mobil* court rejected the argument that private refiners "voluntarily cooperated" and instead found that they had "no choice" but to comply with the federal officer's direction. *Id.* at *11, *12 (J. Howard Marshall, the former Chief Counsel for the Petroleum Administration for War, testified that "companies that 'weren't making essential war materials' were simply not able to run their refineries."). In fact, the federal government "insiste[d] on having the plants operate 24 hours a day, 7 days a week, year round." *Id.* at *8.    Put simply, the federal government "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war

---

[127] Dick Decl. Ex. 48 (Telegram from P.M. Robinson, PAW Assistant Director of Refining, to Ralph K. Davies, PAW Deputy Administrator, Refiners Who Did Not Reply to the Gasoline Yield Reduction Telegrams (Aug. 12, 1942)).

materials." *Id.* at \*14.  Certain Defendants or their predecessors or subsidiaries also produced toluene, a component of the explosive TNT, under direct contract with the Army Ordnance Department.[128]

135.  The controls placed on the production of petroleum during World War II extended through the Korean War.  *See* 2020 WL 5573048 at \*15 (detailing the government's use of the Defense Production Act of 1950 "to force" the petroleum industry to "increase [its] production of wartime . . . petroleum products").  Indeed, the U.S. Navy took possession over Crown Central Petroleum Corporation's ("Crown Central") "refinery, pipe line and related facilities" in October 1945, requiring Crown Central to "conduct its normal business and operations . . . subject, however, to such modifications as may be directed by the Officer-in-Charge," a Navy Vice Admiral.[129]  The Navy took possession of the Crown Central facilities, among others, pursuant to President Truman's Executive Order No. 9639.  That order allowed the Secretary of the Navy to "operate the plants, facilities, and property" "used in the transportation, refining, and processing of petroleum and petroleum products" in order to avoid a shortage of those products,

---

[128] *See Exxon Mobil Corp.*, 2020 WL 5573048, at \*13; Harold Nockolds, *The Engineers*, 28 (1949).

[129] Dick Decl. Ex. 49 (Letter from U.S. Navy Vice Admiral Ben Morrell to Crown Central Petroleum Corporation).

without which "the war effort [would] be unduly impeded or delayed.[130]  The United States government also authorized the full development of its own energy resources by directing large-scale oil production at the Naval Petroleum Reserve at Elk Hills, which was operated by Chevron Corporation's predecessor Standard Oil of California under contract with the U.S. Navy.

136.    At the advent of the Korean War in 1950, President Truman established the Petroleum Administration for Defense ("PAD") under authority of the Defense Production Act of 1950, Pub. L. No. 81–774 ("DPA").  The PAD issued production orders to Defendants and other oil and gas companies, including to ensure adequate quantities of avgas for military use.[131]  As Professor Wilson explains, the DPA "gave the U.S. government broad powers to direct industry for national security purposes," and "PAD directed oil companies to expand production during the Korean War, for example, by calling on [the] industry to drill 80,000 wells inside the United States, and more than 10,000 more wells abroad, in 1952."  Wilson Decl. ¶ 28.

---

[130]  Dick Decl. Ex. 50 (Exec. Order No. 9639, Authorizing the Secretary of the Navy to Take Possession Of and Operate Certain Plants and Facilities Used in the Transportation, Refining and Processing of Petroleum and Petroleum Products (Oct. 4, 1945)).

[131]  *See* Dick Decl. Ex. 96, at 122 (Fourth Annual Report of the Activities of the Joint Committee on Defense Production, H. Rep. No. 84-1, at 122 (Jan. 5, 1955, 1st Sess.)).  *See also Exxon Mobil Corp.*, 2020 WL 5573048, at *15 (detailing the government's use of the DPA "to force" the petroleum industry to "increase their production of wartime . . . petroleum products").

137.    The government also invoked the DPA immediately after the 1973 Oil Embargo to address immediate and critical petroleum shortages by the military.[132] Interior Priority Regulation 2 authorized "directives" to ensure "normal supply of petroleum products required by the Department of Defense" and provided companies that complied with immunity from "damages or penalties."[133]    The Interior Department subsequently "issued directives to 22 companies [including Defendants or their predecessors or subsidiaries[134]] to supply a total of 19.7 million barrels of petroleum during the two-month period from November 1, 1973, through December 31, 1973, for use by the DOD."[135]

138.    The United States Department of Defense ("DOD") is the United States' single largest consumer of energy, and one of the world's largest users of

---

[132]    *See* Dick Decl. Ex. 97 (Twenty-Fourth Annual Report of the Activities of the Joint Committee on Defense Production, S. Rep. No. 94-1, Pt. 1, at 442 (Jan. 17, 1975, 1st Sess.)).

[133]    Petroleum Products Under Military Supply Contracts, 38 Fed. Reg. 30572 §§ 1, 3 (Nov. 6, 1973).

[134]    The companies included Amoco Oil Co., Exxon Co., U.S.A., Mobil Oil Corp., Marathon Oil Co., Standard Oil Co. of California, and Shell Oil Co.  Dick Decl. Ex. 98 (*Naval Petroleum Reserve Numbered 1, Elk Hills, Calif.: Hearing Before the Subcommittee On National Stockpile and Naval Petroleum Reserve of the Committee on Armed Services on S.J. Res. 176*, 93d Cong. 73-74 (1st Sess. 1973)) (reprinting Department of Interior, Office of Oil and Gas, *News Release: Companies Directed to Supply the Needs of Defense Department* (Nov. 28, 1973) (listing companies and quantities)).  Dick Decl. Ex. 99 (John W. Finney, *Fuel is Diverted for the Military*, N.Y. Times (Nov. 28, 1973) (reporting on directives)).

[135]    *See* Dick Decl. Ex. 99.

petroleum fuel.  *See* Dick Decl. Ex. 51; Lengyel, Colonel, USAF, Gregory J., *Department of Defense Energy Strategy: Teaching an Old Dog New Tricks* (August 2007),                http://military-gospel.tygae.org.za/pdf/2007-08_USAF-B_DoD-EnergyStrat-OldDogNewTricks-LengyelCol.pdf.  For more than a century, "these products [have been] used for the war effort," including "many 'ordinary' products [that are] *crucial* to the national defense, such as . . . fuel and diesel oil used in the Navy's ships; and lubricating oils used for various military machines."  *Exxon Mobil Corp.*, 2020 WL 5573048, at *31 (emphasis added); *see also id.* at *47 (noting the "value of [the] petroleum industry's contribution to the nation's military success"). In fiscal year 2019 alone, the DOD purchased 94.2 million barrels of fuel products in compliance with military specifications, totaling $12.1 billion in procurement actions.[136]  As two former Chairmen of the Joint Chiefs of Staff explained, the "history of the Federal Government's control and direction of the production and sale of gasoline and diesel to ensure that the military is 'deployment-ready'" spans "more than a century," and during their tenure, petroleum products were "crucial to the success of the armed forces."  Dick Decl. Ex. 52, at 2–3 (Amici Curiae Brief of General (Retired) Richard B. Myers and Admiral (Retired) Michael G. Mullen, in Support of Petitioners, *BP p.l.c. v. Mayor and City Council of Baltimore*, No. 19-

---

[136] Dick Decl. Ex. 51 Def. Logistics Agency Fact Book.

1189 (U.S. Nov. 23, 2020)).  "Because armed forces have used petroleum-based fuels since the 1910s, oil companies have been essential military contractors, throughout the last century."  Wilson Decl. ¶ 2.  The "U.S. government has controlled and directed oil companies in order to secure and expand fuel supplies for its military forces and those of its allies, both in wartime and in peacetime."  *Id.*

### h.    Defendants Acted Under Federal Officers By Constructing, Operating, And Managing Government Petroleum Production Facilities

139.   Defendants also acted under the federal government by operating and managing government-owned and/or government-funded petroleum production facilities.  During World War II, the government built "dozens of large government-owned industrial plants" that were "*managed by private companies under government direction*."  Wilson Decl. ¶ 14 (emphasis added).  "The U.S. government enlisted oil companies to operate government-owned industrial equipment . . . [in order] to comply with government orders."  *Id.* ¶ 15.  These "oil companies were not merely top World War II prime contractors, but also served as government-designated operators of government-owned industrial facilities" or government-owned equipment within industrial facilities.  *Id.* ¶ 19.  Among the largest facilities was a refinery site in Richmond, California, operated by Socal (a Chevron predecessor), which was "the second-largest of all the facilities focused on aviation gasoline production, providing 10 percent of total global output of aviation fuel" by

1945.  *Id.*   Several other Defendants or their predecessors operated similar production equipment and facilities for the government.   *Id.* ¶ 20.  *Arlington* confirmed that courts "have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*."  2021 WL 1726106, at *4 (emphasis in original).

140.   Defendants built plants and manufactured war products for the Allied effort.  For example, "[o]n January 22, 1942, Shell entered into a contract with the United States on behalf of the Army Ordnance Department for the purchase of 20 million to 25 million gallons of nitration grade toluene over a two-year period.  The contract provided that Shell would construct a toluene plant at Shell['s] Wilmington, California refinery and that the Government would advance 30% of the contract price or $2,040,000 for construction of the plant. . . .  Shell completed a toluene plant in 1943 and produced toluene for the remainder of the war" "to manufacture TNT" and later "as a blending agent" to make "avgas."  Dick Decl. Ex. 53; *see also* Wilson Decl. ¶ 23.

141.  In addition, the government's need for highly specialized fuels, discussed *supra* Section VI.B.1.a., necessitated changes to Defendants' refining

equipment and operations.[137]  And the impacts of the government's particular fuel specifications on Defendants' operations were typically long-lasting.[138]  For example, JP-4 was developed in 1951 and was the most heavily used Air Force fuel until it was phased out around 1998.[139]

142.  The federal government entered into contracts with predecessors or affiliates of Defendants Chevron and Shell Oil Company, as well as ExxonMobil, to obtain "vast quantities of avgas."[140]  These contracts provided federal officers with the power to direct the operations of Defendants.  For example, the government's contract with Shell Oil Company's predecessor or affiliate specified that it "*shall use its best efforts*" and work "*day and night*" to expand facilities producing avgas "*as soon as possible* and not later than August 1, 1943."[141]  To maximize production

---

[137] *See* Dick Decl. Ex. 54 at 40 (W. J. Sweeney, Aircraft Fuels and Propellants, Report for the Army Air Force Scientific Advisory Group (1946)) ("The refiner cannot build the equipment for making the fuel without knowing what its composition must be to meet the needs of the engine.").

[138] Dick Decl. Ex. 55 (I. Waitz, S. Lukachko, & J. Lee, Military Aviation and the Environment: Historical Trends and Comparison to Civil Aviation, 42 J. of Aircraft 2 (2005)).

[139] *See* Dick Decl. Ex. 56 (Coordinating Research Council, Handbook of Aviation Fuel Properties, CRC Report No. 635 (2004)).

[140] Several prior decisions discuss these contracts and the power that the federal government held over Defendants to control production of oil and gas.  *See, e.g.*, *Shell II*, 751 F.3d at 1286; *Exxon Mobil Corp.*, 2020 WL 5573048, at *31.

[141] *Shell Oil Co. v. United States*, No. 1:06-cv-00141-SGB (Fed. Cl. Nov. 20, 2012), ECF No. 106-1 at JA002, JA027 (emphases added).

of this critical product, "[t]he Government directed [those companies] to undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of the refiners' entry into their [avgas] contracts." *Shell II*, 751 F.3d at 1287 (internal citations omitted). At the direction of the federal government, the oil companies, which include certain Defendants here, increased avgas production "over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945, [which] was crucial to Allied success in the war." *Id.*

143. With respect to Exxon Mobil's affiliates, the government "exerted substantial control and direction over the refineries' actions, including decisions on how [and when] to use raw materials and labor." *Exxon Mobil Corp.*, 2020 WL 5573048, at *1, *8. Courts have concluded that "[b]y controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry," and that it "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials." *Id.* at *11, *14.

### i. Defendants Acted Under Federal Officers By Constructing Pipelines For Oil Transportation

144. Defendants also acted under the federal government as agents in constructing and operating pipelines transporting oil for war. During World War II, oil transportation by tankers "experienced major disruption as a result of attacks by

German submarines."[142]

145.    "To [e]nsure adequate supplies of petroleum through the east during the late World War II, the Government caused to be constructed, between the Texas oilfields and the Atlantic seaboard, two large pipelines, commonly known as the 'Big Inch' and the 'Little Big Inch,' respectively" (together, the "Inch Lines"). *Schmitt v. War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949) ("*WEP II*"). War Emergency Pipelines, Inc. ("WEP"), "a Delaware corporation created by eleven of the major oil companies," including predecessors or affiliates of Defendants,[143] constructed and operated the Inch Lines "under contracts" and "as agent" for the federal government. *WEP II*, 175 F. 2d at 335; *Schmitt v. War Emergency Pipelines, Inc.*, 72 F. Supp. 156, 158 (E.D. Ark. 1947) ("*WEP I*").[144]

---

[142] Dick Decl. Ex. 94, at 3 (National Park Service, Historic American Engineering Record No. TX-76, War Emergency Pipeline (Inch Lines) Inch Lines Historic District (1968)).

[143] The eleven companies that constituted WEP were Shell Oil Company, Inc., Standard Oil Company (New Jersey), The Texas Company, Gulf Refining Company, Pan American Petroleum & Transport Company, Cities Service Company, Atlantic Pipe Line Company, Sinclair Oil Corporation, Sun Pipe Line Company (Texas), Socony-Vacuum Oil Company, Inc. and Tidal Pipe Line Company. Several of these companies are predecessors or affiliates of current Defendants. *See* Dick Decl. Ex. 31 (Certificate of Dissolution of War Emergency Pipelines, Inc. 1–2 (Aug. 28, 1947)); *id.* Ex. 46, at 108 (John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War: 1941-1945* (1946)).

[144] These decisions provide details of the construction contracts under which the government "delegat[ed] operating function to [WEP]" "by a document called 'Agency Agreement.'" *WEP I*, 72 F. Supp. at 157.

146.    Federal officers exerted operational control over the Inch Lines and Defendants' affiliates.  WEP operated wholly on capital from the government, and "received no fee or profit."  *WEP II*, 175 F.2d at 336; *see also, e.g.*, *WEP I*, 72 F. Supp. at 158.  The government also required approval and set the salaries of all personnel that WEP employed.  *See WEP II*, 175 F.2d at 336.

> After completion of the pipe lines, [WEP], in the name of, and acting as agent for [the government], purchased petroleum or petroleum products at the origins of the respective pipe lines, at OPA prices, and as such agent delivered and sold the through-put at the respective termini.  The sales price was cost plus a sum specified by Defense Supplies Corporation.  The Petroleum Administration for War issued directives to . . . [WEP], which, among other things, designated from whom products should be purchased and to whom they should be sold.

*WEP I*, 72 F. Supp. at 158.

147.    Petroleum Directives 63 and 73 governed the Big Inch and Little Big Inch pipelines, respectively, and exerted substantial control over WEP, and thus Defendants.  The government required WEP to prepare and file "daily reports" and a monthly "forecast" regarding its operation of the Inch Lines.[145]  The government had power to "direct such affirmative action as may be necessary to accomplish the purposes" of the Inch Lines—namely, "relieving shortages" and "augmenting

---

[145] Utilization of War Emergency Pipeline, 8 Fed. Reg. 1068–69 (Jan. 20, 1943) (Petroleum Directive 63); War Emergency Petroleum Products Pipeline, 8 Fed. Reg. 13343 (Sept. 30, 1943) (Petroleum Directive 73).

supplies for offshore shipments" while replacing "tankers normally engaged in the transportation of petroleum products from the United States Gulf Coast to Atlantic ports" that were "los[t] through enemy action." *Id.* The goal was to ensure "maximum operating capacity for the prosecution of the war and most effective utilization of petroleum." *See* Dick Decl. Ex. 95, at 25–26 (Statement of W. Alton Jones, Chairman, Committee on Postwar Disposal of Pipe Lines, Refineries, and Tankers, Hearings before the Special Committee Investigating Petroleum Resources (Nov. 15, 1945)) ("Under wartime operation, the oil business operated under directives of the Petroleum Administration for War. . . . [Oil companies] w[ere] ordered to divert oil and deliver at the receiving terminals of the big lines sometimes by expensive means to keep these lines running to capacity, and that was done in the interest of the war effort because we needed every barrel of oil we could deliver to the East.").

148.    The government controlled all oil WEP moved through the pipelines on its behalf.[146]  During their operation by WEP, the Inch Lines provided "life lines to the east," delivering "379,207,208 barrels of crude oil and refined products" and

---

[146] 8 Fed. Reg. at 1069, 1555.1 § (e)(4) ("No petroleum or petroleum products shall be transported through the facilities of the War Emergency Pipeline System except in pursuance of this Directive or amendments and supplements thereto."); *id.* at 13343, § (d)(3) (same).

serving "military necessity" for "the cross-Atlantic fronts."[147]  The Inch Lines "*were built for a single purpose, to meet a great war emergency. . . .* [T]hey helped to win a war that would have taken much longer to win without them."  Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, S. Res. 36 at 11 (Nov. 28, 1945).  Without Defendants as contractors and agents (via WEP), "the Government itself would have had to perform" these essential wartime activities.  *Watson*, 551 U.S. at 154.

### 2.    Defendants' Activities Are Related To Plaintiffs' Claims

149.   Plaintiffs' claims are "for or relating to" acts Defendants performed under color of federal office.  To meet this prong, there need only be "a *connection* or *association* between the act in question and the federal office."  *Sawyer*, 860 F.3d at 258; *Def. Ass'n of Philadelphia*, 790 F.3d at 471.  Indeed, the Fourth Circuit recently reiterated that Congress has abandoned "the old 'causal nexus' test," such that a removing defendant need show only "a connection or association between the act in question and the federal office."  *Arlington*, 2021 WL 1726106, at *8.  The Removal Clarification Act of 2011 inserted the words "or relating to" into the statute, which "broaden[ed] the universe of acts that enable Federal officers to remove to Federal court."  *Def. Ass'n of Philadelphia*, 790 F.3d at 467 (quoting H.R. Rep. 112-17, at 6, 2011 U.S.C.C.A.N. 420, 425).  Even before the Removal Clarification Act,

---

[147] Dick Decl. Ex. 46, at 104–05, 108.

a removing party was required only to "'demonstrate that the acts for which they [we]re being sued' occurred *at least in part* '*because of* what they were asked to do by the Government.'" *Id.* at 471 (quoting *Isaacson v. Dow Chemical Co.*, 517 F.3d 129, 137 (2d Cir. 2008)) (emphasis added). The Act, however, "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Latiolais*, 951 F.3d at 292; *see also Baker*, 962 F.3d at 943.

150.  It is, therefore, not necessary "that the complained-of conduct *itself* was at the behest of a federal agency"; rather, it is "sufficient" if Plaintiffs' "allegations are directed at the relationship between the [Defendants] and the federal government" for at least *some* of the time frame relevant to Plaintiffs' claims. *Baker*, 962 F.3d at 944–45; *accord Def. Ass'n of Philadelphia*, 790 F.3d at 470–71; *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805 (3d Cir. 2016). For instance, in *Baker*, an analogous case, the federal officer removal statute applied where certain products that allegedly contributed to Plaintiffs' purported pollution-based harms had, at times, been "critical wartime commodities" subject to "price control[s]," detailed federal oversight, and mandatory orders "setting aside" a portion of the defendants' products for the government's own use. *Id.* at 940–41, 945.[148] The defendants did

---

[148] *See also Williams v. Todd Shipyards Corp.*, 154 F.3d 416, 1998 WL 526612, at *1, *6 (5th Cir. 1998) (per curiam) (federal officer removal was proper where the

not have to show that federal officers directed the alleged pollution itself, or even the defendants' storage and waste disposal practices; rather it was "enough for the present purposes of removal that at least some of the pollution arose from the federal acts." *Id.* at 945. Similarly, in *Defender Association of Philadelphia*, the "for or relating to" element was satisfied even though the Federal Community Defender was *not* directed by the government in the specific conduct at issue in the suit (representing defendants in state post-conviction proceedings) because that conduct was "related to" acts that were done under federal direction (representing defendants in federal habeas proceedings). 790 F.3d at 471–72. And in *Papp*, the "for or relating to" element was satisfied in a failure-to-warn lawsuit where the defendant established a "connection" between manufacturing aircraft for the federal government and the plaintiffs' alleged asbestos exposure, even though the government had not directly prohibited the defendants from issuing asbestos-related warnings. 842 F.3d at 812–813. Most recently, in *Arlington*, the Fourth Circuit held that nuisance claims premised on defendants' distribution of opioids were sufficiently "related to" defendants' federally directed distribution of opioids, even though the plaintiffs' allegations did not reference any federal distribution, which was just a subset of the distribution at issue. 2021 WL 1726106, at *8–9.

---

plaintiff was exposed to asbestos while working for the defendant, even though the defendant "did both commercial work for private parties" and worked under government contract on ships owned or operated by the federal government).

151.    Numerous federal activities are encompassed in Plaintiffs' Complaint and relate to Plaintiffs' causes of action, especially when construed "in the light most favorable to the" existence of federal jurisdiction, *Def. Ass'n of Philadelphia*, 790 F.3d at 466, and giving Defendants the "benefit of all reasonable inferences from the facts alleged," *Baker*, 962 F.3d at 945.

152.    Plaintiffs allege that Defendants' production and sale of oil and gas—which necessarily includes production and sales under the direction, supervision and control of federal officers described above—led to the combustion of these oil and gas products, which led to the release of greenhouse gases by end users—also including the federal government.  Critically, the oil and gas upon which Plaintiffs base their claims include the *very same* oil and gas that Defendants extracted and produced under the direction, supervision, and control of the federal government.  Moreover, the federal government directed, supervised, and controlled Defendants' production, sale, and distribution of oil and gas to help it accomplish critical domestic and foreign policy objectives.

153.    Accordingly, Plaintiffs seek to hold Defendants liable for the very activities Defendants performed in the implementation of federal policy initiatives under federal direction, supervision, and control of federal officers.  Their claims "necessarily include[] activity that is directly connected to . . . DOD contract[s]." *Arlington*, 2021 WL 1726106, at *9.  This is more than enough to satisfy the nexus

116

element of the federal officer removal statute, which requires only "a connection or association between the act in question and the federal office." *Sawyer*, 860 F.3d at 258; *Def. Ass'n of Philadelphia*, 790 F.3d at 474 (holding same).  At a minimum, under Defendants' reasonable theory of the case, which the Court must credit in assessing whether the nexus element is satisfied, *Acker*, 527 U.S. at 432; *Def. Ass'n of Philadelphia*, 790 F.3d at 474, a clear connection or association exists between Defendants "acting under" federal officers by extracting and producing oil and gas pursuant to federal contracts and specifications, and Plaintiffs' attempt to impose liability on Defendants for that very same conduct.  *See also Leite*, 759 F.3d at 1124 ("In assessing whether a causal nexus exists, we credit the defendant's theory of the case.").

154.    Plaintiffs'    allegations    regarding    Defendants'    alleged misrepresentations and "deception" do not change the analysis in any way.  This is because, as explained above, Plaintiffs' claims, as pleaded, depend on the premise that Defendants' *production* of fossil fuels caused Plaintiffs' alleged injuries.  *See, e.g.*, Compl. ¶ 149.  Defendants have demonstrated that they acted under the direction, supervision, and control of federal officers in producing oil and gas for decades, and therefore this case is removable to federal court.

155.    Similarly, Plaintiffs' attempt to disclaim "injuries arising on federal property and those arising from Defendants' provision of non-commercial,

specialized fossil fuel products to the federal government" is ineffective and cannot defeat removal. Compl. ¶ 19. This disclaimer is a transparent—and ineffective—attempt to artfully plead around removal. Courts consistently reject attempts to frustrate federal removal with disclaimers where, as here, Defendants' federal officer defenses are still applicable to one or more of Plaintiffs' claims. *See Rhodes v. MCIC, Inc.*, 210 F. Supp. 3d 778, 786 (D. Md. 2016) ("[Plaintiffs] have cited no authority that allows such language to bar the assertion of the federal officer defense where it is otherwise applicable. . . . [T]hey are clearly keeping in play a claim against Defendants who could legitimately assert the federal officer defense."); *see also, e.g.*, *Ballenger v. Agco Corp.*, 2007 WL 1813821, at *1 n.2, *4 (N.D. Cal. June 22, 2007) (finding disclaimer ineffective where the plaintiff waived claims for exposure committed at the direction of a federal officer but nonetheless sought relief for exposure aboard Navy vessels). Moreover, the disclaimer is inappropriate in the present case, because, as the Supreme Court has recognized, and Plaintiffs acknowledge, greenhouse gases cannot be traced to any particular source or any particular jurisdiction. *See AEP*, 564 U.S. at 422 ("Greenhouse gases once emitted become well mixed in the atmosphere."); *see, e.g.*, Compl. ¶ 248. Plaintiffs' claims are thus based on *global* emissions that are impossible to trace to any particular source. Accordingly, Plaintiffs have no basis on which to carve out fuel extraction and production on federal lands and at the direction of the federal government, or

anywhere else for that matter.

156.   For similar reasons, the Western District of Michigan recently rejected an attempt by a group of plaintiffs to avoid federal officer removal that went even further than Plaintiffs' disclaimer attempts here.  Plaintiffs in *Nessel v. Chemguard, Inc.* alleged injuries caused by environmental contamination from certain firefighting agents that were sold for both military and civilian purposes.  2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021).  Plaintiffs attempted to avoid removal with respect to civilian production and sales by *filing two separate complaints*—one for injuries resulting from chemicals produced for the military, and one for the commercially produced versions of those same agents.  The court found that it had federal officer removal jurisdiction over the commercial-only complaint because plaintiffs did not establish that injuries from commercial chemicals and military chemicals "will be distinguishable."  *Id.* at *3.  It explained that despite plaintiffs "divid[ing] the two complaints," "[t]he Court . . . will likely have to engage in a detailed fact-finding process to determine whether the injuries . . . can be distinguished" and that "right now, there is not clear evidence either way.  It is entirely possible that Plaintiffs' injuries occurred from actions taken while Defendants were acting under color of federal office."  *Id.*  Plaintiffs here do not even try to separate their claims and injuries into two separate complaints—rather, Plaintiffs flatly assert that their injuries are caused by the cumulative production and

combustion of *all* oil and gas production for decades.  *See, e.g.*, Compl. ¶ 4; *see also Nessel*, 2021 WL 744683, at *3 ("Plaintiffs' artful pleading does not obviate the facts on the ground" demonstrating that "Defendants were at least plausibly acting under color of federal office during the relevant timeframe.").

### 3.    Defendants Have Colorable Federal Defenses

157.    Defendants intend to raise several meritorious federal defenses, including the government-contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500, 504–14 (1988); *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 70 (3d Cir. 1990); preemption, *see Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010); federal immunity, *see Campbell-Ewald v. Gomez*, 577 U.S. 153, 166–69 (2016); and others.   Defendants satisfy all elements of the government-contractor defense. Indeed, liability related to alleged defects in military equipment cannot be imposed when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.  *Boyle*, 487 U.S. at 512. (1988).  Indeed, this defense allows government contractors, like Defendants here, to receive the benefits of sovereign immunity when a contractor complies with the specifications of a federal government contract.  *Id.* at 511-12.

158.    *Boyle* is analogous.  In *Boyle*, the Supreme Court applied a federal

common-law government contractor defense in a state-law product liability action because (1) the suit involved a unique federal interest and (2) a state law holding government contractors liable for design defects in military equipment would present a significant conflict with federal policy. 487 U.S. at 504–13. In addition, as the Court acknowledged in *Campbell-Ewald*, "[w]here the Government's 'authority to carry out the project was validly conferred,'" a contractor "who simply performed as the Government directed," may be immune from liability. 577 U.S. at 167 (quoting *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20 (1940)). Here, Defendants produced oil and gas at the direction of the federal government, and thus have a colorable argument that they are immune from liability.

159. Plaintiffs' claims are also barred by the U.S. Constitution, including the Interstate and Foreign Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and Due Process Clauses, *id.* amends. V & XIV, § 1, and the foreign affairs doctrine, *see Pink*, 315 U.S. at 230–31.

160. Because the relief Plaintiffs seek would have "the practical effect" of "control[ling] conduct beyond the boundaries of [New Jersey]," its claims are barred by the Commerce Clause, which "protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy v. Beer Inst.*, 491 U.S. 324, 336–37 (1989). Imposition of liability under state law on this select group of energy companies would undoubtedly affect

their ability to conduct their businesses, and have far more than an "indirect effect on interstate commerce," particularly where, under Plaintiffs' theory, the only way for Defendants to avoid liability would be "to cease global production altogether." *City of New York*, 993 F.3d at 93. "And even if some level of ongoing liability were deemed palatable, a significant damages award would no doubt 'compel[ ]' the [Defendants] to develop new 'means of pollution control.'" *Id.* (quoting *Ouellette*, 479 U.S. at 495). Awarding relief on Plaintiffs' claims would necessarily have "the practical effect of regulating commerce occurring wholly outside the State's borders." *Star Sci. Inc. v. Beales*, 278 F.3d 339, 355 (4th Cir. 2002).

161. Similarly, imposing such extraordinary extraterritorial liability on lawful, government-encouraged conduct would constitute "a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). A "State cannot," consistent with due process, "punish a defendant for conduct that may have been lawful where it occurred." *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 421 (2003); *see also BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 573 (1996).

162. The foreign affairs doctrine also precludes exercises of state law that would "impair the effective exercise of the Nation's foreign policy." *Garamendi*, 539 U.S. at 419 (quoting *Zschernig v. Miller*, 389 U.S. 429, 440 (1968)). This prohibition extends to state-law causes of action. *See Pink*, 315 U.S. at 230–31 ("[S]tate law must yield when it is inconsistent with or impairs the policy or

provisions of a treaty or of an international compact or agreement."). As explained above, Plaintiffs' claims would interfere with the U.S. government's control of foreign policy, now and prospectively, including governmental efforts to address climate change and the allocation of costs through multilateral negotiations. *See In re Assicurazioni Generali*, *S.P.A.*, 592 F.3d 113, 115, 119–20 (2d Cir. 2010).

163.   And, finally, to the extent Plaintiffs' claims target Defendants' statements, they are barred by the First Amendment. As the Supreme Court has held, lobbying activity is protected from civil liability. *See E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 145 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 671 (1965); *see also Baltimore Scrap Corp. v. David J. Joseph Co.*, 81 F. Supp. 2d 602, 620 (D. Md. 2000), *aff'd*, 237 F.3d 394 (4th Cir. 2001) ("*Noerr–Pennington* immunity . . . applies to . . . state common law claims."). This is true even if "the campaign employs unethical and deceptive methods." *Allied Tube & Conduit Corp. v. Indian Head, Inc*., 486 U.S. 492, 499–500 (1988); *see also New W., L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007) ("[T]he holding of *Noerr* is that lobbying is protected whether or not the lobbyist used deceit.").

164.   These and other federal defenses are more than colorable, and thus satisfy the test for federal officer removal under the statute. *See Willingham*, 395 U.S. at 407 (defendant invoking § 1442(a)(1) "need not win his case before he can have it removed"). Accordingly, removal under Section 1442 is proper.

## VII.  THE ACTION IS REMOVABLE BECAUSE PLAINTIFFS' CLAIMS NECESSARILY RAISE DISPUTED AND SUBSTANTIAL FEDERAL ISSUES

165.  Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  The Supreme Court has held that suits alleging only state-law causes of action nevertheless "arise under" federal law, even if not exclusively governed by federal law, if the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314.  Applying this test "calls for a common-sense accommodation of judgment to [the] kaleidoscopic situations that present a federal issue." *Id.* at 313 (internal quotation marks omitted) (alteration in original).

166.  Plaintiffs' Complaint attempts to supplant federal regulation of greenhouse gas emissions and hold select members of an international industry responsible for the alleged consequences of rising ocean levels and hydrologic cycle disruptions such as drought, extreme precipitation, heat waves, and wildfires that are allegedly caused by global climate change.  Plaintiffs' claims raise "federal issue[s], actually disputed and substantial," for which federal jurisdiction would not upset "any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 313.

167.   The issues of greenhouse gas emissions, global climate change, hydrologic cycle disruption, and sea level rise are not unique to the State of New Jersey, or even the United States.  Yet the Complaint attempts to undermine decades of national energy, economic, and environmental policies by prompting a New Jersey state court to take control over an entire industry and its interstate commercial activities, and impose massive damages and equitable relief contrary to long-standing federal regulatory schemes and systems.  It is well-settled that a collateral attack on a federal regulatory regime—an attempt to substitute state law for existing federal standards—presents a substantial federal question.  *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).

## A.   Plaintiffs' Claims Arise Under Federal Common Law And Are Thus Removable Under *Grable*

168.   *First*, as explained above, Plaintiff's claims arise in an area governed exclusively by federal law.  This fact independently justifies removal under *Grable*.

169.   Numerous courts have upheld removal over nominally state-law claims when "federal common law *alone* governs" those claims.  *Battle v. Seibels Bruce Ins. Co.*, 288 F.3d 596, 607 (4th Cir. 2002); *see also Newton v. Capital Assurance Co.*, 245 F.3d 1306, 1309 (11th Cir. 2001) (similar).  And the Fifth Circuit affirmed removal of "state-law tort claims"—despite the plaintiffs' invocation of "the well-pleaded complaint rule"—because the case "raise[d] substantial questions of federal common law by implicating important foreign policy concerns."  *Torres v. S. Peru*

*Copper Corp.*, 113 F.3d 540, 542–43 (5th Cir. 1997).

170.   The Court must determine whether Plaintiffs' claims are governed by federal law because, if so, they are removable under *Grable*.  And the answer to this question is yes because when, as here, claims "deal with air and water in their ambient or interstate aspects, there is a federal common law." *AEP*, 564 U.S. at 421.

171.   The federal interests at issue are "substantial" because, among other things, claims for interstate and international pollution implicate uniquely federal interests and must therefore be governed by federal law; "the basic scheme of the Constitution so demands." *AEP*, 564 U.S. at 421.  Moreover, this case "directly implicates actions taken by the" federal government, *Manning v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 772 F.3d 158, 165 n.4 (3d Cir. 2014), to address global climate change.  These matters are disputed because Plaintiffs and Defendants disagree over whether federal law allows Plaintiffs to recover at all on their claims. And the claims are properly adjudicated in federal court because this "sprawling case is simply beyond the limits of state law." *New York*, 993 F.3d at 92.

172.   Thus, Plaintiffs' claims raise substantial issues of federal law and are removable under *Grable*.  Indeed, it is difficult to imagine a situation in which a cause of action that could be governed only by federal law would *not* raise a substantial federal question.

**B.    Plaintiffs' Claims Seek To Supplant Federal Energy Policy**

173.  *Second*, Congress has struck a careful balance between energy production and environmental protection by enacting federal statutes such as the Clean Air Act ("CAA"), 42 U.S.C. § 7401(c), and by directing the EPA to regulate Defendants' conduct and perform its own cost-benefit analyses, *see AEP*, 564 U.S. at 426–47.  Plaintiffs' purported state-law claims seek to upend the careful balance Congress has struck between energy production and environmental protection.  Collectively, as well as individually, Plaintiffs' causes of action depend on the interpretation and application of federal statutes, federal regulations, and international treaties.  For example, domestically, the EPA regulates greenhouse gas emissions under the CAA by implementing rules governing both stationary and mobile source emissions.

174.  The Complaint seeks relief for an alleged nuisance.  Plaintiffs allege that Defendants, through their national and, indeed, global activities, "caus[ed] and accelerat[ed] climate change."  Compl. IV.A.  Plaintiffs allege that "sea level rise, flooding, erosion, loss of wetlands and beaches, ocean acidification, and other social and economic consequences," are consequences of Defendants' conduct.  *Id.* ¶ 37.

175.  Under New Jersey law, were it to apply, nuisance claims require a plaintiff to prove that the defendant's conduct is "unreasonable," which depends upon whether "the gravity of the harm outweighs the utility of the actor's conduct" or that "the harm caused by the conduct is serious."  *Seven Plus One, LLC v. Sellers*,

2016 WL 6994346, at *6 (N.J. Super. Ct. App. Div. Nov. 29, 2016) (quoting *Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes*, 90 N.J. 582, 592 (1982)). But under federal law, federal agencies must "assess both the costs and the benefits of [an] intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs." Exec. Order No. 12,866, 58 Fed. Reg. 51735 (Sept. 30, 1993). Thus, there has been, and continues to be, a determination by the federal government of the reasonableness of oil and gas production and the greenhouse gas emissions that come with that level of production.

176. Congress has directed a number of federal agencies to regulate Defendants' conduct, and thus to engage in the same analysis of benefits and costs that Plaintiffs would have the state court undertake. Federal agencies have performed, and continue to perform, these cost-benefit analyses. *See, e.g.*, Final Carbon Pollution Standards for New, Modified and Reconstructed Power Plants, 80 Fed. Reg. 64510, 64518-21 (Oct. 23, 2015) (EPA considering the impacts of "wildfire" and "extreme precipitation events," such as "droughts, floods, hurricanes, and major storms"). The alleged effects of Defendants' operations are broadly distributed throughout the nation, to all residents as well as all state and government entities. Given this diffuse and broad impact, Congress has acted through a variety

of federal statutes—primarily, but not exclusively, the CAA—to meet energy extraction and production needs while achieving environmental protections. *See* Clean Air Act, 42 U.S.C. § 7401(b)(1) (congressional statement that the goal of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources" and promote "the productive capacity" of the country); *see also, e.g.*, Energy Reorganization Act of 1974, 42 U.S.C. § 5801(a) (congressional purpose to "develop, and increase the efficiency and reliability of use of, all energy sources" while "restoring, protecting, and enhancing environmental quality"); Mining and Minerals Policy Act, 30 U.S.C. § 21a (congressional purpose to encourage "economic development of domestic mineral resources" balanced with "environmental needs"); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201(b), (k) (congressional findings that coal mining operations are "essential to the national interest" but must be balanced by "cooperative effort[s] . . . to prevent or mitigate adverse environmental effects").

177.   Regulation of greenhouse gas emissions is governed by the Clean Air Act, *see Massachusetts*, 549 U.S. at 528–29, and the EPA has regulated these emissions under the Act, *see, e.g.*, 40 C.F.R. §§ 51.166(b)(1)(i), 52.21(b)(1)(i) (regulation of greenhouse gases through the Act's prevention of significant deterioration of air quality permitting program); 2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions and Corporate Average Fuel Economy

Standards, 77 Fed. Reg. 62,624 (Oct. 15, 2012) (regulation of greenhouse gas emissions from light-duty motor vehicles); Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2, 81 Fed. Reg. 73,478 (Oct. 25, 2016) (regulation of greenhouse gas emissions from medium- and heavy-duty engines and vehicles).  Put simply, "emissions have been extensively regulated nationwide" by the federal government under the CAA.  *TVA*, 615 F.3d at 298.

178.  Whether the federal agencies charged by Congress to support both energy and environmental needs for the entire nation have struck an appropriate balance is a question that is "inherently federal in character" and gives rise to federal question jurisdiction.  *Buckman Co.*, 531 U.S. at 347; *see also Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (affirming federal question jurisdiction where claims implicated federal agency's acts implementing federal law); *Bennett v. Southwest Airlines Co.*, 484 F.3d 907, 909 (7th Cir. 2007) (finding federal removal under *Grable* appropriate where claims were "a collateral attack on" agency action under a highly reticulated regulatory scheme).  Adjudicating these claims in federal court is appropriate because the relief sought by Plaintiffs would necessarily alter the regulatory regime Congress designed, affecting residents of the nation far outside the state court's jurisdiction.  *See, e.g.*, *Grable*, 545 U.S. at 312 (stating that claims that turn on substantial federal

questions "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues"); *West Virginia ex rel. McGraw v. Eli Lilly & Co.*, 476 F. Supp. 2d 230, 234 (E.D.N.Y. 2007) (stating that removal under *Grable* is appropriate where state common law claims implicate "an intricate federal regulatory scheme . . . requiring some degree of national uniformity in interpretation").

179.   The Complaint also calls into question federal government decisions to contract with Defendants for the extraction, development, and sale of oil and gas resources on federal lands.  Such national policy decisions have expanded fossil fuel production and use and produced billions of dollars in revenue to the federal Treasury.  Reliable, affordable energy is fundamental to economic growth and prosperity generally, as well as to national security and other issues that have long been the domain of the federal government.  *See, e.g.*, 83 Fed. Reg. 23295, 23296 (Final List of Critical Minerals 2018) (describing "fossil fuels" as "indispensable to a modern society for the purposes of national security, technology, infrastructure, and energy production").  Yet, Plaintiffs' purported state-law claims require a determination that the complained-of conduct—the lawful activity of placing oil and gas into the stream of interstate and foreign commerce—is unreasonable, and that determination raises a policy question that, under the U.S. Constitution and applicable federal statutes, treaties, and regulations, is a federal question.  *See*

*Peralta v. ABN AMRO Mortg. Grp., Inc.*, 2014 WL 1673737, at *5 (D.N.J. Apr. 24, 2014) (finding that under *Grable*, Plaintiffs' claims presented "substantial questions of federal law [that] are properly before this Court").

180. The cost-benefit analysis required by Plaintiffs' claims would necessarily disrupt the federal regulatory structure of an essential, national industry. "The validity of [Plaintiffs'] claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law." *Bd. of Comm'rs v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 724 (5th Cir. 2017) ("*Levee Board*"); *see also Bader Farms, Inc. v. Monsanto Co.*, 2017 WL 633815, at *3 (E.D. Mo. Feb. 16, 2017) ("Count VII is in a way a collateral attack on the validity of APHIS's decision to deregulate the new seeds."); *Bennett*, 484 F.3d at 909 (holding that federal removal is proper under *Grable* "when the state proceeding amounted to a collateral attack on a federal agency's action"). Indeed, the "inevitable result of such suits," if successful, is that Defendants "would have to change" their federally regulated "methods of doing business and controlling pollution to avoid the threat of ongoing liability." *Ouellette*, 479 U.S. at 495.

181. Plaintiffs' claims also necessarily implicate substantial federal questions by seeking to obtain compensatory and punitive damages, as well as equitable relief, based on allegations that Defendants waged a "campaign to obscure the science of climate change" and thereby "[d]elayed efforts to curb anthropogenic

greenhouse gas emissions."  Compl. ¶¶ 150–51.  In other words, Plaintiffs claim that Defendants engaged in fraud on a federal agency by hiding or misrepresenting the science of climate change from the EPA, Department of Transportation, and other federal agencies.  Setting aside the sheer implausibility of Plaintiffs' theory that Defendants could have misled federal agencies about core scientific facts addressed by the U.N. Intergovernmental Panel on Climate Change ("IPCC") and publicly known for decades, it is well-settled that claims that a defendant has engaged in fraud on a federal agency arise under federal law.  Claims of fraud on a federal agency arise exclusively under federal law.  *Buckman Co.*, 531 U.S. at 347 ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law."); *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 235 (6th Cir. 2000) ("[C]laims alleging fraud on federal agencies have never come within the 'historic police powers of the States.'") (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495 (1996)).

## C.    Plaintiffs' Claims Necessarily Interfere With Foreign Affairs

182.    *Third*, Plaintiffs' claims impede the foreign-affairs power by seeking to regulate global climate change, which has been and continues to be the subject of major international treaties.  In international negotiations, the United States has sought to balance environmental policy with robust economic growth.  After

President Clinton signed the Kyoto Protocol in 1997, for example, the U.S. Senate expressed its view in a 95-0 vote that the United States should not be a signatory to any protocol that "would result in serious harm to the economy" or fail to regulate the emissions of developing nations. *See* S. Res. 98, 105th Cong. (1997). Congress then enacted a series of laws barring EPA from implementing or funding the Protocol. *See* Pub. L. No. 105-276, 112 Stat. 2461, 2496 (1998); Pub. L. No. 106-74, 113 Stat. 1047, 1080 (1999); Pub. L. No. 106-377, 114 Stat. 1441, 1441A-41 (2000). And President Biden—in one of his first acts in office—rejoined the Paris Agreement on January 20, 2021, *see* Dick Decl. Ex. 100, which provides that government efforts to address "the threat of climate change" should occur "in the context of sustainable development" and "take into consideration" the economic "impacts of response measures." Dick Decl. Ex. 6, art. 2, § 1; *id.* art. 4, § 15. More broadly, the nation's climate change policy is also inextricably "infus[ed]" into its "trade policies," "foreign aid programs," "bilateral discussions and even [its] military readiness." Dick Decl. Ex. 7.

183. Claims that turn on the interpretation of federal treaties are removable under *Grable*. The scope of a treaty "is a matter of federal law and federal treaty interpretation and must be determined from an examination of the four corners of the treaty." *Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256, 1258 (9th Cir. 1977); *see also Horton v. Toyota Tech. Ctr., U.S.A., Inc.*, 1991 WL 333722, at

*2 (C.D. Cal. Dec. 2, 1991) (claims raised "substantial questions of federal law" because the "allegations necessarily require interpretation of the FCN Treaty").

184.    The Complaint advances claims based on the contention that greenhouse gas emissions are a public nuisance.  "[T]o succeed on the merits of a public nuisance claim under New Jersey state law, a plaintiff must establish: (1) an unreasonable interference and (2) a right common to the general public." *Erlbaum v. New Jersey Dep't of Envtl. Prot.*, 2017 WL 465466, at *10 (D.N.J. Feb. 3, 2017). To assess whether conduct qualifies as a nuisance, the court considers and weighs whether "the benefits" or "social utility of th[e conduct] is outweighed by the quantum of harm that it creates." *Rose v. Chaikin*, 187 N.J. Super. 210, 219–20 (1982).

185.    Multiple federal treaties directly address the global emission of greenhouse gases.  A 1989 United Nations resolution called for coordinated action because climate change would contribute to "the potential global problem of sea-level rise." *See* G.A. Res. 44/206 ¶ 1 (Dec. 22, 1989).  In 1992, many countries (including the United States) signed the United Nations Framework Convention on Climate Change.  That convention required each signatory to, among other things, "adopt national policies and take corresponding measures on the mitigation of climate change, by limiting its anthropogenic emissions of greenhouse gases." *See* UNFCCC Art. IV(2)(a) (May 9, 1992).    The Paris Accord imposes similar

obligations.   After recognizing the "importance of ensuring the integrity of all ecosystems, including oceans," the treaty requires signatories to commit to "[h]old[] the increase in the global average temperature to well below 2°C above pre-industrial levels." Dick Decl. Ex. 6 (Paris Accord, T.I.A.S. No. 16-1104 Art. II(1)(a) (Nov. 4, 2016)).  Notably, the Paris Accord explicitly balances concerns about public health against continued economic growth—the same kind of balancing called for by New Jersey nuisance law.  *See id.* Art. IV(19) (providing that signatory nations should implement long-term low greenhouse gas emission development strategies in a way that "tak[es] into account their common but differentiated responsibilities and respective capabilities, in the light of different national circumstances"); *id.* Art. IX(4) (provision of financial resources by developed countries to assist developing countries "should aim to achieve a balance between adaptation and mitigation, taking into account country-driven strategies, and the priorities and needs of developing country Parties").

186.   Adjudicating Plaintiffs' public nuisance claim would require the state court to re-evaluate the policy considerations that motivated the federal government to recently rejoin the Paris Accord, including the proper balance to be struck between the objectives of limiting greenhouse gas emissions, reducing sea level rise, and growing the economy.  This is a federal issue that is disputed and substantial.

187.   Plaintiffs' Complaint also raises substantial federal issues because the

asserted claims necessarily encompass issues of foreign policy and carefully balanced regulatory considerations at the international level, including the foreign affairs doctrine.    Plaintiffs' claims expressly challenge and seek to govern extraterritorial conduct, thereby implicating the foreign-policy prerogatives of the federal government's executive branch as to climate change and energy security treaties.  Such claims are inherently federal in nature:  "an issue concerned with . . . ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law."  *Sabbatino*, 376 U.S. at 425; *see also United States v. Belmont*, 301 U.S. 324, 331 (1937) ("[T]he external powers of the United States are to be exercised without regard to state laws or policies. . . . [I]n respect of our foreign relations generally, state lines disappear."); *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government . . . requires that federal power in the field affecting foreign relations be left entirely free from local interference.").

188.  Accordingly, Plaintiffs' claims necessarily raise substantial federal questions that are appropriate for federal court resolution because they implicate issues of foreign relations that are committed to the federal government and exclusively governed by federal law.  *See, e.g.*, *Republic of Philippines*, 806 F.2d at 346, 352–54 (nominally state-law claim "arises under federal law" when it "necessarily require[s] determinations that will directly and significantly affect

American foreign relations"); *Torres v. S. Peru Copper Corp.*, 113 F.3d 540, 542–43 (5th Cir. 1997) ("[S]tate-law tort claims" arose under federal law because they "raise[d] substantial questions of federal common law by implicating important foreign policy concerns.").

189.    Through this action, Plaintiffs seek to have a state court regulate greenhouse gas emissions worldwide, far beyond the borders of New Jersey, or even the United States.  The remedies Plaintiffs seek—equitable relief and damages that could drastically reduce fossil fuel production, *see* Compl. at 169 (Prayer for Relief)—contravene and threaten to undermine U.S. energy security policy, including through international trade policy, treaties, and agreements.  For example, in 1959, President Dwight D. Eisenhower invoked statutory authority to proclaim quotas on imports of petroleum and petroleum-based products into the United States "to avoid discouragement of and decrease in domestic oil production, exploration and development to the detriment of national security."  Proclamation No. 3279, 24 Fed. Reg. 1781 (Mar. 12, 1959); *see* Act of July 1, 1954, 68 Stat. 360, ch. 445, § 2, as amended by Pub. L. No. 85-686 § 8(a), 72 Stat. 678 (1958).  The import system was "mandatory" and "necessary" to "preserve to the greatest extent possible a vigorous, healthy petroleum industry in the United States" and to regulate "patterns of international trade."  Dick Decl. Ex. 8 (Statement by the President Upon Signing Proclamation Governing Petroleum Imports, 1 Pub. Papers 240 (Mar. 10, 1959)).

President Eisenhower further explained United States foreign and domestic policy as follows: "Petroleum, wherever it may be produced in the free world, is important to the security, not only of ourselves, but also of the free people of the world everywhere." *Id.* After the 1973 oil embargo, the United States signed a treaty that requires member countries of the International Energy Agency to hold emergency oil stocks—through government stocks or industry-obligated stocks—equivalent to at least ninety days of net oil imports. *See* Agreement on an International Energy Program art. 2, Nov. 18, 1974, 1040 U.N.T.S. 271. The United States meets part of its obligation through government-owned stocks held in the U.S. Strategic Petroleum Reserve. *See, e.g.*, 42 U.S.C. § 6231(b); Nat'l Energy Policy Dev. Grp., National Energy Policy 8-17 (2001), https://www.nrc.gov/docs/ML0428/ML042800056.pdf. Plaintiffs' claims infringe on the federal government's environmental, trade, and energy policies that require the United States to speak with one voice in coordinating with other nations.

190.  Plaintiffs also seek to have the state court second-guess diplomatic efforts to address climate change. For example, Plaintiffs contend that Defendants engaged in a campaign to undermine national and international efforts, like the Kyoto Protocol and Paris Accord, to rein in greenhouse gas emissions. Plaintiffs apparently believe that the United States should have adopted a different foreign policy, and that it would have done so had Defendants acted differently. But "[n]o

State can rewrite our foreign policy to conform to its own domestic policies.  Power over external affairs is not shared by the States; it is vested in the national government exclusively.  It need not be so exercised as to conform to state laws or state policies whether they be expressed in constitutions, statutes, or judicial decrees." *Pink*, 315 U.S. at 233.  States have no authority to impose remedial schemes or regulations to address what are matters of foreign affairs.  *Americans United for Separation of Church & State v. Reagan*, 786 F.2d 194, 199 (3d Cir. 1986) ("The power in question—the conduct of foreign affairs—is not only vested in the Government of the United States, but is vested exclusively so.").  Yet Plaintiffs seek to replace international negotiations and congressional and executive decisions with its own preferred foreign policy on climate change issues, using the ill-suited tools of equitable relief under New Jersey common law and private litigation in a state court.  When states have enacted laws seeking to supplant or supplement foreign policy, the Supreme Court has held that state law can play no such role.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375–81 (2000); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420–24 (2003).

### D.    Plaintiffs' Claims Include Federal Constitutional Elements

191.  *Fourth*, Plaintiffs' claims necessarily include federal constitutional elements.  The Supreme Court has made clear that where nominally state-law tort claims target speech on matters of public concern like climate change, the First

Amendment injects affirmative federal-law elements into the Plaintiffs' cause of action, including factual falsity, actual malice, and proof of causation of actual damages. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774–76 (1986) (explaining that state common-law standards "must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages"); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (holding public officials have the burden of proving with "convincing clarity" that a "statement was made with 'actual malice'"); *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) ("[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.").

192. These First Amendment issues are not "defenses" but rather constitutionally required elements of the claim on which Plaintiffs bear the burden of proof—by clear and convincing evidence—as a matter of federal law. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53, 56 (1988) (extending First Amendment substantive requirements beyond the defamation context to other state-law attempts to impose liability for allegedly harmful speech); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 811 (S.D. Tex. 2005) ("First Amendment protections and the actual malice standard . . . have been expanded to reach . . . breach of contract, misrepresentation, and tortious interference with contract or

business.").

193.   To be sure, most state-law misrepresentation claims are not removable because they typically do not implicate the broader federal interests at issue in this case.   As shown above, those federal interests are themselves unquestionably "substantial" under *Grable*.  So is the speech that Plaintiffs are trying to suppress because its claims address a subject of national and international importance that falls within the purview of federal authority over foreign affairs and domestic economic, energy, and security policy.  "Climate change has staked a place at the very center of this Nation's public discourse," and "its causes, extent, urgency, consequences, and the appropriate policies for addressing it" are "hotly debated." *Nat'l Review, Inc. v. Mann*, 140 S. Ct. 344, 347–48 (2019) (Alito, J., dissenting from denial of certiorari).   Moreover, Plaintiffs are public actors seeking to use the machinery of their own state courts to impose *de facto* regulations on Defendants' nationwide speech on issues of national public concern.  *Cf. Sullivan*, 376 U.S. at 264 ("[An] action brought by a public official against critics of his official conduct" "require[s]" "safeguards for freedom of speech.").  But "it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *Falwell*, 485 U.S. at 56 (internal quotation marks and citation omitted).  First Amendment interests are at their apex where, as here, it is a governmental entity that seeks to use state-law claims to regulate speech on issues of "public

concern." *Hepps*, 475 U.S. at 774.  Given the compelling federal interests at stake here, federal courts may entertain the claims at issue in this case "without disturbing any congressionally approved balance of federal and state judicial responsibilities," making removal appropriate. *Grable*, 545 U.S. at 314.

194.   Indeed, freedom of speech is "most seriously implicated . . . in cases involving disfavored speech on important political or social issues," chief among which in the contemporary context is the question of "[c]limate change," which "is one of the most important public issues of the day." *Mann*, 140 S. Ct. at 344 (noting recourse to a federal forum is especially warranted in suits "concern[ing] a political or social issue that arouses intense feelings," because "a plaintiff may be able to bring suit in whichever jurisdiction seems likely to have the highest percentage of jurors who are sympathetic to the Plaintiffs' point of view" (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984))).   Plaintiffs' attempt to regulate Defendants' speech on the important public matter of climate change through litigation thus necessarily raises substantial First Amendment questions that belong in federal court.

## VIII.  THE ACTION IS REMOVABLE BECAUSE IT ARISES FROM ACTS ON MULTIPLE FEDERAL ENCLAVES

195.   Plaintiffs' claims necessarily depend upon holding Defendants liable for their oil and gas operations, and Defendants have produced and sold oil and gas on federal enclaves, including military bases in New Jersey and elsewhere.  Despite

Plaintiffs' purported disclaimer, Compl. ¶ 19, Plaintiffs cannot differentiate between emissions occurring as a result of Defendants' oil and gas operations on federal enclaves and those resulting from operations elsewhere, *see, e.g.*, *id.* ¶ 280. The climate change phenomenon at the heart of Plaintiffs' claims occurs as a result of global, cumulative emissions. In addition, Plaintiffs challenge Defendants' conduct in the District of Columbia, *see, e.g.*, Compl. ¶¶ 30, 105, 112, 130, a federal enclave, as well as the consumption of fossil fuels at federal facilities in New Jersey, including Fort Dix. Given the United States military's presence in the area, including multiple military airports and seaports associated with the above facilities, Plaintiffs' claims are "based on" the provision and use of oil and gas on federal enclaves in New Jersey. *John Crane-Houdaille*, 2012 WL 1197391, at *1 ("A suit based on events occurring in a federal enclave . . . must necessarily arise under federal law and implicates federal question jurisdiction under § 1331."). Further, Plaintiffs' attempt to disclaim injuries to federal property, including Fort Dix, independently fails because those injuries are inseparable from purported injuries to New Jersey property. The allegations in the Complaint therefore establish federal enclave jurisdiction. *See, e.g.*, *Reed v. Fina Oil & Chem. Co.*, 995 F. Supp. 705, 713 (E.D. Tex. 1998).

196. This Court has original jurisdiction under the federal enclave doctrine. The Constitution authorizes Congress to "exercise exclusive legislation in all cases

whatsoever" over all places purchased with the consent of a state "for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings." U.S. Const., art. I, § 8, cl. 17. "A suit based on events occurring in a federal enclave . . . must necessarily arise under federal law and implicates federal question jurisdiction under § 1331." *John Crane-Houdaille*, 2012 WL 1197391, at *1.

197. The "key factor" in determining whether federal enclave jurisdiction exists "is the location of the Plaintiffs' injury or where the specific cause of action arose." *Sparling v. Doyle*, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014). The "[f]ailure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences" of "federal enclave status." *Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992). Federal jurisdiction is available if "some" of the events or damages alleged in the complaint occurred on a federal enclave. *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (finding defendant was permitted "to remove to federal court" because "some of [Plaintiffs'] claims arose on federal enclaves"); *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1336 (N.D. Ala. 2010) (holding jurisdiction will lie where at least "some of the events alleged . . . occurred on a federal enclave").

198. In targeting Defendants' oil and gas operations, Plaintiffs necessarily sweep in those activities that occur on military bases and other federal enclaves. *See, e.g.*, *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 372–74 (1964) (noting that

the United States exercises exclusive jurisdiction over certain oil and gas rights within Barksdale Air Force Base in Louisiana); *see also Miss. River Fuel Corp. v. Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (on Barksdale Air Force Base, "the reduction of fugitive oil and gas to possession and ownership[] takes place within the exclusive jurisdiction of the United States").  Indeed, as of 2000, approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their land," and these activities were spread across 22 different states.  U.S. Gov't Accountability Off., GAO-02-64R, U.S. Fish & Wildlife Service:  Information on Oil and Gas Activities in the National Wildlife Refuge System 1 (Oct. 31, 2001), http://www.gao.gov/new.items/d0264r.pdf.    Furthermore, Chevron and its predecessor companies for many years engaged in production activities on the Elk Hills Reserve—a strategic oil reserve maintained by the Naval Department—pursuant to a joint operating agreement with the Navy.  *See supra* Section VI.B.1.d.; *Chevron U.S.A. Inc. v. United States*, 116 Fed. Cl. 292, 205 (2014).

199.    In addition, the Complaint relies upon conduct occurring in the District of Columbia, which is itself a federal enclave.  *See, e.g.*, *Collier v. District of Columbia*, 46 F. Supp. 3d 6, 20 n.8 (D.D.C. 2014); *Hobson v. Hansen*, 265 F. Supp. 902, 929 n.42 (D.D.C. 1967).  Plaintiffs claim that the Defendants, including American Petroleum Institute—which Plaintiffs concede is "based in the District of Columbia," Compl. ¶ 30—and certain industry trade associations misled federal

regulators and caused them to adopt policies that did not adequately curtail the production and use of fossil fuels.  *Id.* ¶¶ 105, 112, 130.  This alleged lobbying activity, the misleading of federal regulators, and the resulting "under-regulation" of fossil fuels, could *only* occur in the District of Columbia, where the EPA, the Department of the Interior, the DOE, the Department of Transportation, the Department of State, Congress, and other departments of the federal government are located.

200.   Moreover, Plaintiffs complain that Defendants' supposedly wrongful conduct included their memberships in various trade associations, and providing funding to "think tanks," which allegedly had the effect of evading regulation of fossil fuel products by "deceiving" policymakers about "the role of fossil fuel products in causing global warming."   Compl. ¶¶ 141, 320(c).   Similarly, the Complaint points to Defendants' purported funding of "lobbyist[s]" to influence legislation and legislative priorities.  *Id.*  Here, too, "some of the[] locations" giving rise to Plaintiffs' claims "are federal enclaves," further underscoring the presence of federal jurisdiction.  *Bell v. Arvin Meritor, Inc.*, 2012 WL 1110001, at *2 (N.D. Cal. Apr. 2, 2012).  As the Ninth Circuit has contemplated, free speech placed at issue in a federal enclave falls under the jurisdiction of the federal courts.  *Jacobsen v. U.S. Postal Serv.*, 993 F.2d 649, 657 (9th Cir. 1992) (observing that newspaper vendors were required to obtain permits pursuant to a federal statute to sell newspapers in

front of U.S. post office locations, which the court deemed to be "within the federal enclave"). Because Plaintiffs claim that Defendants' speech within the federal enclave of the District of Columbia was, among other alleged causes, a basis of their alleged injury, and because Plaintiffs complain of damages allegedly occurring on federal enclaves, a state court is not the appropriate forum to adjudicate the merits of this dispute.

201. Additionally or alternatively, the exercise of federal enclave jurisdiction is proper because: (1) Plaintiffs' claims allegedly occurred on a federal enclave in New Jersey, *i.e.*, military bases and reservations in New Jersey that were acquired by declaration of taking, Presidential executive order, purchase, or otherwise for military purposes; and (2) Plaintiffs' claims involve substantial federal interests such that a federal question is presented.

202. While Plaintiffs attempt to disclaim injury arising from acts occurring on federal property, *see* Compl. ¶ 19, emissions from the combustion of oil and gas sold or consumed on federal enclaves cannot be "carved out" from contributing to climate change, *see AEP*, 564 U.S. at 422; *Kivalina I*, 663 F. Supp. 2d at 880; *see, e.g.*, Compl. ¶ 266, and thus there is no rational way for Plaintiffs to distinguish between the harms allegedly resulting from conduct on federal enclaves and those allegedly resulting from conduct at any other location. As such, because Plaintiffs' claims derive from conduct on or in federal enclaves, they do not belong in state

court.

203.   Because Plaintiffs' claims derive from conduct on or in federal enclaves, and from injuries to federal enclaves, they do not belong in state court.

## IX.   THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER

204.   Based on the allegations in the Complaint, this Court has original jurisdiction over this action under 28 U.S.C. §§ 1331, 1442, 1367(a), as well as 43 U.S.C. § 1349(b).  Accordingly, removal of this action is proper under 28 U.S.C. §§ 1441(a) and 1446.

205.   The United States District Court for the District of New Jersey is the appropriate venue for removal pursuant to 28 U.S.C. § 1441(a) because it embraces the place where Plaintiffs originally filed this case, in the Superior Court of New Jersey.  *See* 28 U.S.C. § 1441(a).

206.   All defendants that have been properly joined and served have consented to the removal of the action, *see* Dick Decl. ¶ 2, and there is no requirement that any party not properly joined and served consent.  *See* 28 U.S.C. § 1446(b)(2)(A) (requiring consent only from "all defendants who have been properly joined and served"); *see also Canon Fin. Servs., Inc. v. Kalmus*, 2020 WL 4333744, at *2 (D.N.J. July 28, 2020).[149]  Copies of all process, pleadings, and orders

---

[149] In addition, the consent of all defendants is not required for federal officer removal under 28 U.S.C. § 1442.  *See Durham*, 445 F.3d at 1253 ("Whereas all defendants must consent to removal under section 1441, . . . a federal officer or

from the state-court action being removed to this Court that are in the possession of the Chevron Parties are attached hereto as Exhibit 1 to the Dick Declaration. Pursuant to 28 U.S.C. § 1446(a), this constitutes "a copy of all process, pleadings, and orders" received by the Chevron Parties in the action. Upon filing this Notice of Removal, Defendants will furnish written notice to Plaintiffs' counsel, and will file and serve a copy of this Notice with the Clerk of the Superior Court of New Jersey, pursuant to 28 U.S.C. § 1446(d).

207.    Accordingly, Defendants remove to this Court the above action pending against them in the Superior Court of New Jersey.

Respectfully submitted,

Dated: November 22, 2022        By: */s/ Herbert J. Stern*
Florham Park, New Jersey        Herbert J. Stern

STERN, KILCULLEN & RUFOLO, LLC
Herbert J. Stern
   hstern@sgklaw.com
Joel M. Silverstein
   jsilverstein@sgklaw.com
325 Columbia Turnpike, Suite 110
Florham Park, New Jersey  07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

GIBSON, DUNN & CRUTCHER LLP
Theodore J. Boutrous, Jr., *pro hac vice forthcoming*
   tboutrous@gibsondunn.com

---

agency defendant can unilaterally remove a case under section 1442.") (citation omitted).

333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua D. Dick, *pro hac vice forthcoming*
  jdick@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.374.8451

*Attorneys for Defendants*
*Chevron Corporation and Chevron U.S.A.*
*Inc.*